

NC0M7W07QH

## NOTARIAL CERTIFICATE

TO ALL TO WHOM these presents shall come

I, Teo Shih Yee, NOTARY PUBLIC duly admitted, authorised to practise in the Republic of Singapore, DO HEREBY CERTIFY

**AND ATTEST** that I was present on 11 October 2022 and did see **ABDUL RAHMAN BIN SULEIMAN** (NRIC No. S1712465Z) appear before me and duly sign the annexed document "**AFFIDAVIT OF SERVICE**" hereto to be the original and that the signature is the proper handwriting of the said **ABDUL RAHMAN BIN SULEIMAN**.

IN FAITH AND TESTIMONY whereof I the said notary have subscribed my name and set and affixed my seal of office at Singapore, this 11th day of October 2022.

**NOTARY PUBLIC**
**SINGAPORE**

NOTARY PUBLIC
Teo Shih Yee
NP2022/0506
1 Oct 2022 – 30 Sep 2023
SINGAPORE

By virtue of Rule 8(3)(c) of the Notaries Public Rules, a Notarial Certificate must be authenticated by the Singapore Academy of Law in order to be valid.

With effect from 16 September 2021, a Notarial Certificate shall be deemed to be validly authenticated by the affixing of an Apostille to the back of the Notarial Certificate.

# APOSTILLE

(Convention de La Haye du 5 Octobre 1961)

This **Apostille** only certifies the authenticity of the signature, seal or stamp and the capacity of the person who has signed the attached Singapore public document, and, where appropriate, the identity of the seal or stamp. It does not certify the authenticity of the underlying document.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country.

To verify this **Apostille**, go to
https://legalisation.sal.sg
or scan QR code:



**Verification code: 26877252**

| 1.  **Country:** | Singapore |
|---|---|
| **This public document** | |
| 2.  **Has been signed by:** | Teo Shih Yee |
| 3.  **Acting in the capacity of:** | Notary Public |
| 4.  **Bears the seal/stamp of:** | Notary Public |
| **Certified** | |
| 5.  **At:** | Singapore Academy of Law |
| 6.  **The:** | 11th October 2022 |
| 7.  **By:** | Melissa Goh, Head of Statutory Services, SAL |
| 8.  **No.:** | AC0M7W0BNE |
| 9.  **Seal/Stamp:** | **10.  Signature:** |



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW ALBRIGHT, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br>v.<br><br>TERRAFORM LABS, PTE. LTD., JUMP CRYPTO, JUMP TRADING LLC, REPUBLIC CAPITAL, REPUBLIC MAXIMAL LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/DEFINANCE TECHNOLOGIES OY, GSR/GSR MARKETS LIMITED, THREE ARROWS CAPITAL PTE. LTD., PANTERA CAPITAL, NICHOLAS PLATIAS, and DO KWON,<br><br>     Defendants. | Case No. 1:22-cv-07281-JSR-BCM<br><br>The Honorable Jed S. Rakoff<br><br>The Honorable Barbara C. Moses<br><br>CLASS ACTION |

## AFFIDAVIT OF SERVICE

I, **ABDUL RAHMAN BIN SULEIMAN** (NRIC No. S1712465Z), of Virtus Law LLP, located at One Raffles Place, #18-61, Tower 2, Singapore 048616, do solemnly affirm and say the following:

1. I am a clerk with the law firm Virtus Law LLP ("Virtus Law"), counsel to Plaintiff Matthew Albright ("Plaintiff"), and am duly authorized to make this affidavit on the Plaintiff's behalf.

2. Insofar as the matters discussed herein are within my personal knowledge, they are true. Insofar as they are not within my personal knowledge, they are true to the best of my information and belief and based on the sources and grounds stated herein.

3. I was directed by Virtus Law to serve Three Arrows Capital Pte. Ltd. ("Three Arrows") with the Summons and Class Action Complaint for Violations of the Federal Racketeering Laws in Civil Action No. 1:22-cv-07281-JSR-BCM (the "Documents"). True copies of the Documents are attached hereto as "**ARBS-1**".

4.      On Thursday, September 29, 2022 at 5:35 pm, I served copies of the Documents on Three Arrows at Three Arrows' registered address at 7 Temasek Boulevard, #21-04 Suntec Tower One, Singapore 038987 by leaving the Documents at Three Arrows' registered office. A copy of the Accounting and Corporate Regulatory Authority search conducted on Three Arrows stating the address of its registered office is attached hereto as "**ARBS-2**".

5.      I am informed by the statutory declaration made by Chong Xiu Bing, Denise that the service of the Documents on Three Arrows was performed in accordance with Singapore law. The statutory declaration of Chong Xiu Bing, Denise attesting to proper service under Singapore law is attached hereto as "**ARBS-3**".


AFFIRMED by                            )
**ABDUL RAHMAN BIN SULEIMAN**          )
On this 11th day of October 2022       )
In Singapore                           )


Before me,


**A NOTARY PUBLIC**


Teo Shih Yee
NP2022/0506
1 Oct 2022 – 30 Sep 2023

2

This is the exhibit marked **"ARBS-1"** referred to in the

Affidavit of **ABDUL RAHMAN BIN SULEIMAN** affirmed before me

This   11th   day of   October  2022

In Singapore

Before me,

A NOTARY PUBLIC

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York ▾

| | |
|---|---|
| Matthew Albright, Individually and on Behalf of All Others Similarly Situated <br><br> _____ <br> *Plaintiff(s)* <br><br> v. <br><br> Terraform Labs, Pte, Ltd., Jump Crypto, Jump Trading LLC, Republic Capital, Republic Maximal LLC, Tribe Capital, DeFinance Capital/DeFinance Technologies OY, GSR/GSR Markets Limited, Three Arrows Capital Pte, Ltd., Panera Capital, Nicholas Platias, and Do Kwon, <br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No.  1:22-cv-7281-JSR-BCM |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

          See attached Schedule A

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

        Daniel L. Berger
        485 Lexington Avenue, Floor 29
        New York, NY 10017

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  9/1/2022

                                   /s/ P. Canales
                                  *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

*Albright v. Terraform Labs Pte. Ltd.*

## SCHEDULE A TO SUMMONS

**Terraform Labs Pte. Ltd.**
80 Raffles Place, #32-01
UOB Plaza
Singapore 048624

**Jump Crypto**
600 West Chicago Avenue, Suite 600
Chicago, Illinois 60654

**Jump Trading LLC**
600 West Chicago Avenue, Suite 600
Chicago, Illinois 60654

**Republic Capital**
335 Madison Avenue, Suite 7E
New York, New York 10017

**Republic Maximal LLC**
335 Madison Avenue, Suite 7E
New York, New York 10017

**Tribe Capital**
2700 19th Street
San Francisco, California 94110

**DeFinance Capital/DeFinance Technologies Oy**
Lönnrotinkatu 36 K 22
00180 Helsinki Finland

**GSR/GSR Markets Limited**
Central Plaza
18 Harbour Road, Suite 5508, 55th Floor
Wanchai, Hong Kong

**Three Arrows Capital Pte. Ltd.**
7 Suntec Tower One 038987
21-04 Temasek Blvd.
Singapore 038987

**Pantera Capital**
3000 Sand Hill Rd, Suite 1-235
Menlo Park, California 94025

**Nicholas Platias**
Terraform Labs Pte. Ltd.
80 Raffles Place, #32-01
UOB Plaza
Singapore 048624

**Do Kwon**
Terraform Labs Pte. Ltd.
80 Raffles Place, #32-01
UOB Plaza
Singapore 048624

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW ALBRIGHT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TERRAFORM LABS, PTE. LTD., JUMP CRYPTO, JUMP TRADING LLC, REPUBLIC CAPITAL, REPUBLIC MAXIMAL LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/DEFINANCE TECHNOLOGIES OY, GSR/GSR MARKETS LIMITED, THREE ARROWS CAPITAL PTE. LTD., PANTERA CAPITAL, NICHOLAS PLATIAS, and DO KWON,<br><br>Defendants. | Civ No.<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL RACKETEERING LAWS

Plaintiff Matthew Albright brings this class action against Terraform Labs Pte. Ltd. ("Terraform Labs" or the "Company") and other defendants (collectively, "Defendants"), on behalf of a proposed nationwide Class consisting of all persons and entities, other than Defendants and their affiliates, who purchased Terra Tokens (defined below) between May 1, 2019 and June 15, 2022, inclusive (the "Class Period"), and who were damaged thereby. Plaintiff asserts claims against Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq.

