**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW ALBRIGHT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TERRAFORM LABS, PTE. LTD., JUMP CRYPTO, JUMP TRADING LLC, REPUBLIC CAPITAL, REPUBLIC MAXIMAL LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/DEFINANCE TECHNOLOGIES OY, GSR/GSR MARKETS LIMITED, THREE ARROWS CAPITAL PTE. LTD., PANTERA CAPITAL, NICHOLAS PLATIAS, and DO KWON,<br><br>Defendants. | Case No. 1:22-cv-07281-JSR |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS JUMP TRADING, LLC, TERRAFORM LABS, PTE. LTD.,**
**REPUBLIC MAXIMAL LLC, AND PANTERA CAPITAL MANAGEMENT LP'S**
**MOTION TO TRANSFER VENUE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

BACKGROUND .............................................................................................................. 1

ARGUMENT .................................................................................................................. 4

    I.    Transfer Is Warranted Pursuant to the First-Filed Rule ...................................................... 4

    II.    Transfer Is Also Warranted Pursuant to 28 U.S.C. § 1404(a) .......................................... 7

      A.    Plaintiff Could Have Brought This Action In The Northern District of California ......... 7

      B.    Transfer Is An Appropriate Exercise Of This Court's Discretion ................................. 8

          1.    Judicial Economy And The Interests of Justice ......................................................... 8

          2.    The Convenience Of The Witnesses And Location Of Relevant Documents .............. 9

          3.    The Convenience Of The Parties And Their Relative Means ................................... 10

          4.    The Locus Of Relevant Facts .................................................................................. 10

          5.    The Availability Of Process To Compel Witnesses And Forum's Familiarity With The Underlying Law ............................................................................................................ 11

          6.    The Plaintiff's Choice Of Forum ............................................................................. 11

CONCLUSION ............................................................................................................. 13

APPENDIX .................................................................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

## Cases

*800-Flowers, Inc. v. Intercontinental Florist, Inc.*,
   860 F. Supp. 128 (S.D.N.Y. 1994) ................................................................. 5, 6, 7

*Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*,
   11 F. Supp. 2d 729 (S.D.N.Y. 1998) .................................................................. 8

*Bayer Schera Pharma AG v. Sandoz, Inc.*,
   2009 WL 440381 (S.D.N.Y. Feb. 18, 2009) ........................................................ 9

*First City Nat'l Bank and Tr. Co. v. Simmons*,
   878 F.2d 76 (2d Cir. 1989) ........................................................................... 5, 7

*Glass v. S & M NuTec, LLC*,
   456 F. Supp. 2d 498 (S.D.N.Y. 2006) ............................................................ 5, 11

*Iconic IP Holdings, L.L.C. v. Gerrit's Brands, Inc.*,
   2021 WL 7543607 (E.D.N.Y. May 21, 2021) .................................................. 6, 9, 11

*Intema Ltd. v. NTD Lab'ys, Inc.*,
   654 F. Supp. 2d 133 (E.D.N.Y. 2009) ................................................................. 11

*McCain v. Racing*,
   2007 WL 2435170 (S.D.N.Y. Aug. 27, 2007).................................................. 5, 6, 7, 8

*Mohamed v. Tesfaye*,
   2019 WL 1460401 (S.D.N.Y. Jan. 24, 2019) ................................................ 7, 8, 10, 11, 12

*Motion Picture Lab. Technicians Loc. 780 v. McGregor & Werner, Inc.*,
   804 F.2d 16 (2d Cir. 1986) ............................................................................. 5

*Patterson v. Terraform Labs, Pte. Ltd.*,
   No. 3:22-cv-03600 (N.D. Cal. filed June 17, 2022) ............................................ 1, 2, 3, 5, 7, 8

*Totilo v. Herbert*,
   538 F. Supp. 2d 638 (S.D.N.Y. 2008) ............................................................ 5, 11

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964) ..................................................................................... 12

*Williams v. City of New York*,
  2006 WL 399456 (S.D.N.Y. Feb. 21, 2006) ........................................................................ 6, 8

## **Statutes**

18 U.S.C.
  § 1341 ............................................................................................................................................... 3
  § 1343 ............................................................................................................................................... 3
  § 1961 ............................................................................................................................................... 1

28 U.S.C.
  § 1331 ............................................................................................................................................... 8
  § 1404 ............................................................................................................... 1, 4, 6, 7, 8, 12

Defendants Jump Trading, LLC, Terraform Labs, Pte. Ltd., Republic Maximal LLC d/b/a Republic Capital (together, "Republic"), and Pantera Capital Management LP (collectively, the "Moving Defendants") submit this memorandum of law in support of their motion to transfer venue to the Northern District of California for consolidation or coordination with a first-filed action, *Patterson v. Terraform Labs, Pte. Ltd.,* No. 3:22-cv-03600 (N.D. Cal. filed June 17, 2022).