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and public statements issued by Defendants, analyst and media reports, and other commentary analysis and publicly disclosed reports and information about Defendants. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE OF DEFENDANTS' CONDUCT

*"We knew it wasn't sustainable."*
Remi Tetot, Member of the Governing Council of the Luna Foundation Guard

1.      In May 2022, Terraform Labs' coin TerraUS ("UST")—then the fourth largest stablecoin[1] in circulation—collapsed, causing losses to Plaintiff and the Class and sending massive shockwaves across the entire cryptocurrency universe.

---

[1] A stablecoin is a type of cryptocurrency designed to have a "stable" price as compared to another form of currency. For instance, many stablecoins—including UST—are designed to maintain a value of exactly $1.00.

2.     Reactions to the crash were swift.  In the ensuing days, the prices of Bitcoin and other cryptocurrencies descended to levels not seen for years, and the crypto economy as a whole saw losses of approximately $300 billion in value.  Policymakers and politicians, including U.S. Treasury Secretary Janet Yellen, called for immediate regulation of stablecoins, and analysts and market participants widely compared the UST crash to the crash of Lehman Brothers in 2008.  Plaintiff and the Class felt the brunt of the UST collapse, as their coins became essentially worthless.

3.     Unlike many stablecoins that maintain their 1:1 "pegs" through asset reserves, UST algorithmically maintained its peg to the U.S. dollar.  Specifically, cryptocurrency traders can purchase or sell UST on the "Terra" blockchain that hosts UST (created by Terraform Labs) for exactly $1.00 of UST's sister coin, Luna.  In the process, the system "burns" the coins being exchanged and "mints" new coins being given.  As a result—at least in theory—arbitrageurs could use that exchange mechanism to turn a fast profit and stabilize UST's price if it ever deviated from its $1.00 peg.  The Terra blockchain also hosted other foreign-currency-based stablecoins, but UST was the most prominently traded.

4.     On the whole, the Terra blockchain utilizes its coins to drive an on-blockchain market for financial transactions, including lending and derivatives trading.  Those transactions were facilitated by applications designed to run on the blockchain.  The Terra blockchain and its ecosystem of cryptocurrencies and applications built on and around the blockchain are often referred to as simply "Terra."

5.     Throughout the Class Period, Defendants falsely promoted UST, Luna, and other related Terra coins via social media and other web-based and mail channels.  In particular, Defendants touted the stability of the coins and guaranteed 20% annual returns on coins

deposited in Terraform Labs' high-yield savings application on the Terra blockchain—the Anchor Protocol ("Anchor"). Meanwhile, certain Defendants engaged in a pattern of money laundering activity, siphoning billions of dollars from Terraform Labs to a series of private cryptocurrency wallets.

6. Prior to the collapse, the collective value of the Terra ecosystem was approximately $60 billion. At the peak of Terraform Labs' success, the market capitalization value of UST alone reached $17.5 billion, making it the fourth largest stablecoin and tenth largest cryptocurrency.

7. In truth, UST amounted to a Ponzi scheme that was only sustained by the demand for UST created by Anchor's excessive yields. As long as demand for UST remained high, Terra's UST/Luna exchange mechanism would keep the supply of Luna relatively low and sustain a Luna price that could support UST's peg. But as soon as demand for UST fell and users began redeeming UST for Luna in large quantities, Luna could enter a vicious cycle of hyperinflation that would collapse its own price and UST with it.

8. Indeed, that is exactly what occurred. Beginning on May 7, 2022, these longstanding structural infirmities in the Terra ecosystem finally caused UST to lose its peg to $1.00. As traders lost confidence in the price of UST and its demand evaporated, it touched off a mass exodus that collapsed the prices of both UST and Luna. In the weeks that followed, the price of UST dipped below $0.01 on multiple occasions. Luna also fell from its high of over $117 in April 2022 to a small fraction of a penny. For all practical purposes, the coins flatlined and never recovered.

9. Despite their many statements in support of UST, Anchor, and the entire Terra ecosystem, Defendants knew that Terra's status quo was unsustainable. In a stunning blog post

describing the collapse, Remi Tetot, a Governing Council member of the Luna Foundation Guard—a group established in conjunction with Terraform Labs to prop up UST—admitted exactly that: "*we knew it wasn't sustainable*."[2]

10.     Defendants' conduct alleged herein constitutes a RICO violation pursuant to 18 U.S.C. §§ 1961 et seq.  Defendants formed an enterprise for the purpose of artificially inflating the value and trading volume of UST and other coins, so that Defendants could profit by, among other things, selling those coins to Plaintiff and the Class.  Defendants engaged in a pattern of racketeering activity to support and profit off their scheme, namely by making fraudulent statements through interstate wire transmissions regarding Terra's sustainability, and by laundering money out of Terraform Labs and into personal accounts.  Plaintiff and the Class were harmed when Defendants' scheme collapsed and the value of UST and other Terra coins plummeted.

## PARTIES

### *Plaintiff*

11.     Plaintiff Matthew Albright resides in Oldsmar, Florida.  Plaintiff Albright purchased Terra coins, including Luna and UST, during the Class Period, and suffered losses as a result of Defendants' conduct.

### *Defendants*

12.     Defendant Terraform Labs Pte. Ltd. is incorporated in Singapore and headquartered in Seoul, South Korea.  As noted by the Securities and Exchange Commission (the "SEC") in its own investigation into Terraform Labs' digital assets, Terraform Labs "regularly transacts business in the United States, included by contracting with U.S.-based

---

[2] All emphases herein are added unless noted otherwise.

companies, such as a prominent digital asset-trading platform incorporated in Delaware. Several employees of Terraform appear to reside in the United States, including Terraform's General Counsel (located in Pennsylvania), its Business Development lead (located in Texas), its Head of Research [Defendant Platias] (located in California), and its Director of Special Products (located in New York)."

13.     Defendant Jump Crypto is a limited liability company incorporated in Delaware, with its headquarters located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654. In addition to providing funding to Terraform Labs and the Luna Foundation Guard, Jump Crypto also contributed to Wormhole, a bridge between blockchains that can be used to transfer digital assets from one blockchain to another. Upon information and belief, Jump Crypto used its relationship with Wormhole to secure a favorable exit from its UST/LUNA holdings prior to the complete collapse of the Terra ecosystem.

14.     Defendant Jump Trading LLC (together with Jump Crypto, "Jump") is a limited liability company incorporated in Delaware, with its headquarters located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

15.     Defendant Republic Capital is a limited liability company with its headquarters located at 335 Madison Avenue, Suite 7E, New York, New York 10017.

16.     Defendant Republic Maximal LLC (together with Republic Capital, "Republic") is a limited liability company, incorporated in Delaware with its headquarters located at 335 Madison Avenue, Suite 7E, New York, New York 10017.

17.     Defendant Tribe Capital ("Tribe") is a limited liability company with its headquarters located at 2700 19th Street, San Francisco, California 94110.

18.     Defendant DeFinance Capital/DeFinance Technologies Oy ("DeFinance") is a Finnish limited liability company with its headquarters located at Lönnrotinkatu 36 K 22, 00180 Helsinki, Finland.

19.     Defendant GSR/GSR Markets Limited ("GSR") is a foreign limited company registered in Hong Kong, with its headquarters located at Suite 5508, 55th Floor, Central Plaza, 18 Harbour Road, Wanchai, Hong Kong.

20.     Defendant Three Arrows Capital Pte. Ltd. ("Three Arrows") is a Singapore-based company with its headquarters located at 7 Suntec Tower One 038987, 21-04 Temasek Blvd., Singapore.

21.     Defendants Jump, Republic, Tribe, DeFinance, GSR, and Three Arrows are collectively referred to herein as the "LFG Defendants."

22.     Defendant Pantera Capital ("Pantera") is a crypto venture capital fund headquartered in Menlo Park, CA.  Pantera provided capital funding to Terraform Labs, and made false statements in support of the scheme described herein.  Pantera invested $1.7 million in Terraform Labs, and ultimately sold its stake for approximately $170 million.

23.     Defendant Nicholas Platias is the Head of Research and a "founding member" of Terraform Labs, a member of the Governing Council of the Luna Foundation Guard, and one of the creators of the Anchor Protocol. Platias served as a consultant and spokesman for Terraform Labs, the Luna Foundation Guard, and the Anchor Protocol, has exercised control over Terraform Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Terra coins to the public.

24.     Defendant Do Kwon has been the co-founder and Chief Executive Officer of Terraform Labs since 2018. Kwon is a resident of Singapore. Since its inception, Kwon has

exercised control over Terraform Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitations of the Terra Tokens to the public. Kwon travelled to the United States to conduct business on behalf of Terraform Labs, including to a digital asset and blockchain conference held in New York City in September 2021.