The *Patterson* complaint was filed two months before this action, names all but one of the defendants named here, includes nearly identical factual allegations, and alleges essentially the same claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, alleged here.[1]   Despite having the opportunity to do so, Plaintiff here did not move to be appointed lead plaintiff in *Patterson*.   Instead, Plaintiff filed this action a week after lead plaintiff motions were due in *Patterson*, even though this action has no legitimate connection to this district and few, if any, of the relevant witnesses, evidence, or alleged facts have meaningful ties to New York.   Allowing this action to continue would effectively bless Plaintiff's forum shopping, liberal copying from the *Patterson* complaint, and disregard for the filing deadline for lead plaintiff motions in *Patterson*, as explained in detail below.

The Moving Defendants respectfully request that the Court transfer this case to the Northern District of California pursuant to the first-filed rule and 28 U.S.C. § 1404(a).

## BACKGROUND

On June 17, 2022, Nick Patterson filed a putative class action in the Northern District of California, individually and on behalf of all others similarly situated, against both individual

---

[1] A true and correct copy of the *Patterson* complaint is attached hereto as Exhibit A. *Patterson v. Terraform Labs, Pte. Ltd.,* No. 3:22-cv-03600 (N.D. Cal. filed June 17, 2022), ECF No. 1.

defendants and all but one of the entity defendants named in this action.[2]  *See* Exhibit A.  The *Patterson* complaint alleges violations of federal securities law, California state law, and RICO in connection with the Terra blockchain "de-pegging" event that took place during May 2022, when the prices of LUNA and UST, cryptocurrencies on the Terra blockchain, dropped precipitously. The *Patterson* complaint seeks actual and punitive damages and restitution, among other forms of relief.

On June 20, counsel for *Patterson* published a notice of that suit.  Motions to be appointed Lead Plaintiff in *Patterson* were due on ***August 19, 2022***, and five putative lead plaintiffs met that deadline.  The motions were fully briefed as of September 9, 2022.  Plaintiff here did not file any motion to attempt to become lead plaintiff in *Patterson*.  *See* Exhibit B (docket for *Patterson v. Terraform Labs, Pte. Ltd.,* No. 3:22-cv-03600 (N.D. Cal. filed June 17, 2022) as of October 21, 2022).

Instead, Plaintiff filed this action on ***August 25, 2022***, two months after *Patterson* was filed and almost a week after lead plaintiff motions were due in that case.  Plaintiff alleges facts that are nearly identical to those alleged in *Patterson* and asserts a RICO claim that is substantively identical to the one asserted in *Patterson*.  Plaintiff alleges that the same defendants are liable because, "[d]espite their many statements in support of UST, Anchor, and the entire Terra ecosystem, Defendants knew that Terra's status quo was unsustainable" and "by transmitting and publishing false and misleading information regarding Terra stablecoins [defendants] intentionally and artificially inflat[ed] the Terra stablecoin prices, and fail[ed] to disclose such practices." Compl. ¶¶ 9, 132a, ECF No. 1.  Save for one request in *Patterson* for a declaration related to claims

---

[2] Though Plaintiff here has additionally named Pantera Capital Management LP in the suit before this Court, Pantera is mentioned in only two paragraphs of the complaint, one of which, notably, alleges that Pantera is located in California.  Compl. ¶¶ 22, 67, ECF No. 1.

based on §§ 5(a), 12(a), and 15 of the Securities Act, Plaintiff seeks, word-for-word, the same relief sought in *Patterson*.

Notably, as laid out below, and more fully in the attached Appendix, many paragraphs of the complaint before this Court are copied wholesale from the *Patterson* complaint, and many more are nearly identical.

| *Patterson* Complaint, Ex. A | *Albright* Complaint, ECF No. 1 |
|---|---|
| ¶ 24. "As discussed at length below, the Anchor Protocol was at the primary driver of the Terra ecosystem's collapse. Thus, the source of the alleged misconduct related to the Anchor Protocol, UST, and LUNA, as well as numerous misleading statements made on behalf of TFL, occurred within California and impacted its residents." | ¶ 28. "As discussed at length below, the Anchor Protocol was a primary driver of the Terra ecosystem's collapse. Thus, the alleged misconduct related to the Anchor Protocol, UST, and LUNA, as well as numerous misleading statements made on behalf of Terraform Labs, impacted residents of this District." |
| ¶ 89. "TFL and the Luna Foundation Guard promoted the Terra Tokens and Anchor Protocol through, among other means, TFL's website, web application, social media accounts, podcast interviews, and through U.S. media. The promotions all had the same talking points: stability and sustainability." | ¶ 59. "Throughout the Class Period, Defendants promoted Terra coins and the Anchor Protocol, knowing they were unstable and unsustainable, through Terraform Labs' website, web application, social media accounts, podcast interviews, and through U.S. media, among other means. The promotions all had the same talking points: stability and sustainability." |
| ¶¶ 95 – 98, 100, 104, 107, 108-110, 112 (quoting press releases and tweets from the official Twitter accounts for the Anchor Protocol, Kanav Kariya, Do Kwon, and Jump) | ¶¶ 66, 68-70, 80, 81, 82, 84, 85-87, 88 (quoting identical press releases and tweets from the official Twitter account for the Anchor Protocol, Kanav Kariya, Do Kwon and Jump *in largely verbatim language*) |
| ¶ 252. "The RICO Defendants' motive and purpose in creating and conducting the scheme and the Enterprise(s) was to increase the price and trading volume for the Terra Tokens so that they could sell off their portion of the Float for grossly inflated prices. Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the RICO Defendants would be able to sell off in the increased liquidity." | ¶ 135. "Defendants' motive and purpose in creating and conducting the scheme was to temporarily increase the price and trading volume for the Terra stablecoins so that they could sell off their portion of the Float for grossly inflated prices. Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the Defendants would be able to sell off in the increased liquidity." |