25.     Defendants Platias and Kwon are collectively referred to herein as the "Individual Defendants."

## JURISDICTION AND VENUE

26.     This action arises under 18 U.S.C. §§ 1961 et seq.  This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 because the claims arise under the RICO Act.  Similarly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the federal law.

27.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

28.     Terraform Labs actively conducts business within this District. For instance, Defendant Kwon travels to this District for business, including to attend events such as the Messari Mainnet cryptocurrency conference, which he attended most recently in September 2021.  The Company's Director of Special Products also operates out of this District.  Separately, the April 2019 whitepaper describing Terra, the June 2020 whitepaper describing the Anchor Protocol, and Defendant Platias's July 2020 "Introducing Anchor" blog post that described its basics and key features were all made available to traders in this District.  As discussed at length

below, the Anchor Protocol was a primary driver of the Terra ecosystem's collapse. Thus, the alleged misconduct related to the Anchor Protocol, UST, and LUNA, as well as numerous misleading statements made on behalf of Terraform Labs, impacted residents of this District.

29.     Similarly, as noted in court filings by the SEC concerning the "Mirrored Assets" on Terra (described below), Terraform Labs' financial products "are offered and available for purchase by U.S. investors through Terraform's web application" as well as on digital asset trading platforms. Terraform Labs and Defendants Kwon and Platias promoted Terra coins and related protocols through, among other means, Terraform Labs' website, web applications, social media accounts, podcast interviews, and through U.S. media.

30.     A portion of Terraform Labs' funding also comes from entities within this District, including Delphi Digital and Galaxy Digital.  Likewise, one of the funders of the Luna Foundation Guard's reserves—Defendant Republic—is also located in and operates out of this District.

31.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because certain Defendants live and/or conduct business in this District, and therefore a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.    The Terra Ecosystem

####    i.    Terraform Labs

32.    Terraform Labs operates the Terra blockchain, which hosts, supports, and funds a community of decentralized financial applications and products.[3]  These include native governance tokens and a series of so-called "stablecoins," cryptocurrency coins that are pegged on a 1:1 basis to various fiat currencies by a specially designed algorithm.  Most popular amongst the Terra stablecoins is the U.S. dollar-pegged UST.

33.    Unlike other cryptocurrencies whose main utility is in their appreciation potential, stablecoins are intended to maintain their value and thus enable easier transacting between currencies.

34.    The Terra blockchain also hosts a variety of financial products, most significant among them Anchor, a high-yield savings vehicle that offers users 20% annual returns on stablecoin deposits.  Collectively, these products form the Terra ecosystem.

35.    According to a whitepaper published in April 2019 and co-authored by Defendants Kwon and Platias, the Terra blockchain was created, first and foremost, to host price-stable cryptocurrencies to be used as media of exchange and stores of value.  The price of cryptocurrency is notoriously volatile, which creates barriers to trade and substantial risks, including (1) the risk that the value of a payment will decline while a transaction is in progress, (2) the risk that assets being held will diminish tremendously in value, and (3) the risk that the value of a payment will surge just after a transaction is complete.  Stablecoins were invented as

---

[3] Following the collapse of Terra, Defendants effected a "fork" in its blockchain, which created a new blockchain, Tera 2.0, and renaming the original Terra Classic.  References in this compliant to the Terra blockchain are to the original blockchain, unless otherwise indicated.

a solution to these problems, and quickly gained traction. Stablecoins represent only a small percentage of cryptocurrency market capitalization, but in October 2021 more than 75% of all trades on cryptocurrency platforms were between a stablecoin and another token.

36.     With the Terra blockchain, Terraform Labs also aimed to create a platform for Decentralized Finance ("DeFi") applications ("dApps") and protocols, in particular savings products that used stablecoins such as UST as their native currency. Terraform Labs understood that the stability of Terra stablecoins depended to a large extent on users' adoption of Terra currencies and the continued growth of the Terra ecosystem. Without user confidence, the pegging algorithms would fail. Thus, the Terra DeFi apps and protocols were intended, in part, as a means of driving growth and thereby stabilizing price. Terraform Labs viewed investment in dApps as a form of fiscal stimulus intended to grow the Terra "economy." The most significant of these investments was Anchor, discussed below.

**ii.      UST and Luna**

37.     UST and the other fiat-denominated Terra stablecoins form the core of the Terra ecosystem. Stablecoin value can be maintained in several ways. Some coins, like iFinex's Tether, are (at least purportedly) backed on a 1:1 basis by fiat currency. Others, including Dai by MakerDAO, are collateralized by cryptocurrencies. Still others are backed by real-world assets. Terraform Labs, eschewing any form of collateralization, uses a fourth method of stabilization—an algorithm.

38.     The Terra algorithm aims to dynamically stabilize the Terra stablecoins through an incentive-based design using a native sister-coin, Luna. As dictated by the Terra algorithm, the Terra "system" will always agree to be a counterparty to swaps of 1 stablecoin for $1 worth of Luna (or, for stablecoins denominated to other fiat currencies, 1 unit of that fiat currency),

regardless of market conditions. This function is intended to stabilize Terra stablecoins' value by incentivizing arbitrage. For example, if the price of UST falls to $0.98, arbitrageurs are incentivized to trade UST coins for $1 worth of Luna and then sell the Luna for a profit. Inversely, if the price of UST rises to $1.02, arbitrageurs are incentivized to trade their $1 worth of Luna for the more valuable UST. Theoretically, this arbitrage should continue until the price of UST is stabilized at $1.

39.     To further maintain stability, whenever a user swaps coins with the Terra system, the coins the user gives up are "burned" and the coins the user receives are "minted" by the system.[4] The elasticity in supply is a core feature of the Terra blockchain. When the Terra system functions as intended, falling prices lead to a contraction in the supply, causing prices to rise to the target. Inversely, rising prices lead to an expansion of the supply, likewise returning prices to their target.

### iii.     Anchor

51.     Anchor, which launched on the Terra blockchain in March 2021, is by far the most popular protocol in the Terra ecosystem. In the Anchor whitepaper, Terraform Labs described Anchor as a "principal-protected stablecoin savings product that pays depositors a stable interest rate." In exchange for depositing their Terra stablecoins with Terraform Labs in the Anchor Protocol, depositors are promised a steady and reliable 20% annualized return.

52.     Anchor's whitepaper states, in relevant part, the following regarding the "savings product" offered by Terraform Labs:

> Anchor implements a liquidation protocol designed to ***guarantee the principal of depositors. Deposits are safe insofar as all debts against them remain over-collateralized.***

---

[4] For clarity, this only occurs when the Terra system acts as a counterparty. Trades between users do not result in the burning or minting of coins.

*　　　*　　　*

> Given cryptoassets have high price volatility, they may not be the ideal choice for users who seek passive income with low price exposure. Anchor offers a solution with Terra stablecoin money markets. Users who deposit Terra stablecoins will get stablecoins in return, thereby avoiding the high volatility of most cryptoassets. ***Anchor's deposit interest rate stabilization mechanism offers additional protection from volatility by providing stable returns***.

53.  Anchor generated depositors' returns by lending the deposited coins to borrowers, who in turn put up specialized "bAssets" as collateral.  Those bAssets are cryptocurrency derivatives which entitle the holder to returns, and Anchor passed those returns to depositors in the form of its 20% annual yield.

54.  More specifically, bAssets are derivative coins that represent underlying coins that have been "staked" on their native blockchains.  Staking is a process implemented by certain blockchains that allows holders to pledge coins toward the functioning and development of the blockchain for a period of time, and receive rewards in proportion to the number of coins pledged.  For example, if 100 coins are staked for one year on a blockchain that offers 5% annualized returns, the holder will receive 5 new coins after one year.

55.  Staked coins cannot be traded while staked, but bAssets representing the staked coins can be traded.  The holder of the bAsset has the right to receive the rewards generated from staking the underlying coin.  Thus, while Anchor holds bAssets as collateral, it receives the staking rewards and thereby generates the income needed to pay Anchor's depositors.

56.  According to Defendant Platias "bAssets play a key role in Anchor towards offering a stable interest rate to Terra deposits."

57.  Defendants continuously encouraged deposits in Anchor by promoting the protocol and touting its high returns, as a means of increasing traffic on the Terra blockchain, and thus stabilizing UST.  In fact, the marketing of UST and Anchor was so effective that

approximately $14 billion of UST's market capitalization value (75%) was deposited into Anchor at its peak.

58.     The Anchor Protocol also used "ANC" coins as its governance token.  ANC coins were distributed to borrowers as incentives, and ANC could also be received as a reward for staking ANC.  At its height in early March 2022, the market capitalization value of ANC reached approximately $1.5 billion.