Plaintiff alleges that he and defendants are located in different states and countries, with Plaintiff a resident of Florida, three parties allegedly headquartered in California, and the only parties in New York being two named defendants, which is actually a single defendant operating under a d/b/a, and which supports transfer to the Northern District of California. Plaintiff alleges:

- He resides in Oldsmar, Florida (¶ 11);
- Terraform Labs, Pte. Ltd. is incorporated in Singapore and headquartered in South Korea (¶ 12);
- Jump Trading LLC is incorporated in Delaware and headquartered in Chicago (¶ 14);
- Republic is headquartered in New York (¶¶ 15, 16);
- Tribe Capital is headquartered in California (¶ 17);
- DeFinance Capital/DeFinance Technologies Oy is headquartered in Finland (¶ 18);
- GSR/GSR Markets Limited is headquartered in Hong Kong (¶ 19);
- Three Arrows Capital Pte. Ltd. is headquartered in Singapore (¶ 20);
- Pantera Capital is headquartered in California (¶ 22);
- Nicholas Platias is "located in" California (¶ 12); and
- Do Kwon is a resident of Singapore (¶ 24).

## ARGUMENT

The Moving Defendants submit that transfer of this case to the Northern District of California, where it may be consolidated or coordinated with *Patterson*, is appropriate under both the first-filed rule and under 28 U.S.C. § 1404(a). Simply put, the interests of justice, judicial economy, and a balancing of the § 1404(a) factors weigh heavily in favor of transfer, rather than allowing Plaintiff to create duplicative class actions simply because Plaintiff either missed the deadline to file for lead plaintiff in *Patterson* or deliberately decided not to file.

### I.   Transfer Is Warranted Pursuant To The First-Filed Rule

It is a "well-settled principle" in the Second Circuit that, "[w]here there are two competing lawsuits, the first should have priority, absent [a] showing of balance of convenience or special

circumstances giving priority to the second." *First City Nat'l Bank and Tr. Co.* v. *Simmons*, 878 F.2d 76, 79 (2d Cir. 1989) (quoting *Motion Picture Lab. Technicians Loc. 780 v. McGregor & Werner, Inc*., 804 F.2d 16, 19 (2d Cir. 1986)) (internal citations and punctuation omitted). "Specifically, under the so-called 'first-filed rule,' when two district courts concurrently have before them actions involving substantially or effectively the same parties and issues, there is a strong presumption in favor of transfer to the forum of the first-filed suit unless either the balance of convenience or any other 'special circumstances' clearly favor the latter-filed action." *McCain v. Racing*, No. 07 Civ. 5729 (JSR), 2007 WL 2435170, at *2 (S.D.N.Y. Aug. 27, 2007) (Rakoff, J.); *see also 800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 131 (S.D.N.Y. 1994) ("Generally, there is a strong presumption in favor of the forum of the first-filed suit.") (citation omitted). The first-filed rule applies in class actions as it does in other civil suits. *See, e.g.*, *Totilo v. Herbert,* 538 F. Supp. 2d 638, 640 (S.D.N.Y. 2008) (granting motion to transfer class action litigation); *Glass v. S & M NuTec, LLC,* 456 F. Supp. 2d 498, 504 (S.D.N.Y. 2006) (same).

*Patterson* was filed more than two months before this action and names all but one of the same defendants, contains nearly identical factual allegations (many paragraphs of this complaint are simply copied and pasted from the *Patterson* complaint), and asserts a RICO claim that is substantively identical to the one before this Court. The only differences between the two complaints are that Plaintiff alleges a longer class period than in *Patterson*,[3] and the *Patterson* complaint also includes claims for violations of federal securities laws and state-law aiding and abetting, though there are no factual allegations unique to those claims. This facial difference is

---

[3] Plaintiff alleges a class period of May 1, 2019 to June 15, 2022, Compl., ECF No. 1 at 1, and *Patterson* alleges a class period of May 20, 2021 to May 25, 2022, Ex. A ¶ 1. However, the alleged loss in this case is tied only to the de-pegging event in May 2022, which means there is no consequential difference in the proposed class periods. *See* Compl., ECF No. 1 ¶¶ 103-106.

of no moment because the key issues and questions of law in both actions are the same: both complaints allege wrongdoing in connection with the creation of and trading activities related to LUNA, UST, and other projects in the Terra ecosystem, and rely on the same web-based sources and social media posts to purportedly substantiate their allegations.  *See McCain*, 2007 WL 2435170, at \*2-3 (ordering transfer to California pursuant to first-filed rule because the case "effectively involve[d] the same key parties and the same key issues" even though there were 27 distinct defendants in the action before this Court).  Accordingly, the strong presumption in favor of *Patterson* as the first-filed action applies and weighs in favor of transfer.