**B.     Defendants Effect their Scheme on Multiple Fronts**

**i.     Defendants Promote UST and Anchor Through False Statements**

59.     Throughout the Class Period, Defendants promoted Terra coins and the Anchor Protocol, knowing they were unstable and unsustainable, through Terraform Labs' website, web application, social media accounts, podcast interviews, and through U.S. media, among other means. The promotions all had the same talking points: stability and sustainability.

60.     For example, on April 2019, Defendants Kwon and Platias released the Luna whitepaper, outlining Terraform Labs' blueprint for its algorithmic stablecoin and repeatedly claiming that the Terraform Labs stablecoins are both price-stable and growth-driven.

61.     In or about May 2019, Terraform Labs first made Luna available for public purchase.

62.     In June 2020, Defendant Platias released the Anchor Protocol whitepaper, which he co-authored, discussing the features and rewards of the protocol. The whitepaper described Anchor as:

> [A] savings protocol that accepts Terra deposits, allows instant withdrawals and pays depositors a low-volatility interest rate. To generate yield, Anchor lends out deposits to borrowers who put down liquid-staked [proof-of-stake] assets from major blockchains as collateral (bAssets). Anchor stabilizes the deposit interest rate by passing on a variable fraction of the bAsset yield to the depositor. It

guarantees the principal of depositors by liquidating borrowers'
collateral via liquidation contracts and third-party arbitrageurs.

63.     In plain English, Anchor offered depositors a fixed annual return of 20% by redistributing fees from borrowers and rewards from other assets staked in Anchor. The whitepaper repeatedly refers to this 20% interest rates as "stable."

64.     Platias subsequently authored the introductory blog post "Introducing Anchor," which was published by Terraform Labs on July 6, 2020. Throughout the post, Platias described Anchor's interest rate as "stable" and offering a "low-volatility yield" with a "reliable rate of return." He claimed that the DeFi sector had "yet to produce a simple and convenient savings product with broad appeal outside the world of crypto natives." In response to this "pressing need," Platias said Anchor offered users "a ***principal-protected*** stablecoin savings product that accepts Terra deposits and pays a ***stable interest rate***." Platias claimed Anchor could "become the gold standard for passive income on the blockchain."

65.     On or about September 21, 2020, Terraform Labs first made UST available for purchase by the public.

66.     On March 17, 2021, the official Twitter account for the Anchor Protocol bragged that "Anchor is not your ordinary money market. ***The protocol offers stable, 20% APY interest to depositors*** and only accepts liquid staking derivatives as posted collateral by borrowers."

67.     On April 8, 2021, Paul Veradittakit, a partner at Pantera, issued a blog post in which he touted Anchor as a "low-risk financial instrument" that was a "no-brainer for individuals and capital allocators alike." Although he admitted that "20% APY seems too good to be true," he nevertheless assured readers that the "secret" lies in the use of staking-rewards to generate returns for depositors.

68.     On April 23, 2021, the Anchor Twitter account again promoted the stability of Anchor's 20% interest yields: "Markets go down, $UST deposits on Anchor go up . . . Stable 20% APY is a **high-yield safe-haven** in uncertain market conditions."

69.     On May 11, 2021, Anchor posted the following series of tweets promoting Anchor as the "gold standard for savings" and its "stable" 20% yields:

> 1) We're thrilled to announce the release of the Anchor Earn SDK – allowing third parties to seamlessly integrate **20% yields on $UST to expand stable savings opportunities to a greater audience!**
>         *        *        *
> 2) The Anchor Earn SDK significantly expedites the integration process for teams who want to bring **the benefit of stable Anchor savings** to users on their crypto-based platforms. . . .
>         *        *        *
> 3) Keep in mind that for teams who want to go beyond savings integrations and build out additional features on Anchor (e.g., dashboards), Anchor.js is still the way to go."
>         *        *        *
> 4) **Anchor is the gold standard for savings – 20% yield for all**.

70.     Later that day, Anchor said via its Twitter account that it would "love to see" users of the "Revolut" money-management app "benefiting from **stable Anchor yields**."

71.     Defendant Kwon also falsely dismissed concerns that UST and Anchor were unstable and unsustainable, doing so by insulting and mocking the individuals raising those concerns. One of his common responses to critics is to dismiss them as "poor" and undeserving of his time. For example, on July 1, 2021, Kwon mocked a British economist, Frances Coppola, who criticized the algorithmic stablecoin model. Instead of addressing the concerns raised by Coppola—in particular, that the algorithmic stablecoin model could not defend against a bank run—Kwon was dismissive and condescending, stating "I don't debate the poor on Twitter, and sorry I don't have any change on me for her at the moment."

72.     On December 26, 2021, Su Zhu, co-founder of Defendant Three Arrows, bragged that Terraform Labs' algorithmic stablecoin products were the "holy grail" of crypto-finance. He criticized people he referred to as "plebs," who were "selling early."

73.     In the early days of 2022, Kwon again used his signature comeback to deflect accusations that UST was a "Ponzi scheme" and likely to collapse.  Specifically, on December 30, 2021, an engineer at MakerDAO, which has its own stablecoin, predicted on Twitter that "UST will collapse in a death spiral with LUNA hyper-inflating to try to cover the peg."  Days later on January 3, 2022, a MakerDAO co-founder jokingly added, "Look, UST and MIM [another stablecoin] are solid ponzis and I respect that. You can make good money off them for sure. But they are not built for resilience and they are going to 0 once the market turns for real[.]  Now stop trying to scam users looking for actual stability into being ur exit liquidity."  When asked if he was willing to place a bet that the individuals at MakerDAO were wrong, Kwon simply replied "I don't gamble against the poor."

74.     Well aware that algorithmic solutions were not enough to sustain the UST peg or Anchor's 20% returns, on January 19, 2022, Terraform Labs announced the formation of the Luna Foundation Guard—a Singapore-based non-profit organization—for the purpose of "facilitating the growth of the Terra ecosystem" and "improving the sustainability and stability of Terra's algorithmic stablecoins."

75.     The formation of the Luna Foundation Guard was part and parcel of Defendants' efforts to falsely bolster public confidence in Terra.  The announcement noted previous criticisms directed towards algorithmic stablecoins like UST, but downplayed the purported "misconception" that algorithmic stablecoins are "unsustainable." In that vein, the

announcement claimed that a de-pegging of UST that had briefly occurred in May 2021 was not a sign that UST was unstable, but rather, an opportunity to learn and improve Terra:

> By concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins, *UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving upon its design and adoption strategy*. Still, *questions persist about the sustainability of algorithmic stablecoin pegs, which is something our community doesn't hide from and tackles head-on*.
>
> * * *
>
> In order to succeed, we need to continue supplementing the Terra economy with effective resources across multiple dimensions. These include everything from technical developer tooling to capital backing projects, educational materials helping onboard new users and builders, and innovative mechanisms to support algorithmic stablecoin models amid volatility.

76. The Luna Foundation Guard's so-called "core mandate" was to "buttress the stability of the UST peg and foster the growth of the Terra ecosystem." It would do so by "[b]uilding reserves that backstop the peg of algorithmic stablecoins amid volatility and funneling resources into research that further advances what's possible with stablecoins[.]" In short, UST and other Terra stablecoins would no longer be purely algorithmic, as they would now also be supported by asset reserves (the "Yield Reserve Fund").

77. In addition to deploying "capital backing," the Luna Foundation Guard also was tasked with allocating grants for "builders, researchers, community members, and anyone else pursuing bold ideas in the interest of the Terra economy[.]" Similarly, the Yield Reserve Fund would be used to pay the 20% yield on Anchor deposits when staking revenues were inadequate.

78. The Luna Foundation Guard is overseen and operated by a "Governing Council, initially comprised of . . . leaders and experts in the industry, which will expand to include leading builders in the Terra ecosystem." The members of the Luna Foundation Guard's Governing Council included Defendants Kwon and Platias from Terraform Labs; Kanav Kariya, the

President of Defendant Jump Crypto (one of the financial backers of the Luna Foundation Guard); Remi Tetot, co-founder of RealVision; Jonathan Caras, the Project Lead at Levana Protocol; and José Maria Delgado, co-founder of Delphi Digital.

79.  The Luna Foundation Guard was initially funded with 50 million Luna coins from Terraform Labs to "help bootstrap its stabilizing reserves and grants framework."

80.  With the Luna Foundation Guard in place, Defendants continued to falsely tout UST and Anchor's reliability.  On January 28, 2022, Jump's President and Luna Foundation Guard Governing Council member, Kanav Kariya, posted a thread on Twitter discussing the "confusion and panic" concerning UST and the possibility that the Anchor yield could be impacted if a de-pegging event occurred. "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M." Kariya added that a "$450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA."