Additionally, the balance of the conveniences, which considers the same factors that weigh in favor of a transfer pursuant to 28 U.S.C. § 1404(a) and each of which is analyzed below, do not weigh against that presumption.  *See infra* Section II; *Williams v. City of New York*, No. 03 Civ. 5342 (RWS), 2006 WL 399456, at \*4 (S.D.N.Y. Feb. 21, 2006) ("Weighing the balance of conveniences in the context of a first-filed rule analysis requires consideration of the same factors that apply to the decision of whether transfer is appropriate under 28 U.S.C. § 1404(a).").

Nor can Plaintiff show any special circumstances to overcome the first-filed presumption.  As the second filer, Plaintiff "bears the burden of demonstrating any special circumstances justifying an exception to the rule." *800-Flowers*, 860 F. Supp. at 132 (plaintiff did not meet its burden in showing special circumstances existed and first-filed rule applied) (citation omitted). "Special circumstances" are "quite rare" and include situations such as "where the first-filed lawsuit is an improper anticipatory declaratory judgment action" that was "filed in response to a direct threat of litigation that gives specific warnings as deadlines and subsequent legal action" or "where forum shopping alone motivated the choice of the situs for the first suit." *See Iconic IP Holdings, L.L.C. v. Gerrit's Brands, Inc.*, No. 21-CV-1068 (AMD), 2021 WL 7543607, at \*4

(E.D.N.Y. May 21, 2021).  Plaintiff cannot meet this burden.  To be clear, the Moving Defendants are aware of no special circumstance present in this action, especially given that Plaintiff could have filed this case in California or filed a motion to be appointed lead plaintiff in *Patterson* but elected not to do either.

Accordingly, the motion to transfer should be granted pursuant to the first-filed rule.  *See First City Nat'l Bank & Tr. Co.*, 878 F.2d at 80 (holding trial court properly applied first-filed rule to dismiss second-filed action); *McCain*, 2007 WL 2435170, at *2 (ordering transfer to California pursuant to first-filed rule); *see also 800-Flowers, Inc.*, 860 F. Supp. at 136 (dismissing case pursuant to first-filed rule in favor of "virtually identical action": "The pending action in Florida will provide the plaintiff in the instant action every opportunity to protect and vindicate the rights it sought adjudicated in the instant action.").

## II.     Transfer Is Also Warranted Pursuant to 28 U.S.C. § 1404(a)

Under § 1404(a), a district court may transfer a civil action to any other federal district court where it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice."  *McCain*, 2007 WL 2435170, at *3 (quoting 28 U.S.C. § 1404(a)).  "Motions for transfer lie within the broad discretion of the courts and are determined upon notions of convenience and fairness on a case-by-case basis."  *Mohamed v. Tesfaye*, No. 18-CV-8469 (JSR), 2019 WL 1460401, at *4 (S.D.N.Y. Jan. 24, 2019) (Rakoff, J.) (citation omitted).  A motion to transfer venue requires a two-step inquiry: first, "whether the action could have been brought in the transferee district[,]" and second, "whether transfer would be an appropriate exercise of the Court's discretion."  *Mohamed*, 2019 WL 1460401, at *4.

### A.  Plaintiff Could Have Brought This Action In The Northern District of California

There is no question that Plaintiff could have brought this action in the Northern District of California.  The *Patterson* action *was* brought in the Northern District of California against the

very same defendants, with the exception of Pantera Capital, which Plaintiff alleges is headquartered in California. *See* ECF No. 1 ¶ 22. Because this is pleaded as a RICO class action, the Northern District of California has jurisdiction pursuant to 28 U.S.C. § 1331. Additionally, Plaintiff could have asserted the RICO claim alleged here by (a) filing it as a related action in the Northern District of California or (b) filing a timely motion to be appointed lead plaintiff in *Patterson* the week before it commenced this lawsuit.

### B.  Transfer Is An Appropriate Exercise Of This Court's Discretion

"Since there is no question that this action could have been brought in the [Northern] District of California," the Court proceeds to the second step of the inquiry. *See McCain*, 2007 WL 2435170, at *3. In so doing, the Court looks to the "standard list of factors that bear on a § 1404 transfer":

> (1) the convenience of witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of circumstances.

*Id.* (quoting *Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, 11 F. Supp. 2d 729, 730 (S.D.N.Y. 1998)); *Mohamed*, 2019 WL 1460401, at *4. All nine factors—and in particular, the last factor, judicial economy and the interests of justice—either weigh in favor of transfer or, at best for Plaintiff, are neutral.

### 1.  *Judicial Economy And The Interests of Justice*

"[C]ourts consistently recognize that the existence of a related action in the transferee district is a strong factor to be weighed with regard to judicial economy, and may be determinative" because "with respect to trial efficiency and judicial economy, the Supreme Court has held that the consideration of the 'interest of justice' factor encompasses the private and public economy of

avoiding multiple cases on the same issues." *Williams*, 2006 WL 399456, at *3 (citation omitted).