81.  As time progressed, lending on Anchor (and therefore staking revenue) failed to meet the levels needed to pay yields to depositors.  On February 8, 2022, a researcher at the crypto-related venture capital firm Hashed warned Anchor that its Yield Reserve Fund would only sustain the Anchor Protocol until roughly February 20, 2022, at which point an infusion of at least $436 million will be required to maintain the protocol's current yields until November 2022. Such an infusion would be "a short-term solution to allow sufficient time for growth" while developers work on improving mechanisms and incentives.

82.     Two days later, on February 10, 2022, Defendant Kwon announced that the Luna Foundation Guard's Governing Council had voted to capitalize the Anchor Yield Reserve by 450 million UST.

83.     In an attempt to further bolster confidence in Terra, on February 22, 2022, the Luna Foundation Guard announced that it had raised $1 billion in order to establish a Bitcoin-denominated forex reserve for UST.  Funding for the reserve came primarily from the LFG Defendants, who purchased Luna tokens in a private sale from the Luna Foundation Guard.

84.     According to the Luna Foundation Guard, the reserve assets could be used when "protracted market selloffs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."  Platias bragged in the Luna Foundation Guard's press release that the reserve "eliminated" the main counter-argument for the "sustainability of algorithmic stablecoins."  Kariya similarly proclaimed that the reserve "further strengthens confidence in the peg of the market's leading decentralized stablecoin UST . . . . It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions."

85.     That same day, Jump endorsed Kariya's comments, stating in a tweet: "As @KariyaKanav has mentioned, the UST Forex Reserve will strengthen confidence in the peg [g]iving users confidence by following central banks that hold a variety of foreign currencies to protect against severe market risks."

86.     Jump also promoted its relationship with Terraform Labs and the future prospects of UST: "We're excited to share our latest collaboration with @terra_money. . . . Our goal is to

make DeFi more accessible and meaningful for everyone. . . . By making $UST more accessible we can create the decentralized finance world that keeps us moving forward."

87.    Defendant Kwon and Tribe Capital's co-founder, Arjun Sethi, were also actively promoting UST/LUNA on Twitter on February 22, 2022. Kwon touted the "$1B BTC reserve for $UST" as the "[l]argest ever cap formation in crypto" and how the Luna Foundation Guard had "plans to scale reserve to larger numbers." Sethi reposted a thread from the Luna Foundation Guard official account announcing the $1 billion reserve funding, which stated, among other things, that UST was "a consistently stable asset through market volatility" and that the "hypothetical risk of a 'bank run'" was mitigated by the forex reserve's creation.

88.    On March 8, 2022, Kariya announced that "UST is in high demand atm and is generally trading at a premium."

89.    On or about March 10, 2022, two of Terraform Labs' early investors, Polychain Capital and Arca, proposed a cut to the yield rate in the Anchor Protocol. Luna Foundation Guard Governing Council members Kanav Kariya of Jump and José Maria Macedo of Delphi Digital opposed the proposal. Similarly, the Anchor Protocol's official Twitter account publicly endorsed another post objecting to the proposal.  The proposal ultimately failed.

90.    Around the same time that Kariya was promoting the demand for UST and voting against reducing the Anchor Protocol's yield rate, a popular crypto trading personality on Twitter, @AlgodTrading ("Algod"), publicly criticized Luna as being a "[p]onzi" and disclosed his plan to short Luna "with size." Importantly, Algod pointed out the vulnerabilities regarding the sustainability of UST and Luna, noting that more UST creates "more pressure on Luna" and that at a certain point Luna will no longer be able to sustain UST's price if users redeem their UST for Luna in large quantities.

91. As usual, Kwon defaulted to insulting Algod and did not disclose that Algod was, in fact, correct that Kwon and the other Defendants could not "keep fuel[ing] anchor." Kwon instead sought to undermine Algod's prophetic criticism with mockery and bravado, even going so far as to place a $1 million bet with Algod on whether or not Luna's price would be higher in a year.

92. Luna Foundation Guard member Three Arrows, via its co-founder Kyle Davies, also made misleading statements regarding UST and the Anchor Protocol around the same time. For example, on March 17, 2022, Davies promoted UST, along with an implicit promotion of Anchor's high-interest yield, stating that UST is "backed by [Bitcoin], hardest money known to humanity, and has a nice fat yield." Then on March 22, 2022, Davies stated that "UST is the only substantially decentralized stable coin of significant size." Davies, however, failed to also advise that UST's growth and Anchor's yield were unsustainable and would likely cause a breakdown of the Terra ecosystem.

93. On March 28, 2022, the Chief Investment Officer at the investment firm Arcane Assets, Eric Wall, posted a thread on Twitter discussing how the 50 million Luna coins that served as the initial funding for the Luna Foundation Guard came from Luna's initial coin offering and why choosing to use non-renewable liquidity sources like the funding for the Luna launch could be problematic for a so-called algorithmic stablecoin since it was "inherently unsustainable." In the opening post of that thread, Wall stated:

> Don't mean to be a party pooper but I think Terra is making a mistake to use LUNA funds that originated from the ICO to build the [Luna Foundation Guard] reserve.
>
> The goal of $UST is to be (i) decentralized and (ii) sustainable.
>
> This reserve is neither of those two things.

94.     Kwon retorted, "I like to say things that are true and well informed, and i think after all this we can both agree this is neither of those things: But you know, you do you."

95.     Notwithstanding Defendants' bullish public view of UST and Anchor, another infusion to the Yield Reserve Fund occurred on or around April 7, 2022, when the Luna Foundation Guard announced that it had acquired $100 million in AVAX tokens (another cryptocurrency) to "help bolster its UST Decentralized Forex Reserve." According to Defendant Platias, the purpose of the UST Reserve is "to provide a backstop against UST peg deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model . . . . By diversifying the base of non-correlated assets to major assets like [Bitcoin] and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives."

96.     Despite the appearance that more and more infusions undercut the Defendants' bullish narrative, Defendants, including the Luna Foundation Guard members, continued to make false statements in support of UST and Anchor.

97.     On April 29, 2022, Davies proclaimed that "Memecoins may exhibit a Pareto distribution, but stablecoins are winner take all based on liquidity. There will be distribution only by significant differentiation. ***And for the holy grail, the decentralized stablecoin, the winner will be $UST $LUNA***."

98.     On May 3, 2022, Zhu went so far as to encourage his Twitter followers to take out loans using Bitcoin as collateral, and then use the proceeds to buy UST and stake it in Anchor for the 20% yield. Of course, if the price of UST fell, anyone taking Zhu's advice would have lost their money and be unable to pay back their loans.  Seven days later, immediately following the UST collapse, Zhu deleted his post.

**ii.      Defendants Siphon Money From Terra to Private Accounts**

99.     Defendants knew the Terra project was unsustainable.   Seeing the writing on the wall, several months before UST's de-pegging, Kwon and the other Defendants began pulling 100 billion won—the equivalent of $80 million—per month out of Terraform Labs' funds and siphoning it off to multiple cryptocurrency wallets.

100.     In a June 11, 2022 post, a Terra observer and researcher using the handle @FatManTerra stated that "Do Kwon cashed out $2.7 billion (33 x $80m!) over the span of mere months" using a separate borrowing protocol that he described as "Anchor on steroids."   The researcher claimed that Kwon abused the abundant liquidity created by that protocol to "cash out billions of UST . . . without disturbing the peg[.]"   He also slammed the "constant lies and misrepresentations" made in support of Terra.

101.     Terraform Labs' outflows to other platforms support the researcher's claim:

| Query results   TFL USDT Outflows | |
|---|---|
| **to** | **USDT** |
| Binance | 1086851391.791976 |
| Kucoin | 558177777.93215 |
| Huobi | 545519385.327788 |
| OKEx | 500791322.43886 |
| \x91fdc60e621a00e04badb44813db8f27f450af15 | 133492197.901287 |
| Curve.fi UST Deposit | 78850296.98 |
| Bitfinex | 42925893.079219 |
| Curve.fi UST Swap | 18934452.831033 |
| \xe11970f2f3de9d637fb786f2d869f8fea44195ac | 10000000 |
| Curve.fi 3pool Depositer | 3236633.21 |
| Jump trading: Binance | 600000 |
| \x7da848f26d7bcec605031496e99453de0f94a4ea | 300000 |

**C.      The Collapse**

102.      The promise of fixed high-double-digit yields on deposits combined with the general hype around crypto that continued from Terra's launch through the end of 2021 drove rapid growth for both Anchor and Terraform Labs.   Under positive market conditions, the UST peg seemed to be holding and Anchor seemed to be delivering.  When the crypto market turned in 2022, however, it became apparent that Terra's stablecoin pegging algorithm was far from foolproof.  And if Anchor's promise of 20% APY sounded too good to be true, it is because it was.