Here, the existence of *Patterson* in the Northern District of California plainly weighs in favor of

transfer so as to preserve judicial economy.

Moreover, avoiding potentially inconsistent determinations on the same questions of law

and fact serves the interests of justice. *See Iconic IP Holdings*, 2021 WL 7543607, at *6 ("The

two cases involve the same claims and the same facts; having two judges deciding the same issue

poses an obvious risk of inconsistent judgments, not to mention a waste of judicial resources.").

At issue in both cases is alleged wrongdoing related to the same cryptocurrencies, ecosystems, and

underlying factual allegations.  If both cases proceed, they will delve into the specifics of the

creation, marketing, trading, and management of the same cryptocurrency tokens and ecosystems,

and require assessment of the viability of RICO claims.  Therefore, allowing both cases to proceed

in separate districts risks potentially inconsistent judgments, which weighs heavily in favor of

transfer.  *See Bayer Schera Pharma AG v. Sandoz, Inc.,* No. 08 Civ. 03710 (PGG), 2009 WL

440381, at *4 (S.D.N.Y. Feb. 18, 2009).

2.  *The Convenience Of The Witnesses And Location Of Relevant Documents*

Where, as here, witnesses and documents are not apparently concentrated in either New

York or California, avoiding duplicative proceedings in two districts that will encompass the same

questions of fact and law also supports transfer.  The Moving Defendants are aware of no material

third-party witnesses located in New York.  Although no witnesses have been formally identified,

witnesses and relevant documents in both cases would be identical and are no more likely to be

located closer to New York than to Northern California.  There are witnesses located outside of

the United States, which will require them to travel great distances to either New York or

California.  To the extent witnesses are located in the United States, there is no suggestion that

they are concentrated in one place or are closer to New York than to California.  Moreover, witnesses and third parties with relevant documents should not be required to participate in the same discovery in two lawsuits.  Accordingly, these factors also favor transfer to the Northern District of California.

   3.   *The Convenience Of The Parties And Their Relative Means*

   The convenience of the parties and their relative means also weigh in favor of transfer in order to consolidate or coordinate this action with *Patterson*.  "Courts have found that the convenience of parties favors transfer where neither party is located in the original forum state." *Mohamed*, 2019 WL 1460401, at *6.  Here, Plaintiff is not located in New York.  He is a Florida resident and is represented by counsel with offices in multiple locations including San Francisco. *See* Compl., ECF No. 1 ¶ 11.  The only defendants alleged to be located in New York, Republic, support transfer, and there are several defendants alleged to be headquartered in California.  *See, e.g.*, Compl., ECF No. 1 ¶ 17 (alleging Tribe Capital is headquartered in California), ¶ 22 (alleging Pantera Capital is headquartered in California), ¶ 12 (alleging Nicholas Platias is "located in" California).  To the extent the parties' means are at issue, it will be significantly more burdensome and costly for all parties to litigate the same factual and legal issues in both New York and California than it would be to litigate them in one forum.  These factors clearly weigh in favor of transfer.

   4.   *The Locus Of Relevant Facts*

   "The locus of operative facts is a primary factor in determining whether to transfer venue" and "substantially favors transfer from this district when a party has not shown that any of the operative facts arose in the Southern District of New York."  *Mohamed*, 2019 WL 1460401, at *5. Plaintiff makes no attempt in the complaint to even suggest any material connection between the

facts alleged and this district.  Other than alleging jurisdiction and venue, Plaintiff does not allege that any wrongdoing took place in this district.  *See generally* Compl., ECF No. 1.  Accordingly, this factor weighs in favor of transfer or is, at best for Plaintiff, neutral.

5.  *The Availability Of Process To Compel Witnesses And Forum's Familiarity With The Underlying Law*

The availability of process to compel witnesses and the forum's familiarity with the underlying law are neutral factors.  Because witnesses are unlikely to be located in one particular place, there is no reason to believe that either district would enjoy a greater ability to subpoena them.  Likewise, both districts are in equally appropriate positions to determine the questions of law present in both actions.  *See Mohamed,* 2019 WL 1460401, at *7 ("Familiarity with the governing law is generally given little weight in federal courts.").

6.  *The Plaintiff's Choice Of Forum*

"[W]here the first-filed rule applies and there are significant overlapping factual issues between the two pending cases, the choice of forum factor favors the district of the first-filed action."  *See Iconic IP Holdings*, 2021 WL 7543607, at *6 (quoting *Intema Ltd. v. NTD Lab'ys, Inc.*, 654 F. Supp. 2d 133, 141 (E.D.N.Y. 2009)).  Moreover, as this case is pleaded as a class action with a nationwide proposed class, Plaintiff, a Florida resident, "has no special connection" to this district, entitling his choice of forum to little or no deference.  *See Totilo*, 538 F. Supp. 2d at 640 ("Where, however, the plaintiff sues on behalf of a putative class, the degree of deference accorded its choice is diminished."); *accord Glass v. S & M NuTec*, 456 F. Supp. 2d at 504 ("This [factor] bears little weight, however, in a putative class action involving plaintiffs who are scattered throughout the country."); *Mohamed*, 2019 WL 1460401, at *7 ("[P]laintiff's choice of forum,

while normally accorded significant weight, is given less deference if the chosen forum is not the plaintiff's home state.") (citation omitted).