103.      Both the size of the deposits in Anchor and the ballooning interest payments owed to customers became too much for the Terra ecosystem to bear.  On May 7, 2022, amid a sharp slump in the wider cryptocurrency market, a large sale of UST pushed its price slightly below its peg.  As risk-averse investors with positions in UST took note of the de-pegging, they started selling UST to reduce their exposure.  As those sales created more downward pressure on the price of UST and the de-pegging was exacerbated, a mass exodus began where users sold UST or redeemed it for $1.00 of Luna in the hope of making a fast profit by then re-selling those Luna coins.  As a result, the Anchor Protocol saw the value of its deposits *fall by $11 billion* between May 9, 2022 and May 11, 2022—a staggering sum considering that deposits totaled $14 billion at their peak.  The redemptions of UST further caused an explosion in Luna's supply, sending its price into freefall.  It was not enough to save UST, and both coins lost nearly all their value as a result.

104.      Within days, UST was trading for only pennies apiece, and Luna was trading for only fractions of a penny after reaching a high of more than $117 in April 2022:



105.    ANC also lost nearly all its value, falling from approximately $1.59 per coin May

8, 2022 to a low of approximately $0.09 per coin on May 13, 2022.  The price of ANC has

stabilized at just over $0.11 since the crash.

106.    The losses sustained by individual investors were tremendous.  *The New York*

*Times* reported that Redditors were sharing numbers for suicide hotlines due to the extent of

some users' losses.  Reverberations were felt throughout the crypto universe, with approximately

$300 billion in value disappearing in the weeks that followed.

107.    Kwon knew from experience that algorithmic stablecoins were dangerous. In late

2020, Kwon launched the Basis Cash ("BAC") token, another algorithmic stablecoin project that

sought and failed to maintain a $1.00 peg.  BAC's theoretical stabilization mechanism was very

similar to UST's, relying on a pairing with "Basis Bonds," which could be bought or redeemed

for one BAC.  Basis Bonds were to BAC what Luna is to UST.  But the system never worked.

Following its launch, the price of BAC jumped to $155, and though it soon fell to approximately

$1, that value never stuck. Today, BAC trades for less than a penny. With the launch of Terraform Labs, Kwon was only repeating his mistakes.

108. The UST peg was particularly dangerous. Unlike other stablecoins whose value is designed to be supported by collateral, UST depended primarily on an algorithm to maintain its value. That algorithm, in turn, depended on forces outside Defendants' control, namely demand for UST, public willingness to perform the stabilizing arbitrage, and reliable price information. But it only took one large withdrawal to knock UST off its peg, prompting a death spiral that led to the coin's—and Terra's—demise.

109. The Anchor Protocol was also unsustainable. In a "post-mortem analysis" of the Terra ecosystem collapse, Luna Foundation Guard Governing Council member Remi Tetot admitted what Terraform Labs had denied all along: that the Anchor Protocol's 20% yield was neither sustainable nor stable. Instead, Terraform Labs was offering 20% returns as a *marketing* ploy to draw more people into the Terra ecosystem. But Defendants knew that the 20% returns could not last as deposits outstripped lending.

110. In particular, Tetot candidly confessed:

> They called Luna a Ponzi because of the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make the yield sustainable around 10–12%. Unfortunately, [i]t didn't have time to make it . . . ***20% yield was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't sustainable***, but I think it was acceptable for the time being, yield should have been dynamic as the system gr[e]w.

111. Tetot further explained that the "20% yield was a mistake because it increased UST demand too quickly" for defense mechanisms such as reserves to scale. Even though "strategic" moves had been made to put reserves in place, they were "not technically ready" despite Defendants' assurances that the reserves were sufficient.

112.    Although Tetot sought to deflect the blame of the failure of Terraform Labs' algorithmic stablecoin to "human behavior" instead of Defendants' failures, he acknowledged that he had "earned" the criticism he was receiving for his role.

113.    Defendant Kwon himself was warned before Anchor's launch that the 20% yield was unsustainable.  According to an Anchor developer, the system was initially designed to offer an interest rate of 3.6%, but this was increased to 20% the week before release to attract more traders.  The developer stated that he told Defendant Kwon that the rate should be reduced, but he was ignored.  As a result of the high rate, the developer said he "thought it was going to collapse from the beginning."

**D.    The Aftermath**

114.    Defendants' conduct has spawned multiple governmental investigations.  Even before Terra's downfall, in September 2021 the SEC began investigating whether certain cryptocurrency derivatives on Terra's "Mirror Protocol"—a Terra blockchain application which creates coins algorithmically designed to "mirror" the price of other assets—were unregistered securities.  Kwon had sought to avoid responding to a subpoena issued in connection with that investigation, but on June 8, 2022 the U.S. Court of Appeals for the Second Circuit rejected his challenge.

115.    The SEC is also reportedly investigating whether the marketing of UST before its crash violated federal regulations, and whether Defendant Kwon laundered money in connection with the $80 million monthly payments he allegedly extracted from Terraform Labs.

116.    In South Korea, prosecutors are reportedly considering bringing charges against Defendant Kwon for running Anchor as a Ponzi scheme.  Investigators there have issued subpoenas to Terraform Labs employees and have barred certain individuals from leaving the

country. Moreover, Seoul police are allegedly investigating whether a Terraform Labs employee embezzled Bitcoin from the Company's treasury.

117.    Separately, as a result of Terra's collapse and the wider cryptocurrency decline, Three Arrows filed for bankruptcy in early July 2022 and a court in the British Virgin Islands ordered that the company be liquidated. Its founders, however, Zhu and Davies, have allegedly been uncooperative and may be trying to pilfer Three Arrows' assets before they reach creditors. According to court documents, the individuals tasked with liquidating Three Arrows' assets have tried unsuccessfully to secure Zhu's and Davies' aid, and believe "there is an actual and imminent risk that [Three Arrows'] assets may be transferred or otherwise disposed of" in advance of the formal liquidation. Additionally, a representative for Zhu and Davies claims that they have been in discussions with the Monetary Authority of Singapore, which "reprimanded" Three Arrows on June 30, 2022 for "providing false information" and exceeding the threshold for permitted assets under management.

## CLASS ALLEGATIONS

118.    Plaintiff brings this action individually and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), defined as follows:

> All persons who, during the Class Period, purchased Terra blockchain coins and were damaged thereby.

119.    The Class Period is defined as the period between May 1, 2019 and June 15, 2022.

120.    Excluded from the Class are Defendants and their affiliates, agents, employees, officers, and directors, and any members of their immediate families. Plaintiff reserves the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

121. The Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is currently unknown, upon information and belief, there are at least thousands of Class members. The number of Class members can be determined based on Terraform Labs' and other third parties' records.

122. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants are persons within the meaning of the RICO statute;

b. whether Defendants formed an enterprise that engages in interstate commerce;

c. whether Defendants violated federal laws regarding mail and wire fraud;

d. whether Defendants violated federal laws regarding money laundering;

e. whether Defendants falsely promoted UST and Anchor;

f. whether Defendants' promotion of UST and Anchor occurred via mail or wire;

g. whether Defendants conspired to artificially inflate the price of the Terra Tokens and then sell their Terra Tokens to unsuspecting users; and

h. whether Plaintiff and Class members have suffered damages, and, if so, the nature and extent of those damages.

123. Plaintiff's claims against Defendants are typical of the claims of the members of the Class because all members sustained damages arising out of the Company's wrongful conduct as detailed herein. Plaintiff's and the Class members' claims all arise out of Terraform Labs' uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of Terra coins.

124.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action lawsuits.  Plaintiff has no interests antagonistic to or in conflict with those of the Class and therefore is an adequate representative for the Class.

125.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual members of the Class may in some instances be relatively small, the expense and burden of individual litigation make it impossible for such Class members individually to redress the wrongs done to them.  Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

126.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION

**Violation of the Racketeer Influenced
and Corrupt Organizations Act ("RICO")
18 U.S.C. §§1961, *et seq*.
(Against all Defendants)**

127.    Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

128.    This cause of action, which arises under 18 U.S.C. § 1964(c), asserts claims against Defendants for violations of 18 U.S.C. § 1962(c) for conducting the affairs of "enterprises," as described herein, through a "pattern of racketeering activity."