***

Transferring this action to the Northern District of California would promote judicial economy, save the time, energy, and money of the litigants and the public, and is an appropriate exercise of this Court's discretion. *See Mohamed*, 2019 WL 1460401, at *4, 8 (granting motion to transfer to Central District of California and noting purpose of § 1404 "is to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense") (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964)).

## **CONCLUSION**

For all the foregoing reasons, the Moving Defendants respectfully request that the Court transfer this action to the Northern District of California.

Dated:  New York, New York
        October 21, 2022

Respectfully submitted,

KOBRE & KIM LLP

/s/ Amanda Tuminelli
Steven W. Perlstein
Jonathan Cogan
Amanda Tuminelli
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Email: steven.perlstein@kobrekim.com
Email: jonathan.cogan@kobrekim.com
Email: amanda.tuminelli@kobrekim.com

*Attorneys for Defendant Jump Trading, LLC*

DENTONS US LLP

/s/ Douglas W. Henkin
Douglas W. Henkin
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6832
Email: douglas.henkin@dentons.com

Stephen J. Senderowitz
233 South Wacker Drive, Ste 5900
Chicago, IL 60606
Telephone: (312) 876-8141
Email: stephen.senderowitz@dentons.com

*Attorneys for Terraform Labs, Pte. Ltd.*

SCHULTE ROTH & ZABEL LLP

/s/ Michael E. Swartz
Michael E. Swartz
Gary Stein
919 Third Avenue
New York, NY 10022
Telephone: (212) 756-2441
Email: gary.stein@srz.com
Email: michael.swartz@srz.com

*Attorneys for Pantera Capital Management LP*

POLSINELLI PC

/s/ Bryan Westhoff
Bryan Westhoff
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Telephone: (312) 873-2973
Email: bwesthoff@polsinelli.com

*Attorneys for Republic*

**APPENDIX**

| *Patterson* Complaint (Ex. A) | *Albright* Complaint, ECF No. 1 |
|---|---|
| ¶ 24. "As discussed at length below, the Anchor Protocol was at the primary driver of the Terra ecosystem's collapse. Thus, the source of the alleged misconduct related to the Anchor Protocol, UST, and LUNA, as well as numerous misleading statements made on behalf of TFL, occurred within California and impacted its residents." | ¶ 28. "As discussed at length below, the Anchor Protocol was a primary driver of the Terra ecosystem's collapse. Thus, the alleged misconduct related to the Anchor Protocol, UST, and LUNA, as well as numerous misleading statements made on behalf of Terraform Labs, impacted residents of this District." |
| ¶ 25. "In addition, as noted in court filings by the SEC concerning TFL's Mirrored Assets (discussed below), TFL's financial products "are offered and available for purchase by U.S. investors through Terraform's web application" as well as on digital asset trading platforms. TFL and Individual Defendants Kwon and Platias promoted the Terra Tokens and related protocols through, among other means, TFL's website, web application, social media accounts, podcast interviews, and through U.S. media." | ¶ 29. "Similarly, as noted in court filings by the SEC concerning the "Mirrored Assets" on Terra (described below), Terraform Labs' financial products "are offered and available for purchase by U.S. investors through Terraform's web application" as well as on digital asset trading platforms. Terraform Labs and Defendants Kwon and Platias promoted Terra coins and related protocols through, among other means, Terraform Labs' website, web applications, social media accounts, podcast interviews, and through U.S. media." |
| ¶ 89. "TFL and the Luna Foundation Guard promoted the Terra Tokens and Anchor Protocol through, among other means, TFL's website, web application, social media accounts, podcast interviews, and through U.S. media. The promotions all had the same talking points: stability and sustainability." | ¶ 59. "Throughout the Class Period, Defendants promoted Terra coins and the Anchor Protocol, knowing they were unstable and unsustainable, through Terraform Labs' website, web application, social media accounts, podcast interviews, and through U.S. media, among other means. The promotions all had the same talking points: stability and sustainability." |
| ¶ 91. "In June 2020, TFL's Head of Research, Defendant Platias, released the Anchor Protocol whitepaper, which discussed the features and rewards of the protocol. The whitepaper described Anchor as: [A] savings protocol that accepts Terra deposits, allows instant withdrawals and pays depositors a low-volatility interest rate. To generate yield, Anchor lends out deposits to borrowers who put down liquid-staked PoS assets from major blockchains as collateral (bAssets). Anchor stabilizes the deposit interest rate by passing on a variable fraction of the bAsset yield to | ¶ 62. "In June 2020, Defendant Platias released the Anchor Protocol whitepaper, which he co-authored, discussing the features and rewards of the protocol. The whitepaper described Anchor as: [A] savings protocol that accepts Terra deposits, allows instant withdrawals and pays depositors a low-volatility interest rate. To generate yield, Anchor lends out deposits to borrowers who put down liquid-staked [proof-of-stake] assets from major blockchains as collateral (bAssets). Anchor stabilizes the deposit interest rate by passing on a variable fraction |