129.    During the Class Period, each of the Defendants, Plaintiff, and the members of the Class were each a "person," as that term is defined in 18 U.S.C. § 1961(3).

130.    Terraform Labs and the Luna Foundation Guard are "enterprises," as that term is defined in 18 U.S.C. § 1961(4).  As alleged above, pursuant to their contractual agreements and courses of dealing, each of the Individual Defendants was employed by or associated with Terraform Labs. Likewise, each Defendant was employed by or associated with the Luna Foundation Guard.  Similarly, all Defendants together formed an association-in-fact enterprise for the purpose of propping up the Terra ecosystem and prolonging their fraudulent scheme.

131.    During the Class Period, Defendants violated 18 U.S.C. § 1962(c) by conducting the affairs of Terraform Labs, a RICO "enterprise," through a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(1)(A)-(B) & (5).  Also during the Class Period, Defendants, including Terraform Labs, violated 18 U.S.C. § 1962(c) by conducting the affairs of Luna Foundation Guard through a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(1)(A)-(B) & (5).  Moreover, during the Class Period, all Defendants together violated 18 U.S.C. § 1962(c) by conducting the affairs of their association-in-fact enterprise through a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(1)(A)-(B) & (5).

132.    During the Class Period, as alleged herein, Defendants committed, engaged in and/or aided and abetted a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(1) & (5), involving multiple violations of the following federal statutes:

    a.    violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, by transmitting and publishing false and misleading information regarding Terra stablecoins and Anchor, intentionally and artificially inflating the

Terra stablecoin prices, and failing to disclose such practices. Defendants conducted these activities through the use of the U.S. Mail or interstate wire facilities, including through the transmission of: (1) communications on official Terraform Labs, Luna Foundation Guard, and Anchor Protocol accounts on various social media platforms, including, but not limited to: Twitter, Reddit, Telegram, and Discord to customers,; (2) written representations and telephone calls between Defendants regarding the promotion of Terra stablecoins, the financial benefits to the Defendants for doing so, and effectuating the fraud scheme; and (3) receipts of profits sent through the U.S. Mail and interstate wire facilities – the wrongful proceeds of the scheme; and

b.       violations of the federal money laundering statutes, 18 U.S.C. § 1956, by laundering the equivalent of $80 million of Terraform Labs money to secret wallets once per month in the months leading up to the UST crash.

133.    Defendants' violations of these federal statutes, as described herein constituted a "pattern of racketeering activity" because such predicate acts were related to each other in that they were committed as part of the illegal and fraudulent marketing scheme, and they amounted to or pose a threat of continued criminal activity.

134.    Many of the precise dates and times of Defendants' violations of the federal criminal statutes are not known. Indeed, an essential part of the successful operation of the illegal sales and marketing scheme alleged herein depended upon secrecy and each of these Defendants took deliberate steps to conceal their wrongdoing. However, given the massive scope of the illegal and fraudulent scheme, these Defendants likely committed thousands of predicate acts of "racketeering activity."

135.     Defendants' motive and purpose in creating and conducting the scheme was to temporarily increase the price and trading volume for the Terra stablecoins so that they could sell off their portion of the Float for grossly inflated prices. Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the Defendants would be able to sell off in the increased liquidity.

136.     Plaintiff and Class members were injured in their business or property by reason of Defendants' above-referenced violations of 18 U.S.C. § 1962(c).  Plaintiff and the members of the Class have standing to sue Defendants under 18 U.S.C. § 1964(c) and to recover compensatory damages, treble damages, and the costs of suit, including reasonable attorneys' fees.  Plaintiff seeks restitution in the form of the monetary value of the difference between the purchase price of the Terra Tokens and the price those Terra Tokens sold for.

137.     In addition, Plaintiff and Class members are entitled to declaratory and injunctive relief, pursuant to 18 U.S.C. § 1964(a), to remedy and prevent Defendants from engaging in further violations of federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests that this Court:

A.     Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

C.     Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

D.     Award post-judgment interest on such monetary relief;

E.      Grant appropriate injunctive and/or declaratory relief;

F.      Award reasonable attorneys' fees and costs; and

G.      Grant such further relief that this Court deems appropriate.

**<u>JURY DEMAND</u>**

Plaintiff, individually and on behalf of the putative Class, demand a trial by jury on all issues so triable.

DATED: August 25, 2022          **GRANT & EISENHOFER P.A.**
                                 */s/ Daniel L. Berger*
                                 Daniel L. Berger
                                 485 Lexington Avenue, Floor 29
                                 New York, NY 10017
                                 Telephone: (646) 722-8500
                                 Email: dberger@gelaw.com

                                 *Attorney for Plaintiff and the Proposed Class*

This is the exhibit marked **"ARBS-2"** referred to in the

Affidavit of **ABDUL RAHMAN BIN SULEIMAN** affirmed before me

This    11th    day of    October  2022

In Singapore

Before me,

**A NOTARY PUBLIC**

ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
(ACRA)



**INFORMATION RESOURCES**

**WHILST EVERY ENDEAVOR IS MADE TO ENSURE THAT INFORMATION PROVIDED IS UPDATED AND CORRECT. THE AUTHORITY DISCLAIMS ANY LIABILITY FOR ANY DAMAGE OR LOSS THAT MAY BE CAUSED AS A RESULT OF ANY ERROR OR OMISSION.**

**Business Profile (Company) of  THREE ARROWS CAPITAL PTE. LTD. (201302969M)**      Date: 29/09/2022

**The Following Are The Brief Particulars of :**

| | | |
|---|---|---|
| UEN | : | 201302969M |
| Company Name. | : | THREE ARROWS CAPITAL PTE. LTD. |
| Former Name if any | : | |
| Incorporation Date. | : | 30/01/2013 |
| Company Type | : | EXEMPT PRIVATE COMPANY LIMITED BY SHARES |
| Status | : | Live Company |
| Status Date | : | 30/01/2013 |

**Principal Activities**

| | | |
|---|---|---|
| Activities (I) | : | OTHER FINANCIAL SERVICE ACTIVITIES, EXCEPT INSURANCE AND PENSION FUNDING ACTIVITIES N.E.C. (64999) |
| Description | : | HEDGE FUND COMPANY |
| Activities (II) | : | |
| Description | : | |

**Capital**

| Issued Share Capital (AMOUNT) | Number of Shares * | Currency | Share Type |
|---|---|---|---|
| 6331146 | 6331146 | SINGAPORE, DOLLARS | ORDINARY |

* Number of Shares includes number of Treasury Shares

| Paid-Up Capital (AMOUNT) | Number of Shares | Currency | Share Type |
|---|---|---|---|
| 6331146 | | SINGAPORE, DOLLARS | ORDINARY |

COMPANY HAS THE FOLLOWING ORDINARY SHARES HELD AS TREASURY SHARES

| Number Of Shares | Currency |
|---|---|
| | |

Authentication No. : G22831158K

ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
(ACRA)



**INFORMATION RESOURCES**

**WHILST EVERY ENDEAVOR IS MADE TO ENSURE THAT INFORMATION PROVIDED IS UPDATED AND CORRECT. THE AUTHORITY DISCLAIMS ANY LIABILITY FOR ANY DAMAGE OR LOSS THAT MAY BE CAUSED AS A RESULT OF ANY ERROR OR OMISSION.**

**Business Profile (Company) of  THREE ARROWS CAPITAL PTE. LTD. (201302969M)**          **Date: 29/09/2022**

| | | |
|---|---|---|
| Registered Office Address | : | 7 TEMASEK BOULEVARD<br>#21-04<br>SUNTEC TOWER ONE<br>SINGAPORE (038987) |
| Date of Address | : | 18/07/2016 |
| Date of Last AGM | : | 30/06/2021 |
| Date of Last AR | : | 16/07/2021 |
| FYE As At Date of Last AR | : | 31/12/2020 |

**Audit Firms**

| NAME |
|---|
| OAKFIELD & ASSOCIATES |

**Charges**

| Charge No. | Date Registered | Currency | Amount Secured | Chargee(s) |
|---|---|---|---|---|

**Officers/Authorised Representative(s)**

| Name | ID | Nationality/Citizenship | Source of Address | Date of Appointment |
|---|---|---|---|---|
| Address | | Position Held | | |
| KYLE LIVINGSTON DAVIES | S8786388C | SINGAPORE CITIZEN | ACRA | 14/05/2013 |
| 7 TEMASEK BOULEVARD<br>#21-04<br>SUNTEC TOWER ONE<br>SINGAPORE (038987) | | Director | | |
| ZHU SU | S8776088Z | SINGAPORE CITIZEN | OSCARS | 30/01/2013 |
| 7 TEMASEK BOULEVARD<br>#21-04<br>SUNTEC TOWER ONE<br>SINGAPORE (038987) | | Director | | |
| CHIA MENG MENG | S7268555E | SINGAPORE CITIZEN | ACRA | 19/04/2021 |
| 26 BUKIT BATOK EAST AVENUE 2<br>#12-08<br>HILLVIEW REGENCY<br>SINGAPORE (659920) | | Secretary | | |
| ZHU SU | S8776088Z | SINGAPORE CITIZEN | OSCARS | 30/01/2013 |