| | |
|---|---|
| the depositor. It guarantees the principal of depositors by liquidating borrowers' collateral via liquidation contracts and third-party arbitrageurs." | of the bAsset yield to the depositor. It guarantees the principal of depositors by liquidating borrowers' collateral via liquidation contracts and third-party arbitrageurs." |
| ¶ 92. "In plain English, Anchor offered depositors a fixed annual return of 20% by redistributing fees from borrowers and rewards from other assets staked in Anchor. The whitepaper repeatedly refers to this 20% interest rates as 'stable.'" | ¶ 63. "In plain English, Anchor offered depositors a fixed annual return of 20% by redistributing fees from borrowers and rewards from other assets staked in Anchor. The whitepaper repeatedly refers to this 20% interest rates as 'stable.'" |
| ¶ 93. "Platias subsequently authored the introductory blog post "Introducing Anchor," which was published by TFL on July 6, 2020. In this post, Platias claimed that the Decentralized Finance ("DeFi") sector had "yet to produce a simple and convenient savings product with broad appeal outside the world of crypto natives." In response to this "pressing need," Platias introduced "Anchor, a savings protocol on the Terra blockchain," which offered investors "a principle protected stablecoin savings product that accepts Terra deposits and pays a stable interest rate." Again, Platias promoted Anchor as 'becom[ing] the gold standard for passive income on the blockchain.'" | ¶ 64. "Platias subsequently authored the introductory blog post "Introducing Anchor," which was published by Terraform Labs on July 6, 2020. Throughout the post, Platias described Anchor's interest rate as "stable" and offering a "low-volatility yield" with a "reliable rate of return." He claimed that the DeFi sector had "yet to produce a simple and convenient savings product with broad appeal outside the world of crypto natives." In response to this "pressing need," Platias said Anchor offered users "a principal-protected stablecoin savings product that accepts Terra deposits and pays a stable interest rate." Platias claimed Anchor could 'become the gold standard for passive income on the blockchain.'" |
| ¶¶ 95 – 98, 100, 104, 107, 108-110, 112 (quoting identical tweets from the official Twitter accounts for the Anchor Protocol, Kanav Kariya, Do Kwon, and Jump) | ¶¶ 66, 68-70, 80, 81, 82, 84, 85-87, 88 (quoting identical tweets from the official Twitter accounts for the Anchor Protocol, Kanav Kariya, Do Kwon and Jump *in largely verbatim language*) |
| ¶ 113. "On or about March 10, 2022, two of TFL's early investors, Polychain Capital and Arca, proposed a cut to the yield rate in the Anchor Protocol. Luna Foundation Guard Governing Council members Kanav Kariya of Jump and José Marie Macedo of Delphi Digital, rejected the proposal. Similarly, the Anchor Protocol's official Twitter account publicly endorsed another post voicing objections to the proposal." | ¶ 89. "On or about March 10, 2022, two of Terraform Labs' early investors, Polychain Capital and Arca, proposed a cut to the yield rate in the Anchor Protocol. Luna Foundation Guard Governing Council members Kanav Kariya of Jump and José Maria Macedo of Delphi Digital opposed the proposal. Similarly, the Anchor Protocol's official Twitter account publicly endorsed another post objecting to the proposal. The proposal ultimately failed." |

| | |
|---|---|
| ¶ 114. "Around the same time as Kariya was promoting the demand for UST and voting against reducing the Anchor Protocol's yield rate, a popular crypto trading personality on Twitter, @AlgodTrading ("Algod") publicly criticized LUNA as being a "[p]onzi" and disclosed his plan to short LUNA "with size." Importantly, Algod pointed out the vulnerabilities regarding the sustainability of UST and LUNA, noting that "more ust = = more pressure on Luna." | ¶ 90. "Around the same time that Kariya was promoting the demand for UST and voting against reducing the Anchor Protocol's yield rate, a popular crypto trading personality on Twitter, @AlgodTrading ("Algod"), publicly criticized Luna as being a "[p]onzi" and disclosed his plan to short Luna "with size." Importantly, Algod pointed out the vulnerabilities regarding the sustainability of UST and Luna, noting that more UST creates "more pressure on Luna" |
| ¶ 116. "Kwon did not disclose that Algod was, in fact, correct that Kwon and the other Defendants could not "keep fuel[ing] anchor." Kwon instead sought to undermine the prophetic criticism with mockery and bravado, even going so far as to place a $1 million bet with Algod on whether or not LUNA's price would be higher in a year." | ¶ 91. "[Kwon] did not disclose that Algod was, in fact, correct that Kwon and the other Defendants could not "keep fuel[ing] anchor." Kwon instead sought to undermine Algod's prophetic criticism with mockery and bravado, even going so far as to place a $1 million bet with Algod on whether or not Luna's price would be higher in a year." |
| ¶ 117. "Luna Foundation Guard member, Three Arrows via its co-founders Davies and Zhu, also made misleading statements regarding UST and the Anchor Protocol around the same time. For example, on March 17, 2022, Davies promoted UST, along with an implicit promotion of Anchor high interest yield, stating that UST is "backed by [Bitcoin], hardest money known to humanity, and has a nice fat yield." Then on March 22, 2022, Davies stated that "UST is the only substantially decentralized stable coin of significant size." Davies, however, failed to also advise investors that UST's growth and Anchor's yield were unsustainable and would likely cause a breakdown of the Terra ecosystem." | ¶ 92. "Luna Foundation Guard member Three Arrows, via its co-founder Kyle Davies, also made misleading statements regarding UST and the Anchor Protocol around the same time. For example, on March 17, 2022, Davies promoted UST, along with an implicit promotion of Anchor's high-interest yield, stating that UST is "backed by [Bitcoin], hardest money known to humanity, and has a nice fat yield." Then on March 22, 2022, Davies stated that "UST is the only substantially decentralized stable coin of significant size." Davies, however, failed to also advise that UST's growth and Anchor's yield were unsustainable and would likely cause a breakdown of the Terra ecosystem." |
| ¶ 120. "On April 7, 2022, the Luna Foundation Guard announced that it acquired $100 million in AVAX tokens to "help bolster its UST Decentralized Forex Reserve."⁵⁵ According to Defendant Platias, the purpose of the UST Reserve is "'to provide a backstop against UST peg deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model . . . . By diversifying the base of non-correlated assets | ¶ 95. "April 7, 2022, when the Luna Foundation Guard announced that it had acquired $100 million in AVAX tokens (another cryptocurrency) to "help bolster its UST Decentralized Forex Reserve." According to Defendant Platias, the purpose of the UST Reserve is "to provide a backstop against UST peg deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model . . . . By |