Authentication No. : G22831158K

ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
(ACRA)



**INFORMATION RESOURCES**

**WHILST EVERY ENDEAVOR IS MADE TO ENSURE THAT INFORMATION PROVIDED IS UPDATED AND CORRECT. THE AUTHORITY DISCLAIMS ANY LIABILITY FOR ANY DAMAGE OR LOSS THAT MAY BE CAUSED AS A RESULT OF ANY ERROR OR OMISSION.**

**Business Profile (Company) of  THREE ARROWS CAPITAL PTE. LTD. (201302969M)**          Date: 29/09/2022

**Officers/Authorised Representative(s)**

| Name | ID | Nationality/Citizenship | Source of Address | Date of Appointment |
|---|---|---|---|---|
| **Address** | | **Position Held** | | |
| 7 TEMASEK BOULEVARD<br>#21-04<br>SUNTEC TOWER ONE<br>SINGAPORE (038987) | | Managing Director | | |

**Shareholder(s)**

| | Name | ID | Nationality/Citizenship<br>Place of incorporation/<br>Origin/Registration | Source of Address | Address Changed |
|---|---|---|---|---|---|
| | **Address** | | | | |
| 1 | ZHU SU | S8776088Z | SINGAPORE CITIZEN | ACRA | 24/06/2022 |
| | 7 TEMASEK BOULEVARD<br>#21-04<br>SUNTEC TOWER ONE<br>SINGAPORE (038987) | | | | |
| | **Ordinary(Number)** | | **Currency** | | |
| | 3165573 | | SINGAPORE, DOLLARS | | |
| 2 | KYLE LIVINGSTON DAVIES | S8786388C | SINGAPORE CITIZEN | ACRA | 24/06/2022 |
| | 7 TEMASEK BOULEVARD<br>#21-04<br>SUNTEC TOWER ONE<br>SINGAPORE (038987) | | | | |
| | **Ordinary(Number)** | | **Currency** | | |
| | 3165573 | | SINGAPORE, DOLLARS | | |

Authentication No. : G22831158K

ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
(ACRA)



**INFORMATION RESOURCES**

**WHILST EVERY ENDEAVOR IS MADE TO ENSURE THAT INFORMATION PROVIDED IS UPDATED AND CORRECT. THE AUTHORITY DISCLAIMS ANY LIABILITY FOR ANY DAMAGE OR LOSS THAT MAY BE CAUSED AS A RESULT OF ANY ERROR OR OMISSION.**

**Business Profile (Company) of  THREE ARROWS CAPITAL PTE. LTD. (201302969M)**     Date: 29/09/2022

**Abbreviation**

UL - Local Entity not registered with ACRA

UF - Foreign Entity not registered with ACRA

AR - Annual Return

AGM - Annual General Meeting

FS - Financial Statements

FYE - Financial Year End

OSCARS - One Stop Change of Address Reporting Service by Immigration & Checkpoint Authority.

**Note :**

- The information contained in this product is collated from lodgements filed with ACRA, and/or information collected by other government sources.

- The list of officers for this entity is available for online authentication within 30 days from the date of purchase of this Business Profile. Please scan the QR code available on the last page of this profile to access the authentication page. For more information, please visit www.acra.gov.sg.

FOR REGISTRAR OF COMPANIES AND BUSINESS NAMES
SINGAPORE

RECEIPT NO.          : ACRA220929172803

DATE                      : 29/09/2022

This is computer generated. Hence no signature required.



Authentication No. : G22831158K

This is the exhibit marked **"ARBS-3"** referred to in the

Affidavit of **ABDUL RAHMAN BIN SULEIMAN** affirmed before me

This   11th   day of   October  2022

In Singapore

Before me,

**A NOTARY PUBLIC**

**STATUTORY DECLARATION**

I, **CHONG XIU BING, DENISE** (NRIC No.: S9301923G), care of One Raffles Place #18-61, Tower 2, Singapore 048616, do solemnly and sincerely declare as follows:

1.    I am an associate with the law firm Virtus Law LLP ("Virtus Law"), counsel to Plaintiff Matthew Albright ("Plaintiff").

2.    I refer to the affidavits of service to be affirmed by Abdul Rahman Bin Suleiman ("Rahman") (the "Affidavits of Service"), a clerk with Virtus Law, setting out the steps taken to effect service of the Summons and Class Action Complaint for Violations of the Federal Racketeering Laws in Civil Action No. 1:22-cv-07281-JSR-BCM (the "Documents") on Terraform Labs, Pte. Ltd. ("Terraform") and Three Arrows Capital Pte. Ltd. ("Three Arrows").

3.    I confirm that under Singapore law:

    (a)    pursuant to Order 64 Rule 3(2) of the Singapore Rules of Court 2021, service of any foreign legal process in Singapore, such as the Documents, may be effected by a method of service authorized by the Singapore Rules of Court 2021 for the service of analogous process issued by the Singapore Court;

    (b)    process issued by the Singapore Court which is analogous to the Documents would be an originating claim or originating application;

    (c)    pursuant to Order 6 Rule 4 of the Singapore Rules of Court 2021, a Singapore originating claim or an originating application must be served personally on each defendant;



(d)      pursuant to Order 7 Rule 2(1)(c) of the Singapore Rules of Court 2021, personal service of a document is effected on any entity according to the requirements of any written law; and

(e)      pursuant to section 387 of the Singapore Companies Act 1967, a document may be served on a company by leaving it at the registered office of the company.

4.      Copies of the relevant rules and sections in the Singapore Rules of Court 2021 and the Singapore Companies Act 1967 are attached hereto.

5.      Rahman served the Documents on Terraform and Three Arrows by leaving the same at their respective registered addresses.

6.      Therefore, the steps taken by Rahman to serve the Documents on Terraform and Three Arrows as stated in his Affidavits of Service are, under Singapore law, effective methods of service of the Documents on them.

And I make this solemn declaration by virtue of the Oaths and Declarations Act 2000 of Singapore, and subject to the penalties provided by that Act for the making of false statements in statutory declarations, conscientiously believing the statements contained in this declaration to be true in every particular.

DECLARED in Singapore      )
By **CHONG XIU BING, DENISE**  )
On this 7th day of October 2022    )

Before me,

_____

**A COMMISSIONER FOR OATHS**

Teo Shih Yee
CO2022/0629
1 Oct 2022 – 30 Sep 2023

SUPREME COURT OF JUDICATURE ACT
(CHAPTER 322)

RULES OF COURT 2021

**Personal service of originating claim or originating application (O. 6, r. 4)**

**4.** Subject to the provisions of any written law and these Rules, an originating claim or an originating application must be served personally on each defendant.

**Personal service (O. 7, r. 2)**

**2.**—(1) Personal service of a document is effected —

   (*a*)  on a natural person by leaving a copy of the document with that person, or the person's agent if that person is an overseas principal under Rule 4;

   (*b*)  on any entity by leaving a copy of the document with the chairperson or president of the entity, or the secretary, treasurer or other officer;

   (*c*)  on any person or entity according to the requirements of any written law; or

   (*d*)  in any manner agreed with the person or the entity to be served.

(2) The following persons may effect personal service:

   (*a*)  a process server of the Court;

   (*b*)  a solicitor;

   (*c*)  a solicitor's employee;

   (*d*)  a litigant who is not legally represented or such a person's employee;

   (*e*)  any other person that the Registrar may allow in a particular case or generally.

(3) If the process server of the Court effects service, the Registrar must notify the requesting person of the fact and manner of such service.

**Alternative mode of service of foreign legal process (O. 64, r. 3)**

**3.**—(1) Subject to Rule 4, this Rule applies in relation to the service of any process required in connection with civil proceedings pending before a court or other tribunal of a foreign country where Rule 2 does not apply or is not invoked.

(2) Service of any such process within Singapore may be effected by a method of

service authorised by these Rules for the service of analogous process issued by the Court.

(3)  This Rule applies even though the foreign process is expressed to be or includes a command of the foreign sovereign.

# COMPANIES ACT 1967

[29 December 1967]

**Service of documents on company**

    **387.** A document may be served on a company by leaving it at or sending it by registered post to the registered office of the company.