| | |
|---|---|
| to major assets like BTC and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives.'" | diversifying the base of non-correlated assets to major assets like [Bitcoin] and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives." |
| ¶ 122. "On May 3, 2022, Zhu of Three Arrows even encouraged his Twitter following to take out loans using their Bitcoin as collateral, and he advised investors to then use the proceeds to buy UST and stake it in Anchor for the 20% yield. Seven days later, immediately following the UST collapse, this post was deleted." | ¶98. "On May 3, 2022, Zhu went so far as to encourage his Twitter followers to take out loans using Bitcoin as collateral, and then use the proceeds to buy UST and stake it in Anchor for the 20% yield. … Seven days later, immediately following the UST collapse, Zhu deleted his post." |
| ¶ 130. "In a "post-mortem analysis" of the Terra ecosystem collapse, Luna Foundation Guard Governing Council member, Remi Tetot, admitted what TFL had denied all along – that the Anchor Protocol's 20% yield was not sustainable or stable …<br>In particular, Tetot candidly confessed:<br>They called Luna a Ponzi because of the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make the yield sustainable around 10–12%. Unfortunately, It didn't have time to make it …. *20% yield was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't sustainable*, but I think it was acceptable for the time being, yield should have been dynamic as the system grow." | ¶ 109. "In a "post-mortem analysis" of the Terra ecosystem collapse, Luna Foundation Guard Governing Council member Remi Tetot admitted what Terraform Labs had denied all along: that the Anchor Protocol's 20% yield was neither sustainable nor stable."<br>¶ 110. "In particular, Tetot candidly confessed: They called Luna a Ponzi because of the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make the yield sustainable around 10–12%. Unfortunately, [i]t didn't have time to make it . . . *20% yield was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't sustainable*, but I think it was acceptable for the time being, yield should have been dynamic as the system gr[e]w." |
| ¶ 250. "The RICO Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the fraudulent promotion scheme involved thousands of communications throughout the Class Period including, *inter alia*:<br><br>a. Communications on official TFL, Luna Foundation Guard, and Anchor Protocol | ¶ 132a. "violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, by transmitting and publishing false and misleading information regarding Terra stablecoins and Anchor, intentionally and artificially inflating the Terra stablecoin prices, and failing to disclose such practices. Defendants conducted these activities through the use of the U.S. Mail or interstate wire facilities, including through the transmission of:<br><br>(1) communications on official Terraform Labs, Luna Foundation Guard, and Anchor |

| | |
|---|---|
| accounts on various social media platforms, including, but not limited to: Twitter, Reddit, Telegram, and Discord to investors, which occurred on a regular basis as investors like Plaintiff and Class members purchased Terra Tokens; | Protocol accounts on various social media platforms, including, but not limited to: Twitter, Reddit, Telegram, and Discord to customers,; |
| b. Written representations and telephone calls between Defendants regarding the promotion of Terra Tokens and the financial benefits to the RICO Defendants for doing so…" | (2) written representations and telephone calls between Defendants regarding the promotion of Terra stablecoins, the financial benefits to the Defendants for doing so" |
| ¶ 252. "The RICO Defendants' motive and purpose in creating and conducting the scheme and the Enterprise(s) was to increase the price and trading volume for the Terra Tokens so that they could sell off their portion of the Float for grossly inflated prices. Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the RICO Defendants would be able to sell off in the increased liquidity." | ¶ 135. "Defendants' motive and purpose in creating and conducting the scheme was to temporarily increase the price and trading volume for the Terra stablecoins so that they could sell off their portion of the Float for grossly inflated prices. Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the Defendants would be able to sell off in the increased liquidity." |