# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MATTHEW ALBRIGHT, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

TERRAFORM LABS, PTE. LTD., JUMP TRADING, LLC, DELPHI DIGITAL CONSULTING INC., DO KWON, NICHOLAS PLATIAS, LUNA FOUNDATION GUARD LTD., JOSE MACEDO, KANAV KARIYA, and REMI TETOT,

Defendants.

Civ No. 1:22-cv-07281-JSR-BCM

<u>CLASS ACTION</u>

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL RACKETEERING LAWS

# TABLE OF CONTENTS

Page

I.    NATURE OF THE CASE ................................................................. 1

II.   PARTIES ......................................................................................... 8

    A.    PLAINTIFF ............................................................................. 8

    B.    DEFENDANTS ........................................................................ 9

III.  JURISDICTION AND VENUE .................................................... 12

IV.   THE RICO ENTERPRISE SCHEME ......................................... 14

    A.    THERE HAS LONG BEEN DEMAND IN THE CRYPTO COMMUNITY
        FOR A STABLECOIN ............................................................... 14

    B.    DEFENDANT KWON PREVIOUSLY DEVELOPED A STABLECOIN WHICH
        FAILED .................................................................................. 16

    C.    DEFENDANT KWON AND OTHERS PUBLISH THE TERRA WHITE PAPER IN
        2019, PURPORTING TO HAVE CREATED THE FIRST SUCCESSFUL
        ALGORITHMIC STABLECOIN .................................................. 17

    D.    THE LUNA AND UST COINS ARE LAUNCHED ....................... 20

    E.    THE UST STABLECOIN LAUNCH WAS TIMED TO OCCUR IN A
        CRYPTO BULL MARKET .......................................................... 21

    F.    THE TERRA STABLECOIN MECHANISM LACKED ADEQUATE
        SAFEGUARDS ......................................................................... 24

        1.    Bonds ......................................................................... 25

        2.    Reserves ..................................................................... 27

        3.    Lack of Governance ................................................... 29

    G.    THE ANCHOR PROTOCOL, CREATED TO DRIVE FURTHER DEMAND
        TO THE TERRA ECOSYSTEM, EXACERBATED ITS PROBLEMS ................... 30

    H.    DEFENDANT KWON CLAIMS A FALSE ALLIANCE WITH CHAI TO DRIVE
        DEMAND TO THE TERRA ECOSYSTEM ..................................... 35

    I.    THE LUNA FOUNDATION GUARD IS FOUNDED TO GIVE THE ILLUSION
        THAT THE ANCHOR PROTOCOL AND THE TERRA ECOSYSTEM WERE
        STABLE .................................................................................. 37

V.      THE TERRA ECOSYSTEM COLLAPSES IN MAY 2022 ............................................ 46

VI.     DEFENDANTS PROFITED FROM THE RICO SCHEME ............................................ 50

        A.      DEFENDANTS EXCHANGED BILLIONS OF UST FOR OTHER STABLECOINS
                PRIOR TO THE COLLAPSE OF THE TERRA ECOSYSTEM ............................................ 50

        B.      DEFENDANTS ABSCONDED WITH THE LUNA FOUNDATION GUARD'S
                BITCOIN ............................................................................................ 54

VII.    THE AFTERMATH OF DEFENDANTS' RICO SCHEME ............................................ 56

VIII.   THE LUNA AND UST COINS ARE NOT SECURITIES ............................................ 57

IX.     DEFENDANTS' SPECIFIC PARTICIPATION IN THE RICO ENTERPRISE ............ 58

        A.      DO KWON ............................................................................................ 58

        B.      NICHOLAS PLATIAS ............................................................................ 59

        C.      TERRAFORM LABS ............................................................................ 60

        D.      JUMP /KARIYA ............................................................................ 62

        E.      LUNA FOUNDATION GUARD ............................................................ 64

        F.      TETOT ............................................................................................ 65

        G.      Delphi / Macedo ............................................................................ 66

X.      CLASS ALLEGATIONS ............................................................................ 68

XI.     COUNTS ............................................................................................ 70

FIRST CAUSE OF ACTION
VIOLATIONS OF RICO, 18 U.S.C. §§1962(C) (AGAINST ALL DEFENDANTS) ................................. 70

        A.      THE RICO ENTERPRISE ........................................................................ 71

        B.      PATTERN OF RACKETEERING ACTIVITY ................................................ 72

                1.      Multiple Instances of Mail and Wire Fraud in Violation
                        of 18 U.S.C. §§ 1341, 1343 ............................................................ 72

                2.      Multiple Instances of Money Laundering in Violation
                        of 18 U.S.C. §§ 1341, 1343 ............................................................ 75

                3.      Multiple Instances of Obstruction of Justice in Violation
                        of 18 U.S.C. § 1503 ............................................................ 76

C.      INJURY AND CAUSATION ........................................................................ 76

SECOND CAUSE OF ACTION
CONSPIRACY TO VIOLATE RICO, 18 U.S.C. §1962(D) (AGAINST ALL DEFENDANTS) ................... 76

PRAYER FOR RELIEF ............................................................................................ 78

JURY DEMAND ..................................................................................................... 79

Plaintiff Matthew Albright brings this class action against Do Kwon ("Kwon"); Nicholas Platias ("Platias"); Terraform Labs Pte. Ltd. ("Terraform Labs" or the "Company"); Luna Foundation Guard Ltd. ("Luna Foundation Guard"); Jump Trading LLC ("Jump"); Kanav Kariya ("Kariya"); Delphi Digital Consulting, Inc. ("Delphi"); Jose Macedo ("Macedo"); and Remi Tetot ("Tetot") (collectively, "Defendants"), on behalf of a proposed Class consisting of all persons and entities, other than Defendants and their affiliates, who either purchased Terraform Labs' stablecoin, TerraUSD ("UST"), or its native token, the Luna coin ("Luna") (or both), between May 1, 2019 and June 15, 2022, inclusive (the "Class Period"), and who were damaged thereby. Plaintiff asserts claims against Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq.

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and public statements issued by Defendants, analyst and media reports, discussions with experts and investigators, review of blockchain data, and other commentary, analysis and publicly disclosed reports and information about Defendants. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## I.    NATURE OF THE CASE

1.      Plaintiff brings this action on behalf of a proposed Class to seek redress for the Defendants' scheme to defraud the Class out of billions of dollars. Plaintiff and the Class trusted and relied upon the public statements made by the Defendants regarding the Terraform Labs'

ecosystem ("Terra Ecosystem"), including public statements and publications on Terraform Labs'

stablecoin UST and its "sister coin", Luna.

2.     Defendant Kwon was the creator and architect of the fraudulent scheme.   He

operated his scheme through his company, Terraform Labs, and through support from the other

Defendants named herein.

3.     There were three primary components to the Terraform Labs fraud: an algorithmic

"stablecoin" (UST) that purported to maintain a steady value so that it could be used as a medium

of transaction, a "bank" (the "Anchor Protocol"), which purported to guarantee depositors a return

of 19.5%, paid for by interest from borrowers, and the overarching Luna coin market, which was

directly fed by and indirectly promoted by UST and Anchor Protocol.   But these components were

fraudulent to the core, as their very design had hidden flaws that rendered it impossible for

Defendants to keep promises to the coin purchasers.   When cracks in the scheme began to develop,

Defendant Kwon and other Defendants doubled-down, establishing a reserve fund (run by the

"Luna Foundation Guard") designed to shore up consumer confidence to propagate the fraud

longer so they could pull out their own funds and profit from the scheme.   But the reserve fund

was likewise a fraud, and there is evidence that its coffers were transferred to private wallets at the

very moment when it should have been stepping in to preserve the value of UST and Luna.   Every

facet of the Terra Ecosystem was designed to do nothing other than fool crypto enthusiasts into

parting with their money to benefit Defendant Kwon and the other Defendants.

4.     At the center of the scheme and RICO enterprise is a certain type of cryptocurrency

known as a "stablecoin."   There has long been demand within the crypto community for a medium

of exchange which could act as an equivalent to a traditional fiat currency.   For that to happen, the

stablecoin would have to maintain a relatively constant value so that it could be used to transact

2

business for ordinary goods and services.   Stable cryptocurrencies are thus an important component of the crypto universe, and many view them as essential to further adoption of cryptocurrencies.

5.       Maintaining a constant value in any currency is a highly complex process, and requires input from experienced and skilled monetary experts.   Defendant Kwon, however, asserted that an algorithm run entirely by computer programs could achieve the stability in a stablecoin without having to resort to other significant monetary policy tools.   In fact, this has proven impossible, but based on his and the other Defendants' repeated assertions that their particular algorithmic stablecoin was safe, and had withstood stress tests, ordinary consumers and crypto enthusiasts believed him and forked over billions of dollars in their life savings.

6.       The Terra Ecosystem was launched in or around April 2019, through a white paper titled, "Terra Money: Stability and Adoption," (the "Terra White Paper") and authored by Defendants Kwon and two others.   The Terra White Paper claimed that Terraform Labs had finally created the long-awaited algorithmic stablecoin, a product that had not previously been demonstrated to succeed.   As explained in more detail below, they stated that their stablecoin – UST – would always be worth $1.00.   They claimed this value could be maintained through "minting" (expanding) and "burning" (contracting) the supply of UST based on demand, and constructing an exchange and arbitrage system operating in conjunction with its sister coin, Luna, a cryptocurrency that was not backed by any underlying assets and whose value would fluctuate with demand; that is, it was not expected to remain stable.   The burning and minting processes would be governed automatically, that is, through the algorithm.

7.       But the UST coin, and the Terra Ecosystem more broadly (including Luna), were destined to fail from the start, which Defendants knew based on their expertise and prior

3

experience.  Far from ensuring that the UST coin would always maintain a value of $1.00, the algorithm governing the minting and burning of UST and Luna coins was subject to serious design flaws which exposed purchasers to serious risks that UST would not be able to maintain its $1.00 value in a down-market environment.  Put simply, the supply of the Luna coin was, in effect, significantly governed by demand for UST, and the value of UST was primarily dependent, in effect, on there always being some value in Luna.  Thus, the entire Terra Ecosystem depended on sufficient demand and liquidity for Luna, which could not be guaranteed.  To assuage skeptics, the Terra White Paper claimed to have run "stress tests" showing that the UST-Luna algorithm could withstand fierce market downturns.  But this was false.

8.     Defendant Kwon and the other Defendants exacerbated this design flaw when they introduced the "Anchor Protocol", an application launched on the Terra Blockchain to generate more demand for UST and Luna coins.  The Anchor Protocol was meant to operate like a bank and purported to guarantee an astounding 19.5% return on certain cryptocurrencies deposited. Funding for these high yields was purportedly to be derived from interest that borrowers of UST derivative products owed.  But in fact, it was merely a tool created to drive further demand for UST and the Luna coins.  Demand for Luna alone was sustaining the entire Terra Ecosystem.

9.     Defendant Kwon and the other Defendants knew that the Terra Ecosystem would fail from the start.  In particular, Defendant Kwon and other employees from Terraform Labs had recent experience with a failed algorithmic stable coin, Basis and Basis cash.  Their experience informed them that the simplistic design of the algorithm underlying the new Terra Ecosystem would never be able to address complicating factors such as market participant manipulation or severe market downturns, black swan events (that is, an unexpected event that causes severe and widespread ramifications), and death spirals (that is, severe downward price pressure caused by a

sudden drop in demand, which fuels further loss of demand and price declines).  Navigating such events, which were foreseeable to Defendants, would require a much more nuanced approach to monetary policy governance and decision-making, particularly concerning the supply of the coins at issue, than was possible through Defendant Kwon's automated algorithm.

10.     The ordinary people who lost billions of their savings in the failed Terra Ecosystem, in contrast, could not understand that the algorithm regulating the value of UST would never be able to address the complexities that would inevitably arise in the market.  Nor would they know that the guaranteed returns of the Anchor Protocol were nothing more than a Ponzi scheme.

11.     Meanwhile, Defendants, did what they could to hide and gloss over the design flaws in the UST stablecoin and in the Anchor Protocol, thereby perpetuating confidence (and, essentially, demand) in the scheme which allowed them to watch as the value of the Luna coin soared to great heights, and the supply of UST increased.   When certain commentators or consumers questioned the sustainability of UST, and the Terra Ecosystem, Defendant Kwon and other Defendants mocked them, insinuating that they simply were not smart enough to understand his genius behind the stablecoin.

12.     Cracks began to surface in the scheme in early 2022.  Fearing that their fraud would be exposed before they had a chance to extract their ill-gained profits, Defendants responded by forming the "Luna Foundation Guard," or LFG, which was meant to provide a backstop of "hard" assets (in this case bitcoin) to safeguard against market forces which might "depeg" UST from the $1.00 valuation.   Terraform Labs itself contributed over $800 million to the Luna Foundation Guard, and the remainder was comprised of smaller investments from well-known and respected funds such as Republic Capital, Republic Maximal LLC (together, "Republic"), Tribe Capital, and

GSR/GSR Markets Limited ("GSR").  Their participation was sought by Defendants to lend a veneer of legitimacy to the Luna Foundation Guard.

13.     Ultimately, the Terra Ecosystem collapsed on itself, as was its destiny, once it faced serious market headwinds.  In May 2022, there was a significant softening in demand for cryptocurrencies.  The value of UST declined, and its holders sought en masse to redeem their "stablecoins" for $1 of Luna tokens, as was their right under the algorithm that Defendant Kwon created, explained in further detail below.  Per its design, the algorithm mechanically printed vast quantities of Luna coins to keep up with this demand, which then swelled the supply of Luna coins, ultimately bringing down the value Luna.  With the value of Luna crashing under the flood of supply, the UST coin could no longer maintain its $1.00 value, and both coins crashed to zero, as stunned purchasers saw the value of their crypto wallets plummet.

14.     The UST crash sent shockwaves throughout the cryptocurrency universe.  In the ensuing days, the prices of bitcoin and other cryptocurrencies descended to levels not seen for years, and the crypto economy as a whole saw losses of approximately $300 billion in value. Policymakers and politicians, including U.S. Treasury Secretary Janet Yellen, called for immediate regulation of stablecoins, and analysts and market participants widely compared the UST crash to the crash of Lehman Brothers in 2008.  Plaintiff and the Class felt the brunt of the UST collapse, as their coins became essentially worthless.

15.     Throughout the Class Period, Defendants falsely promoted UST, Luna, and other related Terra coins via social media and other web-based and mail channels.  In particular, Defendants touted the stability of the coins and guaranteed 19.5% annual returns on coins deposited in Terraform Labs' high-yield savings application on the Terra blockchain: the Anchor Protocol.  Meanwhile, certain Defendants engaged in a pattern of money laundering activity,

siphoning billions of dollars from Terraform Labs to a series of private cryptocurrency wallets. Similarly, the multi-billion dollar reserve fund (the Luna Foundation Guard) established to lend credibility and support to the Terra Ecosystem was depleted in the midst of the collapse, as over 80,000 bitcoins were sent to two unknown wallet addresses on the Gemini and Binance platforms.

16.     Prior to the collapse, the collective value of the Terra Ecosystem – which included UST, Luna, and the Anchor Protocol (and more than a dozen other tokens, coins, derivative products, and applications which, at this point, are not at issue) – was approximately $60 billion. At the peak of Terraform Labs' success, the market capitalization value of UST alone reached $17.5 billion, making it the fourth largest stablecoin and tenth largest cryptocurrency.

17.     In truth, the Terra Ecosystem itself amounted to a fraudulent RICO scheme that was primarily sustained by the demand for Luna significantly promoted by false promises of the Anchor Protocol's excessive yields and stability of UST, among other lies Defendants disseminated.

18.     Despite their many statements in support of UST, the Anchor Protocol, and the entire Terra Ecosystem, Defendants knew that the Terra Ecosystem would fail.  In a stunning blog post describing the collapse, Defendant Tetot, a Governing Council member of the Luna Foundation Guard admitted that: "***we knew it wasn't sustainable***."[1]

19.     Throughout the Class Period, Defendants promoted UST, Luna, and the Anchor Protocol, knowing they were unstable and unsustainable, through Terraform Labs' website, web application, social media accounts, podcast interviews, news articles and through other news media in the United States, among other means.  The promotions were made with intent to mislead the public into believing that the UST and Luna coins and the Anchor Protocol were stable and

---

[1] All emphases are added unless noted otherwise.

sustainable.  Defendants' statements were made with knowledge that the designs in the Terra Ecosystem made their statements false.  As described below, the algorithm underlying the UST-Luna coins had inherent flaws that ensured eventual demise of the system once there was a significant market downturn, which did occur.  Further, Defendants knew that the Anchor Protocol could not pay a sustainable 19.5% return on deposits.

20.     Defendants' conduct alleged herein constitutes a RICO violation pursuant to 18 U.S.C. §§ 1961 *et seq*.  At the center of the scheme sat Defendant Kwon, who had a concealed history in failed algorithmic stablecoins, who founded Terraform Labs, and who was the chief designer and promoter of the Terra Ecosystem.  The remaining Defendants engaged in a pattern of racketeering activity to support and profit off their scheme, namely by profiting from the RICO scheme, by making fraudulent statements through interstate wire transmissions regarding Terra's sustainability, and by laundering money out of Terraform Labs and the Luna Foundation Guard and into personal accounts.  Plaintiff and the Class were harmed when Defendants' scheme collapsed and the value of UST and Luna coins plummeted.

21.     Defendants Kwon, Platias, Mercado, Kariya, Teto, Terraform Labs, the Luna Foundation Guard Jump and Delphi are "persons" as that term is defined in 18 U.S.C. § 1961(3).  Collectively, they formed an association-in-fact, giving rise to an "Enterprise" as that term is defined in 18 U.S.C. § 1961(4).

## II.   PARTIES

### A.   PLAINTIFF

22.     Plaintiff Matthew Albright resides in Puerto Rico.  Plaintiff Albright purchased Luna coins and UST coins, during the Class Period, and suffered losses as a result of Defendants' conduct.

## B.   DEFENDANTS

23.    Defendant Terraform Labs Pte. Ltd. is incorporated in Singapore and headquartered in Seoul, South Korea.  As noted by the Securities and Exchange Commission (the "SEC") in its own investigation into Terraform Labs' digital assets, Terraform Labs "regularly transacts business in the United States, included by contracting with U.S.-based companies, such as a prominent digital asset-trading platform incorporated in Delaware. Several employees of Terraform Labs appear to reside in the United States, including Terraform's General Counsel (located in Pennsylvania), its Business Development lead (located in Texas), its Head of Research [Defendant Platias] (located in California), and its Director of Special Products (located in New York)."  Defendant Terraform Labs is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the "enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

24.    Defendant Do Kwon has been the co-founder and Chief Executive Officer Terraform Labs since 2018. Kwon is a resident of Singapore, and a 2015 graduate of Stanford University, where he earned a BS in Computer Science.  The protocols underlying the UST stablecoin, including the Anchor Protocol, were Defendant Kwon's brainchild, based on his previous experience developing a stablecoin that failed, called Basis.  Defendant Kwon co-authored the Terra White Paper and the Anchor White Paper.  Indeed, when Defendant Kwon announced the birth of his daughter in April 2022, he tweeted that he named her "Luna" after the Luna coin:  "My dearest creation named after my greatest invention."  Since the inception of Terraform Labs, Defendant Kwon has exercised control over Terraform Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitations of UST and Luna to the public. Defendant Kwon travelled to the United States to conduct business on behalf of Terraform Labs, including to a digital asset and blockchain conference held in New York City in September 2021.

Defendant Kwon is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the "enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

25.     Defendant Nicholas Platias is the Head of Research and a "founding member" of Terraform Labs, a member of the Governing Council of the Luna Foundation Guard, and one of the creators of the Anchor Protocol.  Defendant Platias co-authored the Terra White Paper, and served  as a consultant and spokesman for Terraform Labs, the Luna Foundation Guard, and the Anchor Protocol.  Defendant Platias has exercised control over Terraform Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Terra coins to the public. Defendant Platias is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the "enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

26.     Defendant Jump Trading LLC d/b/a Jump Crypto ("Jump") is a limited liability company incorporated in Delaware, with its headquarters located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.  In 2021, when the Terra Ecosystem faltered, Jump infused cash into Terraform Labs to prop up the illusion.  In early 2022 when further cracks developed, Jump helped organize and contributed to the Luna Foundation Guard, which was a phony reserve meant to instill public confidence in the Terra Ecosystem.  Jump also contributed to Wormhole, a bridge between blockchains that can be used to transfer digital assets from one blockchain to another.  Jump used its relationship with Wormhole to secure a favorable exit from its UST and Luna prior to the collapse of the Terra Ecosystem.  Jump is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the

"enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

27.     Defendant Kanav Kariya ("Kariya") is the President of Jump Crypto and a member of the Governing Council of the Luna Foundation Guard.  Throughout the Class Period, Defendant Kariya made false statements in support of and promoted the scheme described herein.  Defendant Kariya is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the "enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

28.     Defendant Luna Foundation Guard Ltd. is a non-profit organization located in Singapore.  After the UST stablecoin began to falter, the Luna Foundation Guard was founded to create the illusion that the UST stablecoin was stable.  The Luna Foundation Guard made false statements in support of the scheme described herein.  During the period when the Terra Ecosystem was crashing, the Luna Foundation Guard siphoned billions of dollars worth of bitcoin into an unknown wallet address.  Defendant Luna Foundation Guard is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the "enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

29.     Defendant Remi Tetot ("Tetot") is member of the Governing Council of the Luna Foundation Guard. Throughout the Class Period, Defendant Tetot made false statements in support of and promoted the scheme described herein.  Defendant Tetot is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the "enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

30.     Defendant Delphi Digital Consulting, Inc. ("Delphi") is a Delaware corporation with its headquarters located at 80 Broad Street, New York, New York 10004.  Delphi invested in the Luna Foundation Guard and made false statements in support of and promoted the scheme described herein.  Defendant Delphi is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the "enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

31.     Defendant Jose Maria Macedo ("Macedo") is a Founding Partner at Delphi Ventures, Head of Delphi Labs, and a member of the Governing Council of the Luna Foundation Guard.  Throughout the Class Period, Macedo made false statements in support of and promoted the scheme described herein.  Defendant Macedo is a "person", as that term is defined in 18 U.S.C. § 1961 (3), who engaged in racketeering activities, and is likewise a member of the "enterprise", as that term is defined in 18 U.S.C. § 1961 (4), through which the racketeering activities were conducted.

## III.   JURISDICTION AND VENUE

32.     This action arises under 18 U.S.C. §§ 1961 *et seq*.  This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 because the claims arise under the RICO Act.  Similarly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the federal law.

33.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.  *See United States Securities and Exchange*

*Commission v. Terraform Labs Pte Ltd.*, Case No. 0:2022cv00368 (2d Cir. June 8, 2022) (ECF No. 109).

34.     Terraform Labs actively conducts business within this District. For instance, Defendant Kwon travels to this District for business, including to attend events such as the Messari Mainnet cryptocurrency conference, which he attended most recently in September 2021. Defendant Kwon has also appeared on multiple podcasts which are produced and broadcast within the United States.  The Company's Director of Special Products also operates out of this District. Separately, the April 2019 Terra White Paper, the June 2020 Anchor White Paper, and Defendant Platias's July 2020 "Introducing Anchor" blog post that described its basics and key features were all made available to traders in this District.  As discussed at length below, the Anchor Protocol was a primary driver of the Terra Ecosystem's collapse.  Thus, the alleged misconduct related to the Anchor Protocol, UST, and Luna, as well as numerous misleading statements made on behalf of Terraform Labs, impacted residents of this District.

35.     Similarly, according to court filings by the SEC, Terraform Labs' financial products "are offered and available for purchase by U.S. investors through Terraform's web application" as well as on digital asset trading platforms. Terraform Labs and Defendants Kwon and Platias promoted Terra coins and related protocols through, among other means, Terraform Labs' website, web applications, social media accounts, podcast interviews, and through U.S. media.

36.     A portion of Terraform Labs' funding also comes from entities within this District, including Defendant Delphi.

37.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because certain Defendants live and/or conduct business in this District, and

therefore a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## IV.    THE RICO ENTERPRISE SCHEME

### A.    THERE HAS LONG BEEN DEMAND IN THE CRYPTO COMMUNITY FOR A STABLECOIN

38.    Cryptocurrencies have seen rapid and increasingly-wide adoption in recent years. Despite this enthusiasm, and belief in the utility of cryptocurrencies, the value of most cryptocurrencies fluctuates wildly based on supply and demand, and they therefore have had limited use as mediums used to purchase ordinary goods and services.

39.    For example, bitcoin – the most popular and widely known cryptocurrency – has significant disadvantages preventing it from being integrated or adopted as a primary currency. Bitcoin's value derives largely from supply and demand, which have not been stabilized, and therefore it is subject to price volatility.  Thus, it cannot be used as a medium of exchange because its value as measured in stable fiat currency is always changing.  As an example, if a person in the United States sold a car for one bitcoin today, she might be receiving an asset worth $20,000 in exchange, whereas tomorrow, that asset might be worth only $16,000.  Merchants and consumers that accumulate high amounts of bitcoin thus risk rapid and significant decline in the value of their holdings.  Furthermore, since they are decentralized and unregulated, bitcoin transactions are irreversible making it difficult – if not impossible – to trace in the event an issue or dispute arises. Thus, sending bitcoin to the wrong person or wallet address is final and cannot be refunded.

40.    The "stablecoin" was seen as one potential solution to cryptocurrency price volatility.  In theory, a stablecoin is a cryptocurrency whose value remains stable as measured against an external asset class.  It is thus "pegged" to that asset class, typically fiat currency.  This would, in theory, minimize price volatility and allow it to be used as a medium of exchange.  A

broader purpose would be to lessen the speculative nature of most cryptocurrencies and help create a more consistent and reliable market environment in order to foster increase adoption of digital assets.

41.     The first stablecoin, BitUSD, was released on July 21, 2014 and was collateralized through other cryptocurrency assets and backed by the BitShares core token "BTS."  In late 2018, BitUSD lost its parity to the U.S. dollar and, as a result, has come under heavy criticism.  BitUSD currently trades at approximately $0.82.

42.     The second stablecoin, NuBits, was released in September 2014 and was collateralized by bitcoin.  However, as bitcoin declined in value so did NuBits thereby suffering two major crashes in 2016 and 2018.  NuBits currently trade for about $0.01.

43.     The third stablecoin, Tether, was released in 2015 and was collateralized off the blockchain by traditional assets.  According to a May 23, 2022 report, Tether has over $70 billion dollars of collateral which can be redeemed.  Its value is pegged to the US dollar, and it has traded at values ranging from $0.88 to approximately $1.05.  Tether has since leveled out and currently sits at $1.00.

44.     Prior to the introduction of stablecoins, cryptocurrency traders were unable to withdraw or convert their digital assets into fiat currency without significant delay which – given the price volatility of the cryptocurrency market – could substantially affect the value of their digital assets.  Stablecoins were designed to remove this limitation and corresponding risk, allowing traders to quickly convert their digital assets into a digital stablecoin with a fixed price pegged to fiat currency.  However, as history illustrates, stablecoins that are backed by other cryptocurrency, such as BitUSD and NuBits, which are themselves subject to demand fluctuations, fail to evade the price volatility of the cryptocurrency market and inevitably crash.

### B.   DEFENDANT KWON PREVIOUSLY DEVELOPED A STABLECOIN WHICH FAILED

45.    In 2020, an algorithmic stablecoin called "Basis Cash" was launched into the crypto community by two anonymous developers, who called themselves "Rick" and "Morty."  In an article dated May 11, 2022, Coindesk.com revealed that Defendant Kwon was actually the "Rick" behind Basis Cash.

46.    Basis Cash was modeled after an earlier project called Basis, which was an early iteration of an algorithmic stablecoin.  Its creators claimed the shut down was due to regulatory concerns, but many industry experts believe that the project was canceled because its creators were unable to demonstrate that their algorithmic stablecoin was able to maintain its stable peg.

47.    In the summer of 2020, two anonymous actors calling themselves "Rick and Morty" stepped in to revive Basis.  According to unnamed sources cited in an article on CoinDesk.com, Defendant Kwon was the "Rick Sanchez" in the Basis Cash venture.  Although he attempted to distance himself from the project in order to conceal his involvement, he was the person who proposed most of the core ideas behind Basis Cash and its underlying token, which are strikingly similar to those behind the UST and Luna mechanism.  Basis Cash relied on a "bonding" mechanism to maintain its $1 peg.  New coins would be minted when the price was too high, and be distributed to participants in the Basis system, who would sell them at these high prices, increasing supply and lowering the price.

48.    Flaws in the design were identified, including the possibility that the Basis participants could collude to drive up the price even further by not selling their newly minted Basis Cash, in which case the system would print even more, which would in turn be distributed again to the shareholders.  Solutions to these potential manipulations could be implemented, but they need to be decided and engineered by a committee of incentivized monetary policy experts, not

automatically by an algorithm.  A programmatic, a.k.a., algorithmic stablecoin design alone is simply not capable of adjusting to any and all market conditions.

49.     In essence, the Basis Cash project was a test run for UST, and it failed.  In fact, Basis Cash never even achieved a value of $1, and it was pulled from the market.

50.     It is not surprising that Defendant Kwon sought to conceal his involvement with the failed Basis Cash experiment.  If the crypto community had known that Defendant Kwon was the engineer of Basis Cash, they would have been reluctant to participate in his next venture, the Terra Ecosystem.  Nobody in their right minds would have entrusted Defendant Kwon with their life savings if they had known that a very similar product he created, with simply a different label, had failed.  Defendant Kwon knew this, of course, which is why he withheld this critical piece of information from the public.

**C.    DEFENDANT KWON AND OTHERS PUBLISH THE TERRA WHITE PAPER IN 2019, PURPORTING TO HAVE CREATED THE FIRST SUCCESSFUL ALGORITHMIC STABLECOIN**

51.     In April 2019, Defendants Kwon and Platias, along with Evan Kereiakes and Marco Di Maggio, claimed to have created a stablecoin which would maintain a steady price via an algorithm.  In a whitepaper dated "April 2019," they described their concoction: Terra Money.  The abstract explained:

> Since the value of a currency as a medium of exchange is mainly driven by its network effects, a successful new digital currency needs to maximize adoption in order to become useful.  We propose a cryptocurrency, Terra, ***which is both price-stable and growth-driven***.  It ***achieves price-stability*** via an elastic money supply, enabled by stable mining incentives.  It also uses seigniorage created by its minting operations as transaction stimulus, thereby facilitating adoption.

But this was false.  As later revealed, the Terra cryptocurrency (i.e., UST) was neither price-stable nor growth-driven.  It was driven only by demand for Luna, which could not be sustained.

52.     The Terra White Paper further explained the importance of "achieving [price] stability with consistent mining rewards."  It stated,

> [o]nce the system has detected that the price of a Terra currency has deviated from its peg, it must apply pressures to normalize the price.  Like any other market, the Terra money market follows the simple rules of supply and demand for a pegged currency.  That is:
>
> - Contracting money supply, all conditions held equal, will result in higher relative currency price levels.  That is, when price levels are falling below the target, reducing money supply sufficiently will return price levels to normalcy.
>
> - Expanding money supply, all conditions held equal, will result in lower relative currency price levels.  That is, when price levels are rising above the target, increasing money supply sufficiently will return price levels to normalcy.

53.     The Terra White Paper also acknowledged that contracting a money supply "isn't free".  Whereas in ordinary currencies, central banks and governments bear the costs for pegged fiat systems, via, for example, issuing bonds and incurring interest expenses, in the Terra Ecosystem, miners would "absorb volatility in Terra supply."  In the short-term, miners would bear the costs of contracting the Terra money supply, and in the mid- to long-term, miners of Terra Money would be compensated with "mining rewards."

54.     The Terra White Paper went on to explain that miners would absorb short-term Terra volatility through Luna.  Specifically, miners would need to "stake a native cryptocurrency Luna to mine Terra transactions."  "Staking" Luna simply meant that the Luna holder committed the use of their Luna coins for a given period of time.

55.     The Terra White Paper then explains how the use of Luna through arbitrage would stabilize the price of Terra.  It stated that "Luna also serves as the most immediate defense against Terra price fluctuations.  The system uses Luna to make the price for Terra by agreeing to be counter-party to anyone looking to swap Terra and Luna at Terra's target exchange rate."  This is

key to understanding how Terra was meant to be price-stabilized, through Luna.  Importantly, there was no true counter-party.  Instead, the "system" (i.e., the programmed algorithm) agreed to be the counterparty.

56.     According to the Terra White Paper, "[t]he system's willingness to respect the target exchange rate irrespective of market conditions keeps the market exchange rate of Terra at a tight band around the exchange rate."   The Terra White Paper then describes a simple arbitrage example which would incentivize holders of Terra to exchange their Terra for Luna if the value of Terra fell below the peg, and vice versa.

57.     Importantly, "[t]he system finances Terra price making via Luna:  - To buy 1 UST, the protocol mints and sells Luna worth 1 SDR;  - By selling 1 UST, the protocol earns Luna worth 1 SDF."

58.     "As Luna is minted to match Terra offers, volatility is moved from Terra price to Luna supply.  If unmitigated, this Luna dilution presents a problem for miners; their Luna stakes are worth a smaller portion of total available mining power post-contraction.  The system burns a portion of the Luna it has earned during expansions until Luna supply has reached its 1 billion equilibrium issuance.  Therefore, Luna can have steady demand as a token with pro-rata rights to Terra mining over the long term."

59.     In fact, from the outset, as described below, the UST-Luna exchange mechanism could only possibly work in an up-market, where there was significant demand for each coin, and specifically for Luna.

60.     The Terra White Paper concludes:

We have presented Terra, a stable digital currency that is designed to complement both existing fiat and cryptocurrencies as a way to transact and store value.  The protocol adjusts the supply of Terra in response to changes in demand to keep its price stable.  This is achieved using Luna, the mining token whose stable rewards

are designed to absorb volatility from changing economic cycles.  Terra also
achieves efficient adoption by returning seigniorage not invested in stability back
to its users.  Its transparent and democratic distribution mechanism gives dApps the
power to attract and retain users by tapping into Terra's economic growth.

61.     As detailed herein, the Terra White Paper was replete with misstatements
concerning the stability of the UST and Luna coins, the feasibility of the algorithmic mechanism,
and the sustainability of the Terra Ecosystem overall.  The entire premise of the algorithmic design
and use of arbitrage to maintain the $1.00 peg of UST was fraudulent because it failed to explain
to investors that, in a down market, more nuanced decision-making would be required to maintain
price stability.  Further, the Terra White Paper included fabricated "stress" tests designed to
assuage the concerns of skeptics.

### D.     THE LUNA AND UST COINS ARE LAUNCHED

62.     Luna coins were first reported on Coingecko.com (a reputable source) to be trading
in May of 2019, shortly after the Terra White Paper was issued.  These coins were trading on
various markets, and the crypto community ascribed some value to them (as many
cryptocurrencies start trading).  Their value (based on "open day" prices on Coingecko.com)
during the period from their launch to the launch of the UST coins ranged from a low of $0.126 to
a high of $3.31.

63.     The first UST coins were first made available on September 21, 2020 (just around
the time that Basis Cash had proven to be a failure).  Per the terms of the Terra White Paper,
purchasers and holders of UST coins had the right, at any time, to trade their UST coin for $1.00
of Luna coins.  If they chose to do this, one new Luna coin was "minted" and the UST coin was
"burned."  Conversely, Luna coins could also be redeemed for UST coins, in which case, Luna
was "burned" and UST was minted.

64.     In theory, if the price of UST, as it was trading on the open market, fell to $0.98, arbitrageurs would be incentivized to redeem their UST coins for the $1.00 of Luna coin, and make a profit of $0.02.  Conversely, if the price of UST coins rose to $1.02, holders of Luna coins would be incentivized to redeem their Luna coins for UST coins and earn a profit of $0.02 that way.

65.     Although the supply of Luna coins fluctuated based on the burning and minting mechanism, the value of Luna fluctuated to a much higher degree.  During the entire Class Period, the price of the Luna coins reached a high of $116.46, according to Coingecko.com.

66.     At the core of Defendant Kwon's stablecoin algorithm was the spurious and fundamental assumption that there would always be ample demand for Luna to support the arbitrage mechanism.  This was exacerbated because redemptions of UST coins resulted in an increased supply of Luna coins.  Thus, if there were ever a surge of UST holders seeking to redeem those coins for Luna coins, there would need to be a large amount of new Luna coins minted in order to satisfy those redemptions.  This would increase the supply of Luna coins quickly, which would then depress the value of the Luna coins quickly, leading to price volatility.  Once the value of the Luna coins was depressed, ever more Luna would need to be minted to satisfy the redemptions, and it would be difficult if not impossible to sustain the arbitrage mechanism.  As described below, this is what ultimately did occur, when investors were pulling their funds out of the broader crypto market.

### E.     THE UST STABLECOIN LAUNCH WAS TIMED TO OCCUR IN A CRYPTO BULL MARKET

67.     Terraform Labs and Defendants Kwon and Platias timed the launch of the UST stablecoin to coincide with an anticipated bull market so that they could maximize their anticipated profits.  The crypto community has come to recognize regular and predictable patterns of price fluctuation in bitcoin, which then ripples across the broader crypto market.  Thus, by observing

bitcoin price movements, Defendants were able to time the launch of UST with the expectation of a bull market.

68.     More specifically, under the Bitcoin protocol, miners receive rewards – in bitcoin – for their work.  But every few years, the rewards that miners will receive are "halved."  For example, the current reward for miners is 6.25 bitcoin per block, but in 2024, that is expected to be halved to 3.125 bitcoin per block.

69.     Historically, there is a surge in the price of bitcoin immediately following a halving event.  This has occurred through three halving cycles, in 2012, 2016 and 2020.  The rationale for the price surge is that while it may be more difficult for miners to obtain bitcoin following a halving, this decline in new bitcoin entering the market increases the value of bitcoin that is already in the market.

70.     Thus, the crypto community has observed the following price movements following bitcoin halving events:  (i) bitcoin was trading at $12 in 2012, and increased to $1,217 in November 2013, a gain of 9,500% after the first halving event in November 2012; (ii) bitcoin was trading at $647 in July 2016, when the second halving event occurred, and rose to $19,800 by December 2017; (iii) bitcoin was trading at $8,787 in May 2020 just before the third halving event, and rose to $64,507, up 634%, in April 2021.  The following chart demonstrates these historical and anticipated price movements:



71.     Terraform Labs launched UST in September 2020, toward the beginning of bitcoin's upswing following the third halving event.  The timing was designed to take advantage of the anticipated bull market that would follow the halving event.

72.     While the certainty, and extent, of these bitcoin cycles may be debated, the members of the crypto community generally accept that bitcoin halving events lead to crypto bull markets that extend for a period of time.  However, the value cycle for other cryptocurrencies lags behind the bitcoin cycle slightly.  During the waxing portion of the cycle, investors first observe that demand for bitcoin is growing, and its price rising, and then invest in other cryptocurrencies. During the waning phase of the cycle, funds are often pulled out of bitcoin and placed into other

cryptocurrencies, which means the peak for these other cryptocurrencies often occurs slightly after the bitcoin peak.  But eventually, as demand for bitcoin drops off more dramatically, so does demand for other cryptocurrencies, and its value declines.

73.     The following chart shows the price of Luna movements as compared to price of bitcoin movements.  It demonstrates that the Luna market acted predictably according to bitcoin cycles, until it crashed in May 2022.



F.     THE TERRA STABLECOIN MECHANISM LACKED ADEQUATE SAFEGUARDS

74.     The UST-Luna stablecoin algorithm was inherently unsustainable and destined to fail in the event that demand for Luna or UST would decline, which could happen if crypto entered a bear market.  An algorithmic stablecoin project is only as good as its protections against inevitable adverse market conditions.  Criteria for the stability of any algorithmic stablecoin

includes the following design features: (i) burning coins through bond tokens; (ii) adequate reserves; and (iii) robust governance. The algorithm was lacking on all three fronts, but the statements in the Terra White Paper misled investors into thinking that algorithm would preserve the stability of UST.

### 1.    Bonds

75.    In existing theories for stable cryptocurrencies, the crypto community, a "bond" token is used to stabilize the price of the stablecoin when the demand for the stablecoin declined It is a token separate from a stablecoin that can be minted and sold at a price lower than its future redemption value. For example, if the price of the stablecoin is $0.90, then enough bond tokens can be minted and sold so that 10% of the currency is raised in the sale. Then this currency is burned, raising the price to $1.00. At some future time, the bonds can be redeemed for a higher price than they were sold, assuming that the market rebounds. If the market does not rebound, this process would fail.

76.    Although not labeled as such, in the case of the UST -Luna protocol, Luna was the "bond" token, and the minting and burning mechanism was meant to be accomplished through arbitrage incentives. This core design would only succeed as long as demand for Luna was growing at a steady rate. If demand were to remain stagnant, or decline, the design would fail because the value of the bonds would never appreciate. Thus, the simplistic arbitrage system was not a "bond" that could actually support a stablecoin.

77.    The bond stabilization mechanism can work under a narrow set of circumstances, specifically if the initial decline in demand drops off due to larger economic forces that are expected to correct. In that way, there would be an expectation of demand rebound, and the bonds could be redeemed for a higher value. If the decline in demand is inherent to the stablecoin itself, the bond token mechanism would not work.

78.     The UST-Luna mechanism is described in the Terra White Paper as follows:

Once the system has detected that the price of a Terra currency has deviated from its peg, it must apply pressures to normalize the price.  Like any other market, the Terra money market follows the simple rules of supply and demand for a pegged currency.  That is:

- Contracting money supply, all conditions held equal, will result in higher relative currency price levels.  That is, when price levels are falling below target, reducing money supply sufficiently will return price levels to normalcy.

- Expanding money supply, all conditions held equal, will result in lower relative currency price levels.  That is, when price levels are rising above the target, increasing money supply sufficiently will return price levels to normalcy.

79.     The Terra White Paper also states that "Luna serves as the most immediate defense against Terra price fluctuations.  The system uses Luna to make the price for Terra by agreeing to be the counterparty to anyone looking to swap Terra and Luna at Terra's exchange rate . . . The System's willingness to respect the target exchange rate irrespective of market conditions keeps the market exchange rate of Terra at a tight band around the exchange rate."

80.     The Terra White Paper lays this all out fairly simplistically and is designed to lure the average person into believing that this simple "system", *i.e.*, the algorithm, could maintain price stability.  But monetary systems, which is really what the Terra Ecosystem was purporting to create, are never so simple.  In fact, there are numerous decisions and actions which need to be made by a nimble, flexible decisionmaker, which cannot be accomplished by an automated algorithm.

81.     To begin, the decision of whether to increase or reduce money supply must take into account many factors, including: (i) What price margin around the peg would be considered acceptable?  For example, would a deviation in value of +/- $0.05 be acceptable, and anything beyond that require intervention?  Or some other amount?  Or would this amount not be fixed, but vary depending on other market conditions?  (ii) How would the value of the coin be measured?

26

(iii) When, and how often, would the value of the coin be measured?  (iv) How much new coins would be minted in response to a price deviating from an acceptable margin?  (v) How are the newly minted coins distributed?  These questions require a highly sophisticated and elevated level of reasoning that is simply not possible based on current computing programs, including Defendant Kwon's UST-Luna algorithm.

82.     The Terra White Paper does not evaluate the need for those monetary policy adjustments and provides no mention of a reliable mechanism to address these issues.  These decisions cannot be made programmatically via an algorithmic solution.  Rather, they are decisions that are typically made, and should be made, by experts on decentralized monetary policy.  The Terra Ecosystem did not allow provide for this.

<blockquote><strong>2.      Reserves</strong></blockquote>

83.     Reserves can be used to protect against "hot money," which results when speculators transfer their funds from one asset class to another, thereby running up the price of the second asset class, while depressing the price of the first.  Reserves are used to minimize price fluctuations resulting from hot money.  Reserves are also used by most modern fiat currency systems.

84.     Reserves are typically activated when the price of a stablecoin exceeds an upper amount, assume for example $1.10.  In this case, new stablecoins would be minted and sold at market for US dollars or another cryptocurrency, perhaps.  The US dollars would then be held liquid in reserve in anticipation of a drop in the price of the stablecoin, due to the increased supply. If the price of the stablecoin declines to, say, $0.90, then it would be purchased with the US dollars being held in reserve, thereby decreasing the supply, and bringing the value back to $1.00

85.     Although the Terra White Paper modelled a reserve mechanism, it was inadequate, which prevented it from reacting appropriately when the price became de-pegged.

86.     Further, the Terra White Paper purported to run "stress tests" designed to dupe the average person who might be skeptical of the simplicity of the algorithm into believing that smarter, more sophisticated creators of the UST stablecoin had already considered and allayed their fears.  Specifically, on page 8 of the Terra White Paper, Defendants Kwon, Platias and Terraform Labs stated that "[w]e have run extensive simulations to stress-test and refine [the mechanism] under a breadth of assumptions."  It then purports to demonstrate, through a series of charts, "how the protocol adjusts its stability levers in response to economic conditions, and how those adjustments in turn shape unit mining rewards" over a ten-year period.   But the Terra White Paper does not provide any data details or analysis underlying the charts, and they appear to be designed solely to appease skeptical purchasers of Luna and/or UST.

87.     According to the Terra White Paper, one of the charts "shows simulated weekly transaction volume and its annual moving average."'  Transaction volume, it explained, is akin to the "GDP of the Terra economy."  It shows a scenario where the "economy" is growing rapidly at first, but then enters a "severe multi-year recession that wipes out 93% of GDP over 3 years."  It purports to show a full recovery after six years.

88.     Two other charts purport to demonstrate that UST and the Terra Ecosystem more broadly can withstand an economic downturn.  The first shows that Luna is burned more rapidly during the period of "recession," meaning that fewer people would be attempting to redeem their Terra for Luna during this period.  And the final chart shows a relatively steady growth in mining rewards during the period of recession and recovery.

89.     In fact, the three charts lack underlying data, methodology, and analytics – which would typically be produced to substantiate such analyses – and were generated simply to allay skepticism among potential purchasers of UST or Luna coins, who would be tricked into believing

that mathematical modeling proved that the UST coin could not fail, when in fact the opposite was true.  Thus, the following statement on page 10 of the Terra White Paper was false:  "While we think that Terra's adoption-driven demand will be far more stable than Bitcoin's speculation-driven demand, the stability mechanism has been designed to confidently withstand Bitcoin-level volatility."

### 3.    Lack of Governance

90.    Instability in the market requires a nimble and responsive governance process, so that temporary fluctuations in value are quickly stabilized with minimal disruption to the monetary system.  The UST-Luna mechanism lacked such a governance mechanism, instead relying only on programmatic (algorithmic) monetary policy.

91.    According to the Terra White Paper:

An important advantage of distributing funding in a programmatic way is that it is simpler, objective, transparent, and streamlined compared to open-ended voting systems.  In fact, compared to decentralized voting systems, it is more predictable, because the inputs used to compute the funding weights are transparent and slow moving.  Furthermore, this system requires less trust in Luna validators, given that the only authority they are vested with is determining whether or not a dApp is honest and makes legitimate use of funding.

92.    This text is false.  In fact, "distributing funding in a programmatic way" was not "more predictable," and in fact this text illustrates a design flaw in the Terra Ecosystem.  It assumes that its "programmatic" functions are capable of dealing with unanticipated and dramatic market downturns.  Flexible governance principles are crucial for ensuring any long-term stable currencies to address inevitable changes in the market.

93.    The lack of sufficient governance safeguards also made the entire system susceptible to manipulation by sophisticated and motivated investors who could game the system for profit, to the detriment of the overall ecosystem.

29

94.     Ultimately, the Terra Ecosystem relied too heavily on its "programmatic," i.e., algorithmic, features to solve any problems that arose, including those generated by market disrupters, and others looking to manipulate the design of the UST-Luna model.   Defendants Kwon and Platias should have known about the need for enhanced government protocols, particularly based on Defendant Kwon's concealed experience with Basis Cash.  But they failed to implement the governance protocols, and the Terra Ecosystem ultimately failed.

### G.     THE ANCHOR PROTOCOL, CREATED TO DRIVE FURTHER DEMAND TO THE TERRA ECOSYSTEM, EXACERBATED ITS PROBLEMS

95.     The Anchor Protocol, which launched on the Terra blockchain in March 2021, is by far the most popular protocol in the Terra Ecosystem.  It is considered by many to be the primary driver of UST's popularity.  It operated as a savings bank that would pay reliable and steady outsized returns of 19.5% APY.  Part of the funding for this generous yield was purportedly to come from interest payments by borrowers, who were borrowing other assets in the Terra Ecosystem.  In fact, the Anchor Protocol was nothing more than a fraud, designed to drive further demand to UST and Luna, to boost its price.

96.     In June 2020, Defendant Platias released the Anchor White Paper, which he co-authored, discussing the features and rewards of the protocol. The whitepaper described the Anchor Protocol as:

> [A] savings protocol that accepts Terra deposits, allows instant withdrawals and pays depositors a low-volatility interest rate. To generate yield, Anchor lends out deposits to borrowers who put down liquid-staked [proof-of-stake] assets from major blockchains as collateral (bAssets). Anchor stabilizes the deposit interest rate by passing on a variable fraction of the bAsset yield to the depositor. It guarantees the principal of depositors by liquidating borrowers' collateral via liquidation contracts and third-party arbitrageurs.

97.     Thus, the Anchor Protocol is a savings, lending and borrowing platform built on the Terra Blockchain.  It offered a "passive income opportunity" (according to the Anchor White Paper) for depositors while providing borrowers easy access to collateral-backed stablecoin loans.

98.     In the Anchor White Paper, Terraform Labs described the Anchor Protocol as a "***principal-protected*** stablecoin savings product that pays depositors a stable interest rate." (emphasis added).  In exchange for depositing their UST coins with Terraform Labs in the Anchor Protocol, depositors are promised a steady and reliable 19.5% annualized return.

99.     The Anchor White Paper states, in relevant part, the following regarding the "savings product" offered by Terraform Labs:

> Anchor implements a liquidation protocol designed to ***guarantee the principal of depositors. Deposits are safe insofar as all debts against them remain over-collateralized.***
>
> *        *        *
>
> Given cryptoassets have high price volatility, they may not be the ideal choice for users who seek passive income with low price exposure. Anchor offers a solution with Terra stablecoin money markets. Users who deposit Terra stablecoins will get stablecoins in return, thereby avoiding the high volatility of most cryptoassets. ***Anchor's deposit interest rate stabilization mechanism offers additional protection from volatility by providing stable returns***.

100.    Defendant Platias subsequently authored the introductory blog post "Introducing Anchor," which was published by Terraform Labs on July 6, 2020.  Throughout the post, Defendant Platias described Anchor's interest rate as "stable" and offering a "low-volatility yield" with a "reliable rate of return."  He claimed that the DeFi sector had "yet to produce a simple and convenient savings product with broad appeal outside the world of crypto natives." In response to this "pressing need," Defendant Platias said the Anchor Protocol offered users "a ***principal-protected*** stablecoin savings product that accepts Terra deposits and pays a ***stable interest rate***."  Defendant Platias claimed the Anchor Protocol could "become the gold standard for passive income on the blockchain."

101.    There were two components of yield paid to those who deposited on the Anchor Protocol: (i) an internal platform yield determined by a function of borrowed UST deposits to total UST deposits; and (ii) staking or bonding yield due on Luna and other cryptocurrencies that were staked or bonded outside the Anchor Protocol.   Other components and mechanisms served to reinforce and provide alternative interest payments (in the form of alternative cryptocurrencies and their derivatives) into the Anchor Protocol.

102.    The Anchor Protocol states that it uses an algorithm to determine depositor and borrower interest rates for UST deposited on the protocol based on borrowing demand and supply. The primary driver in the algorithm is a pool utilization ratio, which is just borrowed deposits divided by total deposits.   As this ratio decreases, borrowers pay less interest, and in turn, depositors receive less interest.   The algorithm lowers borrower interest to encourage more borrowing, which in turn will pay depositors a higher interest rate.   As the utilization ratio rises, borrowers must pay more in interest, which discourages borrowing.

103.    In addition to the rate determined by the Anchor Protocol algorithm, borrowers of UST on the Anchor Platform also earned yield from interest paid by borrowers using collateral of bonded or staked crypto assets, called "proof-of-stake", or "PoS" assets to collateralize their borrowings.   The PoS assets carry the letter "b" to signify they are the PoS assets and not the underlying assets themselves.   The PoS assets have a right to earn a "staking yield" from the platform where the underlying assets are staked.   The staking yield contributes to the rates paid to UST depositors.   The PoS assets paying yield into the Anchor Protocol provide an additional yield over the algorithmically determined yield.

104.    Another component of the Anchor Protocol is the "Yield Reserve."  This was an account designed to be a buffer to provide stability for depositors' APY.  If the Anchor Protocol were generating a profit, this would go into the Yield Reserve, and vice versa.

105.    The Anchor Protocol generated depositors' returns by i) lending the deposited coins to borrowers, who in turn put up specialized "bAssets" as collateral; and ii) collecting interest on the borrowers' loans.  Those bAssets are cryptocurrency derivatives which entitle the holder to returns, and the Anchor Protocol passed those returns to depositors in the form of its 19.5% annual yield.

106.    More specifically, bAssets are derivative coins that represent underlying coins that have been "staked" on their native blockchains.  Staking is a process implemented by certain blockchains that allows holders to pledge coins toward the functioning and development of the blockchain for a period of time, and receive rewards in proportion to the number of coins pledged. For example, if 100 coins are staked for one year on a blockchain that offers 5% annualized returns, the holder will receive 5 new coins after one year.

107.    Staked coins cannot be traded while staked, but bAssets, as derivative coins representing the staked coins can be traded.  The holder of the bAsset has the right to receive the rewards generated from staking the underlying coin.  Thus, while the Anchor Protocol holds bAssets as collateral, it receives the staking rewards and thereby generates part of the income needed to pay Anchor's depositors.

108.    According to Defendant Platias "bAssets play a key role in Anchor towards offering a stable interest rate to Terra deposits."

109.    The Anchor Protocol also used "ANC" coins as its governance token.  ANC coins were distributed to borrowers as incentives, and ANC could also be received as a reward for

staking ANC.  At its height in early March 2022, the market capitalization value of ANC reached approximately $1.5 billion.

110.    Defendants continuously encouraged deposits in Anchor by promoting the protocol and touting its high returns, as a means of increasing traffic on the Terra blockchain, and thus stabilizing UST.  In fact, the marketing of UST and the Anchor Protocol was so effective that approximately $14 billion of UST's market capitalization value (75%) was deposited into Anchor at its peak.

111.    Eventually, however, given the potential for such high yields, deposits greatly outstripped demand for borrowing.  The revenue from borrowers was insufficient to pay depositors their yield.

112.    On March 17, 2021, the official Twitter account for the Anchor Protocol bragged that "Anchor is not your ordinary money market. ***The protocol offers stable, 20% APY interest to depositors*** and only accepts liquid staking derivatives as posted collateral by borrowers."

113.    On April 23, 2021, the Anchor Twitter account again promoted the stability of Anchor's 20% interest yields: "Markets go down, $UST deposits on Anchor go up . . . Stable 20% APY is a ***high-yield safe-haven*** in uncertain market conditions."

114.    On May 11, 2021, the official Anchor Twitter posted the following series of tweets promoting the Anchor Protocol as the "gold standard for savings" and its "stable" 20% yields:

1) We're thrilled to announce the release of the Anchor Earn SDK – allowing third parties to seamlessly integrate ***20% yields on $UST to expand stable savings opportunities to a greater audience!***

* * *

2) The Anchor Earn SDK significantly expedites the integration process for teams who want to bring ***the benefit of stable Anchor savings*** to users on their crypto-based platforms. . . .

* * *

34

3) Keep in mind that for teams who want to go beyond savings integrations and build out additional features on Anchor (e.g., dashboards), Anchor.js is still the way to go."

\* \* \*

4) ***Anchor is the gold standard for savings – 20% yield for all.***

115.    Later that day, Anchor said via its Twitter account that it would "love to see" users of the "Revolut" money-management app "benefiting from ***stable Anchor yields***."

116.    Defendant Kwon also falsely dismissed concerns that UST and the Anchor Protocol were unstable and unsustainable, doing so by insulting and mocking the individuals raising those concerns.  One of his common responses to critics is to dismiss them as "poor" and undeserving of his time.  For example, on July 1, 2021, Defendant Kwon mocked a British economist, Frances Coppola, who criticized the algorithmic stablecoin model.  Instead of addressing the concerns raised by Coppola—in particular, that the algorithmic stablecoin model could not defend against a bank run—Defendant Kwon was dismissive and condescending, stating "I don't debate the poor on Twitter, and sorry I don't have any change on me for her at the moment."

117.    On December 2, 2021, Defendant Tetot published an article titled "Terra – An Emerging Ecosystem" describing Luna as a "volatility absorber that stabilizes the price of UST." He further explains that "Anchor can pay its lenders such high rates partly because borrowers must forgo their collateral staking yields when a loan is initiated" and that "Anchor can sustain its 20% rate for the time being as the gross borrow rate is ~22% APY."

**H.    DEFENDANT KWON CLAIMS A FALSE ALLIANCE WITH CHAI TO DRIVE DEMAND TO THE TERRA ECOSYSTEM**

118.    As indicated, the sustainability of UST's $1.00 peg depended on there always being demand for Luna.  In order to boost demand for Luna, Defendant Kwon made false representations concerning connections between the Terra Ecosystem and Chai Corporation ("Chai").  Chai was

35

founded by a Terraform Labs co-founder, Daniel Shin, who since broke involvement with Terraform Labs.

119.   Chai's invention is a Korean payment network system that was designed to may payments from the Terra Ecosystem to ordinary vendors seamless and easy.  In the summer of 2019, Terraform Labs announced a partnership with Chai. This was an attractive feature of the Terra Ecosystem that, if successful, would drive UST (and Luna) demand so that ordinary consumers could use their cryptocurrencies in everyday life.  However, Chai severed ties with Terraform Labs at some point in 2020, according to an article on techinasia.com published on May 22, 2022.

120.   For months after Chai ended its relationship with Terraform Labs, Defendant Kwon made public statements indicating that the relationship was intact.  In an interview given to the tokenist.com, published on March 19, 2021, Defendant Kwon described Chai as "one of South Korea's most popular payment apps that recently raised a $60 million Series B."  Chai, he explained, "enables merchants to accept payments via 20 different options (e.g., debit, credit, PayPal, etc.) with low fees and fast settlement.  On the back-end, *Chai uses Terra's blockchain (stablecoins) to settle transactions faster and cheaper than legacy counterparts*."  Chai's acceptance was gaining.  In 2020, Defendant Kwon claimed that Chai processed more than $2.0 billion in transaction volume with more than 2.5 million users – "making it one of the most successful and widely adopted applications that uses blockchain technology and is not purely speculative in nature."  As of March 2021, Defendant Kwon claimed that the "bulk of users hail from South Korea, but is slowly expanding to other demographics in SE Asia."

121.    Also, on May 24, 2021, Terraform Labs posted on Twitter under its handle, "@terra_money," that "CHAI has more than 2 million active users in Korea," making the case that there was strong demand for UST due to the Chai app's integration with the Terra blockchain.

122.    These statements were false and designed to mislead consumers into believing that they would be able to use UST and Luna to transact in ordinary goods over the Chai platform. They were made to drive further demand for UST and Luna.

## I.    THE LUNA FOUNDATION GUARD IS FOUNDED TO GIVE THE ILLUSION THAT THE ANCHOR PROTOCOL AND THE TERRA ECOSYSTEM WERE STABLE

123.    True to form, the UST-Luna algorithm did not work.  Defendants knew this long before the investing public did.  Also, on or about May 24, 2021, UST lost its peg to the $1.00 peg. Defendant Kwon arranged for Jump to bail out UST.  This maneuver was designed to give the illusion that there was a strong, organic demand base that was keeping the coin at a stable price. In fact, the price only stabilized due to Jump's investment, which was not disclosed to the public.

124.    Specifically, on its twitter account, "@terra_money", Terraform Labs posted on May 24, 2021, "As long as we create useful applications that people use on top of Terra [UST], a strong locus of demand will always exist."  Defendant Jump's infusion of money in 2022 into UST was part of the RICO scheme, designed to allay investor fears and give the false impression that the algorithm had solved the problem of the UST's de-peg.

125.    Defendant Jump's 2021 bail-out was a band-aid that could only hide the flaws in the Terra Ecosystem during periods of subtle or minor turbulence.  Defendants Kwon, Platias, Kariya, Terraform Labs and Jump knew that a bigger, flashier solution would be required once a more significant market disruption presented itself.  Their idea gave birth to the Luna Foundation Guard.

126.    Well aware that algorithmic solutions were not enough to sustain the UST peg or the Anchor Protocol's 19.5% returns, on January 19, 2022, Terraform Labs announced the formation of the Luna Foundation Guard—a Singapore-based non-profit organization—for the purpose of "facilitating the growth of the Terra ecosystem" and "improving the sustainability and stability of Terra's algorithmic stablecoins."  Defendant Kariya promoted the introduction of the Luna Foundation Guard by retweeting Terraform Labs' introductory thread.

127.    The Luna Foundation Guard was originally funded with a gift of 50 million Luna coins, worth at the time $1.1 billion, from Terraform Labs.

128.    The formation of the Luna Foundation Guard was a central component of Defendants' RICO scheme and efforts to bolster public confidence in UST.  The announcement noted previous criticisms directed towards algorithmic stablecoins like UST, but downplayed the purported "misconception" that algorithmic stablecoins are "unsustainable."  In that vein, the announcement claimed that a de-pegging of UST that had briefly occurred in May 2021 was not a sign that UST was unstable, but rather, an opportunity to learn and improve:

> By concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins, ***UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving upon its design and adoption strategy. Still, questions persist about the sustainability of algorithmic stablecoin pegs, which is something our community doesn't hide from and tackles head-on.***
>
> \* \* \*
>
> In order to succeed, we need to continue supplementing the Terra economy with effective resources across multiple dimensions. These include everything from technical developer tooling to capital backing projects, educational materials helping onboard new users and builders, and innovative mechanisms to support algorithmic stablecoin models amid volatility.

129.    The Luna Foundation Guard's so-called "core mandate" was to "buttress the stability of the UST peg and foster the growth of the Terra ecosystem." It would do so by

"[b]uilding reserves that backstop the peg of algorithmic stablecoins amid volatility and funneling resources into research that further advances what's possible with stablecoins[.]"  In short, UST and other Terra stablecoins would no longer be purely algorithmic, as they would now also be supported by asset reserves (the previously defined "Yield Reserve").

130.    On February 22, 2022, the Luna Foundation Guard announced that it had raised $1 billion through a Luna token sale to establish a bitcoin-denominated reserve for UST.

131.    In addition to deploying "capital backing," the Luna Foundation Guard also was tasked with allocating grants for "builders, researchers, community members, and anyone else pursuing bold ideas in the interest of the Terra economy[.]"  Similarly, the Yield Reserve Fund would be used to subsidize the 19.5% yield on the Anchor Protocol deposits when staking revenues were inadequate.

132.    The Luna Foundation Guard is overseen and operated by a "Governing Council, initially comprised of . . . leaders and experts in the industry, which will expand to include leading builders in the Terra ecosystem."  The members of the Luna Foundation Guard's Governing Council included Defendants Kwon and Platias from Terraform Labs; Defendant Kariya, the President of Defendant Jump Crypto (one of the financial backers and principal organizers of the Luna Foundation Guard); Defendant Tetot, co-founder of RealVision; Defendant Macedo, Founding Partner at Delphi Ventures, Head of Delphi Labs; and Jonathan Caras, the Project Lead at Levana Protocol.

133.    Soon after its formation, the Luna Foundation Guard recruited several well-known and reputable crypto investors to contribute to the reserve fund.  These include Republic, GSR and Tribe Capital.  Pursuant to a token purchase agreement, these entities provided funds ranging from $20 million to $50 million to the Luna Foundation Guard in return for Luna tokens that would vest

over a period of time, up to four years.  But these entities were recruited simply to lend a patina of credibility to the Luna Foundation Guard.  In fact, Terraform Labs itself contributed the vast majority of the funds – $880 million in Luna tokens – to the Luna Foundation Guard.

134.    With the Luna Foundation Guard in place, Defendants continued to tout the reliability of UST, Luna and the Anchor Protocol.   On January 28, 2022, Jump's President and Luna Foundation Guard Governing Council member, Defendant Kariya, posted a thread on Twitter discussing the "confusion and panic" concerning UST and the possibility that the Anchor Protocol yield could be impacted if a de-pegging event occurred.  "It's difficult to imagine a sustained mass exodus to UST given the circumstances.  In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price.  Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."  Defendant Kariya added that a "$450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA."

135.    As time progressed, lending on the Anchor Protocol (and therefore staking revenue) failed to meet the levels needed to pay yields to depositors.  On February 8, 2022, a researcher at the crypto-related venture capital firm Hashed warned Anchor that its Yield Reserve would only sustain the Anchor Protocol until roughly February 20, 2022, at which point an infusion of at least $436 million will be required to maintain the protocol's current yields until November 2022.  Such an infusion would be "a short-term solution to allow sufficient time for growth" while developers work on improving mechanisms and incentives.

136.     Two days later, on February 10, 2022, Defendant Kwon announced that the Luna Foundation Guard's Governing Council had voted to capitalize the Anchor Yield Reserve by 450 million UST.

137.     Less than a week later, on February 16, 2022, Defendant Macedo tweeted that "Anchor's 20% fixed rate is an incredible meme and the ideal way to drive $UST growth and onboard users to the Terra economy."

138.     In an attempt to further bolster confidence in UST, on February 22, 2022, the Luna Foundation Guard announced that it had raised $1 billion in order to establish a Bitcoin-denominated reserve for UST.  Funding for the reserve came from Defendants Jump and Delphi, among others, who purchased Luna tokens in a private sale from the Luna Foundation Guard.

139.     According to the Luna Foundation Guard, the reserve assets could be used when "protracted market selloffs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."  Defendant Platias bragged in the Luna Foundation Guard's press release that the reserve "eliminated" the main counter-argument for the "sustainability of algorithmic stablecoins." Defendant Kariya similarly proclaimed that the reserve "further strengthens confidence in the peg of the market's leading decentralized stablecoin UST . . . . It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions."

140.     On February 22, 2022, Jump endorsed Defendant Kariya's comments, stating in a tweet: "As @KariyaKanav has mentioned, the UST Forex Reserve will strengthen confidence in the peg [g]iving users confidence by following central banks that hold a variety of foreign currencies to protect against severe market risks."  Jump also promoted its relationship with

Terraform Labs and the future prospects of UST: "We're excited to share our latest collaboration with [Terraform Labs]. . . . Our goal is to make DeFi more accessible and meaningful for everyone. . . . By making $UST more accessible we can create the decentralized finance world that keeps us moving forward."

141.    Jump was one of the primary players who aided in raising funds for the Luna Foundation Guard from others such as Delphi, Tribe Capital, Republic and GSR.

142.    Jump promoted its relationship with Terraform Labs and the future prospects of UST: "We're excited to share our latest collaboration with [Terraform Labs]. . . . Our goal is to make DeFi more accessible and meaningful for everyone. . . . By making $UST more accessible we can create the decentralized finance world that keeps us moving forward."

143.    Jump continued to promote its relationship with Terraform labs by consistently retweeting the Company when it was touting its own ecosystem.

144.    On February 22, 2022, Defendant Macedo retweeted the Luna Foundation Guard touting a "big day for [Terraform Labs]" and promoting that UST has achieved the demand needed to raise collateral reserves. Defendant Macedo also retweeted several posts from Defendant Kwon, touting the $1 billion Luna Foundation Guard reserve and the plans to scale the reserve to even larger numbers. Defendant Macedo retweeted a thread on why the Luna Foundation Guard reserve announcement is such a big deal for Terraform Labs' resilience and that the cost of an attack on the UST peg just went up by $1 billion in bitcoin.

145.    Defendant Kwon was also actively promoting UST and Luna on Twitter on February 22, 2022 touting the "$1B BTC reserve for $UST" as the "[l]argest ever cap formation in crypto" and how the Luna Foundation Guard had "plans to scale reserve to larger numbers."

146.     On March 1, 2022, Defendant Kariya and Defendant Kwon appeared live together on The Ship Show – a twitter spaces talk show by Jump and Jump backed Wormhole – promoting, among other things, the longstanding relationship between Defendant Kariya, and Defendant Kwon dating back to 2019; how Jump and Defendant Kariya "helped scale the UST floor back when UST was a 10 million supply"; the burning and minting mechanism behind UST and Luna and how that "absorbs the volatility of Terra stablecoins"; and the security and stability of UST and how the Luna Foundation Guard bolsters the security.  During the show, Defendant Kariya explained that "it's extremely useful to have a reserve that can step in until the market is able to kind of reconsolidate liquidity around those positions.  And so the LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size."  Defendant Kariya also went on to explain how "with Wormhole, we're building a UST highway to deliver Terra stablecoins to every blockchain, right. So we will be big in Solana, we'll be big in Avalanche, we'll be big in Polygon."

147.     On March 8, 2022, Defendant Kariya announced that "UST is in high demand atm and is generally trading at a premium."

148.     On March 9, 2022, Defendant Macedo posted a "LFG meme" to Defendant Kwon's post stating that "[the Luna Foundation Guard] has just added $418M to its reserves – current balance around 1.5B."

149.     On or about March 10, 2022, two of Terraform Labs' early investors, Polychain Capital and Arca, proposed a cut to the yield rate in the Anchor Protocol.  Luna Foundation Guard Governing Council members Defendant Kariya of Jump and Defendant Macedo of Delphi opposed the proposal. Similarly, the Anchor Protocol's official Twitter account publicly endorsed another post objecting to the proposal.  The proposal ultimately failed.

150.   On March 11, 2022, Defendant Macedo echoed Defendant Kwon again by retweeting that "BTC thrives in chaos. An orange light to endure in the darkness – which will bring $UST to millions."

151.   Around the same time that Defendant Kariya was promoting the demand for UST and voting against reducing the Anchor Protocol's yield rate, a popular crypto trading personality on Twitter, @AlgodTrading ("Algod"), publicly criticized Luna as being a "[p]onzi" and disclosed his plan to short Luna "with size." Importantly, Algod pointed out the vulnerabilities regarding the sustainability of UST and Luna, noting that more UST creates "more pressure on Luna" and that at a certain point Luna will no longer be able to sustain UST's price if users redeem their UST for Luna in large quantities.

152.   As usual, Defendant Kwon defaulted to insulting Algod and did not disclose that Algod was, in fact, correct that Defendant Kwon and the other Defendants could not "keep fuel[ing] anchor."  Defendant Kwon instead sought to undermine Algod's prophetic criticism with mockery and bravado, even going so far as to place a $1 million bet with Algod on whether or not Luna's price would be higher in a year.

153.   On March 15, 2022, Defendant Macedo tweeted, in reply to the Luna Foundation Guard council voting to burn another 4 million Luna to mint roughly $372M worth of UST, that "[t]he cost of attacking the $UST peg has increased by another $372M."

154.   On March 17, 2022, Defendant Kariya tweeted promoting the Anchor Protocol's "first birthday" and "first step to the interchain" powered by Jump backed Wormhole.

155.   On March 17, 2022, Defendant Macedo tweeted that "The 6th biggest exchange in the world has just added 71 $UST trading pairs."  He also posted thread on UST downplaying the potential "death spiral" stating that "$UST already defied the odds by not just surviving but

thriving as a pure algo stable." He continues that as UST "moves to exogenous collateral, it will become far more resilient while still enabling fast growth…Exogenous collateral mitigates the death spiral by allowing $UST redemptions to $BTC, reliving the pressure on $LUNA price." He continues by stating that "[a]s someone who holds the majority of their net worth in LUNA, UST and Terra alts, I'm obv bullish and think this is unlikely…I understand the tradeoffs and believe the upside more than justifies the risk."

156.    On March 28, 2022, the Chief Investment Officer at the investment firm Arcane Assets, Eric Wall, posted a thread on Twitter discussing how the 50 million Luna coins that served as the initial funding for the Luna Foundation Guard came from Luna's initial coin offering and why choosing to use non-renewable liquidity sources like the funding for the Luna launch could be problematic for a so-called algorithmic stablecoin since it was "inherently unsustainable." In the opening post of that thread, Wall stated:

> Don't mean to be a party pooper but I think Terra is making a mistake to use LUNA funds that originated from the ICO to build the [Luna Foundation Guard] reserve.
>
> The goal of $UST is to be (i) decentralized and (ii) sustainable.
>
> This reserve is neither of those two things.

Defendant Kwon retorted, "I like to say things that are true and well informed, and i think after all this we can both agree this is neither of those things: But you know, you do you."

157.    On April 6, 2022, Defendant Macedo echoed Defendant Kwon by retweeting that the 20% "Anchor rate is now available to 30+M Binance users. The anchor yield of web3 is living up to its name."

158.    Notwithstanding Defendants' bullish public view of UST and the Anchor Protocol, another infusion to the Yield Reserve occurred on or around April 7, 2022, when the Luna Foundation Guard announced that it had acquired $100 million in AVAX tokens (another

cryptocurrency) to "help bolster its UST Decentralized [] Reserve." According to Defendant Platias, the purpose of the UST reserve is "to provide a backstop against UST peg deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model . . . . By diversifying the base of non-correlated assets to major assets like [bitcoin] and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives."

159.    Despite the appearance that more and more infusions undercut the Defendants' bullish narrative, Defendants, including the Luna Foundation Guard and its members, continued to make false statements in support of UST and the Anchor Protocol.

160.    In the early days of 2022, Defendant Kwon again used his signature comeback to deflect accusations that UST was a "Ponzi scheme" and likely to collapse.  Specifically, on December 30, 2021, an engineer at MakerDAO, which has its own stablecoin, predicted on Twitter that "UST will collapse in a death spiral with LUNA hyper-inflating to try to cover the peg."  Days later on January 3, 2022, a MakerDAO co-founder jokingly added, "Look, UST and MIM [another stablecoin] are solid ponzis and I respect that. You can make good money off them for sure. But they are not built for resilience and they are going to 0 once the market turns for real[.]  Now stop trying to scam users looking for actual stability into being ur exit liquidity."  When asked if he was willing to place a bet that the individuals at MakerDAO were wrong, Defendant Kwon simply replied "I don't gamble against the poor."

## V.    THE TERRA ECOSYSTEM COLLAPSES IN MAY 2022

161.    The promise of fixed high-double-digit yields on deposits combined with the general hype around crypto that continued from UST's launch through the end of 2021 drove rapid growth for both the Anchor Protocol and the Terra Ecosystem.  Under positive market conditions, the UST peg to $1.00 seemed to be holding and the Anchor Protocol appeared to be delivering its

promised returns.  This enthusiasm, coupled with bullish crypto market conditions, fueled the price of Luna to $116 per coin in April 2022.

162.    In May 2022, the broader crypto market experienced a sharp downturn, which led to disastrous consequences for holders of UST and Luna coins.

163.    On May 7, 2022, over $2 billion worth of UST was "unstaked," that is, deposits were removed from the Anchor Protocol.  Hundreds of millions of dollars worth were quickly liquidated.  The huge sell-off depressed the price of UST down to $0.91 per coin.  As the system had designed, droves of UST holders sought to redeemed their coins for $1 in Luna coins, in order to make a quick, sizeable profit.

164.    As more and more UST holders exchanged their coins for Luna coins, the minting of Luna coins quickly ballooned, as the algorithm designed.  This led to a huge glut in Luna coins, which then drove down the price of Luna as well.  The Anchor Protocol saw the value of its deposits *fall by $11 billion* between May 9, 2022 and May 11, 2022—a staggering sum considering that deposits totaled $14 billion at their peak.  Within days, both Luna and UST were essentially worthless.  The following chart depicts the rapid decline in price of both Luna and UST:



165.   The losses sustained by individual investors were tremendous. *The New York Times* reported that Redditors were sharing numbers for suicide hotlines due to the extent of some users' losses.  Reverberations were felt throughout the crypto universe, with approximately $300 billion in value disappearing in the weeks that followed.

166.   Leading crypto funds such as Voyager and Celsius filed for bankruptcy.  Three Arrows Capital was forced into liquidation.  But worse, many retail crypto investors lost some or all of their life savings.  Many reported they had contemplated suicide, and there is at least one confirmed related suicide, of a Luna coin holder who lost his $2 million in life savings.

167.   On May 10-11, 2022, UST was still worth approximately $0.50 per coin. Defendant Kwon publicly stated that he would resuscitate and rebuild UST and Luna.  Specifically, he tweeted on his personal account, "@stablekwon," "Close to announcing a recovery plan for $UST.  Hang tight," and "As we begin to rebuild UST, we will adjust its mechanism to be

collateralized." Many coin holders held on, hoping that Defendant Kwon would make good on these promises. But he quickly abandoned those promises, when, five days later, the price of UST declined even further.

168.    The UST peg was particularly dangerous. Unlike other stablecoins whose value is designed to be supported by collateral, UST depended primarily on an algorithm to maintain its value. That algorithm, in turn, depended on forces outside Defendants' control, namely demand for UST, public willingness to perform the stabilizing arbitrage, and reliable price information. But it only took one large withdrawal to knock UST off its peg, prompting a death spiral that led to the coin's—and the Terra Ecosystem's—demise.

169.    The Anchor Protocol was also unsustainable. In a "post-mortem analysis" of the Terra Ecosystem collapse, Defendant Tetot admitted what Terraform Labs had denied all along: that the Anchor Protocol's 20% yield was neither sustainable nor stable. Instead, Terraform Labs was offering 20% returns as a *marketing* ploy to draw more people into the Terra Ecosystem. But Defendants knew that the 20% returns could not last as deposits outstripped lending.

170.    In particular, Defendant Tetot candidly confessed:

They called Luna a Ponzi because of the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make the yield sustainable around 10–12%. Unfortunately, [i]t didn't have time to make it . . . ***20% yield was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't sustainable***, but I think it was acceptable for the time being, yield should have been dynamic as the system gr[e]w.

171.    Defendant Tetot further explained that the "20% yield was a mistake because it increased UST demand too quickly" for defense mechanisms such as reserves to scale. Even though "strategic" moves had been made to put reserves in place, they were "not technically ready" despite Defendants' assurances that the reserves were sufficient.

172.     Although Defendant Tetot sought to deflect the blame of the failure of Terraform Labs' algorithmic stable coin to "human behavior" instead of Defendants' failures, he acknowledged that he had "earned" the criticism he was receiving for his role.

173.     Defendant Kwon himself was warned before the Anchor Protocol's launch that the 19.5% yield was unsustainable.  According to an Anchor developer, the system was initially designed to offer an interest rate of 3.6%, but this was increased to 19.5% the week before release to attract more traders.  The developer stated that he told Defendant Kwon that the rate should be reduced, but he was ignored.  As a result of the high rate, the developer said he "thought it was going to collapse from the beginning."

## VI.   DEFENDANTS PROFITED FROM THE RICO SCHEME

174.     Defendants knew the Terra Ecosystem was unsustainable.  But they had a two-part exit strategy.  First, they pulled their funds out of the Terra Ecosystem gradually during the bull market run, months before the system crashed.  Second, rather than use the Luna Foundation Guard's assets for their intended purpose – to stabilize the Terra Ecosystem – they transferred billions of dollars of those funds to unidentified wallets on the Gemini and Binance exchanges.

### A.   DEFENDANTS EXCHANGED BILLIONS OF UST FOR OTHER STABLECOINS PRIOR TO THE COLLAPSE OF THE TERRA ECOSYSTEM

175.     Seeing the writing on the wall, months before the depegging of UST, Defendant Kwon and the other Defendants began pulling 100 billion won blocks—the equivalent of $80 million—out of Terraform Labs' funds and siphoning it off to multiple cryptocurrency wallets.

176.     An anonymous researcher with a large following on Twitter who uses the handle "@FatManTerra" ("Fat Man Terra") claimed that his research demonstrates that Defendant Kwon and Terraform Labs profited by several billion dollars from the Terra Ecosystem.  Fat Man Terra was interviewed by *Fortune Magazine*, which published an article about him dated October 7,

2022, in which he described himself as someone who is "an average middle-class guy," aged 20-35, and living in the U.K.  According to the article, he worked in the crypto industry as a project manager for some years.  Also according to the *Fortune* article, Fat Man Terra claims to receive tips from whistleblowers about the fraud underlying the Terra Ecosystem.

177.    On October 21, 2022, Fat Man Terra was also interviewed by well-known and respected cryptocurrency journalist, Laura Shin, on her podcast called "Unchained."  He describes himself as a "crypto and financial researcher."

178.    In a June 11, 2022 post, with regard to the siphoning of funds out of the Terra Ecosystem, Fat Man Terra stated that "Do Kwon cashed out $2.7 billion (33 x $80m!) over the span of mere months" using a separate borrowing protocol (the "Abracadabra" platform, described below) that he described as "Anchor on steroids."

179.    An analysis of the outflow of currency from Terraform Labs to other platforms supports Fat Man Terra's claim.  The open-source website Dune.com makes available transactions of Terraform Labs.  They demonstrate that significant transfers of UST were being siphoned from the Terra Ecosystem and exchanged for non-Terra stablecoins backed by fiat currency, most notably Tether (USDT) and Coin (USDC).

180.    The following charts demonstrate that $2.7 billion worth of UST was funneled from a single wallet containing UST on the Anchor Protocol through another, separate lending platform called "Abracadabra DeFi", which did not share the Anchor Protocol's blockchain.  The Abracadabra platform also bore Defendant Kwon's fingerprints:  months earlier, the two announced a partnership which would allow users to leverage UST coins for "Magic Internet Money", or MIM, stablecoins.

181.    Once the UST coins were exchanged on the Abracadabra platform for MIM, they were then cashed out from Abracadabra via other stablecoins – USDT and USDC.

182.    Importantly, the UST coins siphoned out of the Terra Ecosystem **were transferred into a single wallet** on the Abracadabra platform, suggesting that a single or small group of actors were responsible for the transfers.

183.    These facts were first uncovered by a crypto researcher who uses Dune.com under the handle, @fozzydiablo.  This researcher published the following charts which demonstrate the flow of funds from the Terra Ecosystem to the Abracadabra platform via exchange of UST to MIM to USDT and USDC, and then transfer to other exchanges.

184.    First, as the following Dune query demonstrates, 2.8 billion UST was funneled from a single wallet on the Anchor Protocol to Abracdabra and exchanged for MIM:

| Query results  UST -> MIM sales | | @fozzydiablo |
|---|---|---|
| UST Sold | MIM Bought | Net Difference |
| 2811245996.019272 | 2812017057.6053376 | 771061.5860657878 |

185.    Second, the converted MIM was exchanged for USDC and USDT stablecoins:

| Query results  MIM sales | | | | @fozzydiablo |
|---|---|---|---|---|
| sold_id | sold_sum | bought_id | bought_sum | Net Difference |
| MIM | 149611769.04122287 | USDC | 149241671.515641 | -370097.5255818573 |
| MIM | 2880489229.9425335 | USDT | 2874480610.15544 | -6008619.78709326 |

186.    Third, once the MIM was exchanged for USDC and USDT (backed by fiat currency), the entirety of the new stablecoin holdings were dispersed to outside exchanges or private wallets believed to be linked to Defendants:

**Query results  TFL USDC Outflows**                            ● @fozzydiablo

| to | USDC |
|---|---|
| Binance | 164401033.045167 |
| Curve.fi 3pool Swap | 25000000.002181 |
| Curve.fi UST Deposit | 5563540.14 |
| \x0248e8869fa01255122ae1f316c1401cdf8fb0e2 | 4557138.5035 |
| Curve.fi 3pool Depositer | 3304080.3 |
| \x7cb99a0a6cec5920e896a9b3a537b5b973f7a7b6 | 2000000 |
| \xff89c654846b2e4bc572ceabe77056daf7b299a3 | 1000000 |
| \xa87b2ff0759f5b82c7ec86444a70f25c6bffccbf | 99999.999999 |
| \x5617e47d81189ec211799032d3eee186963ecda7 | 60000 |
| \xe2923d53b944161c44393805681b609f933554a1 | 50000 |
| \xa93c73a6dfafb577ab96760b84dfc8959eebbbbf | 49377.37 |
| \x0897775d05bad17ac191b14d47a6a7b0dbb87c9d | 40000 |
| \x2704fc59527ac8e97d4f23f4b777a84c585cc5f3 | 9990 |
| \x87017b2ecfb09851bd39bfa61aadaa7da58b083e | 951.48 |

**Query results  TFL USDT Outflows**                            ● @fozzydiab

| to | USDT |
|---|---|
| Binance | 1089393518.971245 |
| Kucoin | 558177777.93215 |
| Huobi | 545519385.327788 |
| OKEx | 500791322.43886 |
| \x91fdc60e621a00e04badb44813db8f27f450af15 | 133492197.901287 |
| Curve.fi UST Deposit | 78850296.98 |
| Bitfinex | 42925893.079219 |
| Curve.fi UST Swap | 18934452.831033 |
| \xe11970f2f3de9d637fb786f2d869f8fea44195ac | 10000000 |
| Curve.fi 3pool Depositer | 3236633.21 |
| Jump trading: Binance | 600000 |
| \x7da848f26d7bcec605031496e99453de0f94a4ea | 300000 |
| Polygon Bridge | 100 |
| \xa26083f4f206a5b5b285349e9a8b7a84647176f2 | 10 |
| \x876eabf441b2ee5b5b0554fd502a8e0600950cfa | 1 |

53

187.    Thus, while Defendants were aggressively touting the stability of the Anchor Protocol and boasting across social media about the supremacy of UST and Luna, they were fleeing the Anchor Protocol and Terra Ecosystem by dumping the algorithmic UST for alternative, fiat-based stablecoins.  These huge trades have never been explained, and it is therefore likely that they were part of Defendants' exit strategy which took place before the collapse of the Terra Ecosystem, which they knew would inevitably occur.

**B.    DEFENDANTS ABSCONDED WITH THE LUNA FOUNDATION GUARD'S BITCOIN**

188.    The Luna Foundation Guard was another vehicle that Defendants used to siphon value out of the Terra Ecosystem.

189.    On March 28, 2022, Defendant Kwon announced in a tweet the wallet address holding the Luna Foundation Guard's cryptocurrency:

bc1q9d4ywgfnd8h43da5tpcxcn6ajv590cg6d3tg6axemvljvt2k76zs50tv4q

Activity in the wallet can therefore be tracked.  As of April 20, 2022, the Luna Foundation Guard wallet held 42,530 bitcoin, worth at the time $1.77 billion.

190.    On May 5, 2022, the Luna Foundation Guard wallet bolstered its reserves by adding an additional 37,863 in over-the-counter swaps with @GenesisTrading and Three Arrows Capital.  Thus, as of May 7, 2022, the value of the assets in the Luna Foundation Guard's wallet was $2.88 billion.

191.    According to a May 26, 2022 tweet by the Luna Foundation Guard's official Twitter account, bearing handle @LFG_org, the Luna Foundation Guard began to purchase UST on May 8, 2022, when the price began to drop "substantially below one dollar."  Presumably, this would have had the effect of bolstering the price of UST back up to $1.00.  But that did not occur.

192.    The Luna Foundation Guard stated, in part 3 of the same tweet, that the purchase of UST on May 8, 2022 was accomplished "by directly executing on-chain swaps and transferring

$BTC to a counterparty to enable them to enter trades with the Foundation." The Luna Foundation Guard further claimed that 52,198 $BTC was transferred to trade with a counterparty, for an aggregate of 1,515,689,462 $UST on May 8, 2022, and that 33,206 $BTC was used to purchase 1,164,018,521 $UST on May 10, 2022.

193.    According to blockchain analysis published by the crypto market analytics firm Elliptic, however, there is no evidence of these transfers. Instead, on May 9, 2022, there were two sizeable transfers of bitcoin from the Luna Foundation Guard to a single, unidentified wallet address on the Gemini platform: 22,189 bitcoin, worth approximately $750 million, and 30,000 bitcoin, worth approximately $900 million. Thus, a total of 52,189 bitcoin, worth approximately $1.66 billion at the time, was transferred to a single, unidentified wallet address.

194.    In addition, on May 10, 2022, the remaining 28,206 bitcoin in the Luna Foundation Guard's reserve was sent to a wallet on the Binance platform.

195.    If this bitcoin had actually been used to purchase UST coins, in order to stabilize its price, there would have been an *influx* of UST coins into the Luna Foundation Guard's wallet. ***But no influx of UST coins is observable in the Luna Foundation Guard's wallet***. Therefore, it is highly unlikely that the bitcoin was used to purchase UST or Luna coins.

196.    Further, despite that Defendant Kwon claimed that the Luna Foundation Guard was being entirely transparent with its funds, it claimed to have effectuated the purchase of UST through an anonymous third party, presumably to explain the large outflow of bitcoin to just two wallets. But if the Luna Foundation Guard had really intended to stabilize the price of UST, it would have just purchased the UST in the Terra Ecosystem through the disclosed wallet. There is no reason that this process would have had to be accomplished through an anonymous third party. As one well-known and respected member of the crypto community bearing the Twitter handle

@cz_binance observed on May 15, 2022, more transparency from the Luna Foundation Guard was required: "Including specific on-chain transactions (txids) of all the funds.  Relying on 3rd party analysis is not sufficient or accurate.  This is the first thing that should have happened."

197.    In total, the bitcoin portions of the Luna Foundation Guard reserve, 80,394 bitcoin, valued at $2.44 billion at the time, was transferred to the Gemini and Binance platforms.

## VII.   THE AFTERMATH OF DEFENDANTS' RICO SCHEME

198.    Defendants' conduct has spawned multiple governmental investigations.  Even before the collapse of the Terra Ecosystem, in September 2021 the SEC began investigating whether certain cryptocurrency derivatives on Terraform Labs' "Mirror Protocol"—a Terra blockchain application which creates coins algorithmically designed to "mirror" the price of other assets—were unregistered securities.  Defendant Kwon had sought to avoid responding to a subpoena issued in connection with that investigation, but on June 8, 2022 the U.S. Court of Appeals for the Second Circuit rejected his challenge.

199.    The SEC is also reportedly investigating whether the marketing of UST before its crash violated federal regulations, and whether Defendant Kwon laundered money in connection with the $80 million monthly payments he allegedly extracted from Terraform Labs.

200.    In South Korea, prosecutors are reportedly considering bringing charges against Defendant Kwon for running the Anchor Protocol as a Ponzi scheme.  Investigators there have issued subpoenas to Terraform Labs employees and have barred certain individuals from leaving the country.  Moreover, Seoul police are allegedly investigating whether a Terraform Labs employee embezzled bitcoin from the Company's treasury.

## VIII.  THE LUNA AND UST COINS ARE NOT SECURITIES

201.    In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946), the Supreme Court laid out factors that must be met in order for financial instruments to be considered "securities" and subject to the laws, regulations and rules promulgated by the SEC.  These are: (1) purchasers must have invested money; (2) purchasers must have invested in a common enterprise; (3) purchasers must expert to earn profit from owning the financial instrument at issue; and (4) the profits must be expected to be derived from the efforts of others.

202.    Neither the Luna coins nor the UST coins qualify as securities under *Howey.*

203.    First, purchasers of the Luna coins and UST did not invest in a common enterprise. The Terra Ecosystem was more akin to a monetary system, which included a currency (the UST coins) backed by an "asset" (the Luna coins) both of which could be deposited in a bank (the Anchor Protocol) to earn interest.  There was no common goal among purchasers of Luna and UST coins – each individual had the goal of earning interest for himself or herself.

204.    Second, purchasers of the UST coins had no expectation of earning any profits. Indeed, the entire purpose of the UST coins was to build a coin that would ***not*** fluctuate in value. The UST coins were thus designed to be a medium of transaction, and not an investment.

205.    Third, although purchasers of Luna coins may have had some expectation that they would increase in value, this increase in value was driven primarily by supply and demand, similar to any ordinary commodity such as gold or oil.  Luna purchasers, therefore, did not have the expectation that any profits would be "derived from the efforts of others," and they are not securities.

## IX. DEFENDANTS' SPECIFIC PARTICIPATION IN THE RICO ENTERPRISE

206.    Each of the Defendants is a "person" as that term is defined in 18 U.S.C. § 1961(3).

Together, they formed an association-in-fact that comprises an "Enterprise", as that term is defined

in 18 U.S.C. § 1961(4), for the purpose of carrying out their racketeering activities.

### A.    DO KWON

207.    Defendant Kwon is a "person" as that term is defined in 18 U.S.C. § 1961(3).  He

is responsible for command and control of the Enterprise on a strategic and tactical level, and has

taken actions, and directed other members of the Enterprise to take actions, necessary to

accomplish the overall aims of the criminal enterprise, including as described herein and above.

208.    Defendant Kwon conducted and participated in the operation and management of

the Enterprise and its affairs through his position as the principal authority figure with final say on

business decisions.  The entirety of the Terra Ecosystem was Defendant Kwon's brainchild, and

he has been the chief executive and operator behind all its functions. Defendant Kwon is the face

of the Terra Ecosystem, and the UST and Luna coins.  He has called the Luna coin his "greatest

invention."  Through his position, Defendant Kwon exercised control over the Enterprise.

209.    Defendant Kwon used the Enterprise to engage in a pattern of racketeering.

Continuously, beginning with the inception of the Enterprise in 2018, Defendant Kwon

disseminated numerous false statements concerning the Terra Ecosystem, and the stability and

demand for the UST stablecoin and its sister coin Luna.  The pattern of racketeering actions he

committed include: (i) issuing the Terra White Paper, which included numerous false statements

and material omissions, including failing to explain to consumers that the algorithm underlying

the UST-Luna exchange lacked essential governing controls and would not succeed in a market

downturn; (ii) issuing the Anchor White Paper, which included numerous false statements and

material omissions concerning the feasibility of paying a steady 19.5% yield; (iii) concealing his

involvement with the failed stablecoin, Basis Cash; (iv) accepting, and then concealing, a cash infusion into the Terra Ecosystem from Jump in 2021, and instead misleading investors that the Terra Ecosystem and UST had stabilized; (v) falsely reporting that Terraform Labs had an ongoing association with the Korean payment app, "Chai," when in fact that relationship had been severed; (vi) creating the Anchor Protocol and promising a 19.5% yield on deposits, with the knowledge that this was not sustainable, for the sole purpose of driving demand for UST and Luna; (vii) creating the Luna Foundation Guard to appease skeptics and mislead consumers into believing that the Terra Ecosystem would be safe in a market downturn; (viii) siphoning off billions of dollars of UST from the Terra Ecosystem to his private wallets; (ix) siphoning off billions of dollars of bitcoin from the Luna Foundation Guard to his private wallets; and (x) issuing ongoing and repeated false statements through his and Terraform Labs' Twitter accounts, and through other social media and other media outlets, during the Class Period designed to mislead consumers.

### B.   NICHOLAS PLATIAS

210.   Defendant Platias is a "person" as that term is defined in 18 U.S.C. § 1961(3). Defendant Platias is responsible for command and control of the Enterprise on a strategic and tactical level, and has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall aims of the criminal enterprise, including as described herein and above.

211.   Defendant Platias conducted and participated in the operation and management of the Enterprise and its affairs through his position of authority at Terraform Labs and the Luna Foundation Guard.  Defendant Platias is a founding member of Terraform Labs, Head of Research, and a member of the Governing Council of the Luna Foundation Guard.  Through these positions, Defendant Platias has exercised control over Terraform Labs.

212.    Defendant Platias used the Enterprise to engage in a pattern of racketeering.  From the inception of the Enterprise in 2018, Defendant Platias numerous false statements concerning the Terra Ecosystem, and the stability and demand for the UST stablecoin and its sister coin Luna. The pattern of racketeering actions he committed include: (i) issuing the Terra White Paper, which included numerous false statements and material omissions, including failing to explain to consumers that the algorithm underlying the UST-Luna exchange lacked essential governing controls and would not succeed in a market downturn; (ii) issuing the Anchor White Paper, which included numerous false statements and material omissions concerning the feasibility of paying a steady 19.5% yield; (iii) concealing Defendant Kwon's involvement with the failed stablecoin, Basis Cash; (iv) accepting, and then concealing, a cash infusion into the Terra Ecosystem from Jump in 2021, and instead misleading investors that the Terra Ecosystem and UST had stabilized; (v) failing to correct Defendant Kwon when he falsely reported that Terraform Labs had an ongoing association with the Korean payment app, "Chai," when in fact that relationship had been severed; (vi) creating the Anchor Protocol and promising a 19.5% yield on deposits, with the knowledge that this was not sustainable, for the sole purpose of driving demand for UST and Luna; (vii) creating the Luna Foundation Guard to appease skeptics and mislead consumers into believing that the Terra Ecosystem would be safe in a market downturn; (viii) siphoning off billions of dollars of UST from the Terra Ecosystem to his private wallets; (ix) siphoning off billions of dollars of bitcoin from the Luna Foundation Guard to his private wallets; and (x) issuing ongoing and repeated false statements through his and Terraform Labs' Twitter accounts, and through other social media and other media outlets, during the Class Period designed to mislead consumers.

### C.    TERRAFORM LABS

213.    Defendant Terraform Labs is a "person" as that term is defined in 18 U.S.C. § 1961(3).  Directly and through its agent officers, directors and employees, Terraform Labs has

been an active participant and central figure in the operation and management of the Enterprise and its affairs, and in the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiff and the Class for years.

214.    Terraform Labs conducted and participated in the operation and management of the Enterprise and its affairs by hosting the Terra blockchain, including the Anchor Protocol, that directly facilitated the criminal activities of the Enterprise.  Terraform Labs has exercised direct control over the Enterprise.

215.    Defendant Terraform Labs used the Enterprise to engage in a pattern of racketeering.  From the inception of the Enterprise in 2018, Terraform Labs disseminated numerous false statements concerning the Terra Ecosystem, and the stability and demand for the UST stablecoin and its sister coin Luna.  The pattern of racketeering actions that Terraform Labs committed include: (i) issuing the Terra White Paper, which included numerous false statements and material omissions, including failing to explain to consumers that the algorithm underlying the UST-Luna exchange lacked essential governing controls and would not succeed in a market downturn; (ii) issuing the Anchor White Paper, which included numerous false statements and material omissions concerning the feasibility of paying a steady 19.5% yield; (iii) concealing Defendant Kwon's involvement with the failed stablecoin, Basis Cash; (iv) accepting, and then concealing, a cash infusion into the Terra Ecosystem from Jump in 2021, and instead misleading investors that the Terra Ecosystem and UST had stabilized; (v) failing to correct Defendant Kwon when he falsely reported that Terraform Labs had an ongoing association with the Korean payment app, "Chai," when in fact that relationship had been severed; (vi) creating the Anchor Protocol and promising a 19.5% yield on deposits, with the knowledge that this was not sustainable, for the sole purpose of driving demand for UST and Luna; (vii) creating the Luna Foundation Guard to appease

skeptics and mislead consumers into believing that the Terra Ecosystem would be safe in a market downturn; and (vii) issuing ongoing and repeated false statements through his and Terraform Labs' Twitter accounts, and through other social media and other media outlets, during the Class Period designed to mislead consumers.

     **D.**     **JUMP /KARIYA**

216.     Defendants Jump and Kariya are "persons" as that term is defined in 18 U.S.C. § 1961(3).  Defendant Kariya is responsible for command and control of the Enterprise on a strategic and tactical level, and has taken actions, necessary to accomplish the overall aims of the criminal enterprise, including as described herein and above.

217.     Defendant Kariya conducted and participated in the operation and management of the Enterprise and its affairs through his position of authority at Jump and on the Governing Council at the Luna Foundation Guard.  Through these positions, Defendant Kariya has exercised control over Terraform labs.

218.     Defendant Kariya used the Enterprise to engage in a pattern of racketeering. Defendant Kariya had been involved with the Enterprise for years, as demonstrated by one of his tweets.  On September 14, 2021, Defendant Kariya tweeted that it has been, "a real pleasure working with [Do Kwon] and the Terra team over the last couple years." Since he began with the Enterprise, Defendant Kariya had made the false statements.  Defendant Kariya publicly bolstered UST, Luna, the Anchor Protocol and the Terra Ecosystem. With the motive to funnel profits directly to himself and opportunity to commit this fraud, Defendant Kariya was an intentional participant in the scheme to defraud Plaintiff.

219.     Directly and through its agent officers, directors, board members, and employees, Jump has been an active participant and central figure in the operation and management of the

Enterprise and its affairs, and in the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiff and the Class for years.

220.    Jump conducted and participated in the operation and management of the Enterprise and its affairs. In a tweet on September 14, 2021, Terraform Labs admitted itself that "Jump had quietly played a pivotal role in the Terra ecosystem for a long time…", that "Jump is a consummate Terra partner" and that the "Terra economy is magnified significantly with Jump Crypto by its side." Further, Jump participated in the Enterprises' affairs through Defendant Kariya and his position of authority. Ultimately, Jump had a part in directing the Enterprises' affairs.

221.    Jump's relationship with the Enterprise is manifest in its twitter account. On October 14, 2021, Jump retweeted its partner, Terraform Labs, touting that "Terra's ecosystem sprint into the end of the year is gonna be a sight to behold."  A few days later, on October 19, 2021, Jump tweeted their congratulations "to both [Terraform] and [Wormhole] teams on a big day! We're excited to see the future of cross-chain interoperability when $UST is unleashed in a trust-minimized fashion across the highest value ecosystems."  On that same day, Jump retweeted Wormhole and Terraform Labs touting that "Terra is known for its vibrant ecosystem, #LUNAtic community, and its decentralized stablecoin, $UST."  On November 12, 2021, Jump again retweeted its partner, Terraform Labs, promoting their new website.

222.    Defendants Jump and Kariya used the Enterprise to engage in a pattern of racketeering.  Defendants Jump and Kariya disseminated numerous false statements concerning the Terra Ecosystem, and the stability and demand for the UST stablecoin and its sister coin Luna. The pattern of racketeering actions they committed include: (i) providing, and then concealing, a cash infusion into the Terra Ecosystem in 2021, and misleading investors that the Terra Ecosystem and UST had stabilized; (ii) helping to form the Luna Foundation Guard to appease skeptics and

mislead consumers into believing that the Terra Ecosystem would be safe in a market downturn; (iii) siphoning off billions of dollars of UST from the Terra Ecosystem to private wallets; (iv) siphoning off billions of dollars of bitcoin from the Luna Foundation Guard to private wallets; and (v) issuing ongoing and repeated false statements through their twitter accounts, and through other social media and other media outlets, during the Class Period designed to mislead investors about all of the foregoing.

E.    LUNA FOUNDATION GUARD

223.    Defendant Luna Foundation Guard is a "person" as that term is defined in 18 U.S.C. § 1961(3).  The Luna Foundation Guard operated directly and through its agent officers, directors and employees.

224.    The Luna Foundation Guard conducted and participated in the operation and management of the Enterprise and its affairs.  The Luna Foundation Guard was created specifically to "facilitate the growth of the Terra ecosystem."  By raising funds for the Enterprise and deciding how to disperse those funds, the Luna Foundation Guard participated in the Enterprises affairs.

225.    Through its participation in the Enterprise, the Luna Foundation Guard engaged in a pattern of racketeering since 2022 and with the substantial threat that the Enterprise's racketeering activities would continue past these acts.  The Luna Foundation Guard was directly responsible for facilitating the fraudulent scheme by systematically raising funds for the purpose of publicly bolstering UST and the Terra Ecosystem and making false public statements about the stability of UST and the Anchor Protocol.  With the motive to the motive to funnel profits directly to itself and opportunity to commit this fraud, the Luna Foundation Guard was an intentional participant in the scheme to defraud Plaintiff.

226.    The pattern of racketeering actions that the Luna Foundation Guard committed include: (i) existing to appease skeptics and mislead consumers into believing that the Terra

Ecosystem would be safe in a market downturn; (ii) siphoning off billions of dollars of bitcoin from the Luna Foundation Guard to private wallets; and (iii) issuing ongoing and repeated false statements through its and Terraform Labs' Twitter accounts, and through other social media and other media outlets, during the Class Period designed to mislead consumers.

### F.   TETOT

227.   Defendant Tetot is a "person" as that term is defined in 18 U.S.C. § 1961(3). Defendant Tetot is responsible for command and control of the Enterprise on a strategic and tactical level, and has taken actions, necessary to accomplish the overall aims of the criminal enterprise, including as described herein and above.

228.   Defendant Tetot conducted and participated in the operation and management of the Enterprise and its affairs through his position of authority on the Governing Council at the Luna Foundation Guard.

229.   Defendant Tetot engaged in a pattern of racketeering since 2022 and with the substantial threat that the Enterprise's racketeering activities would continue past these acts. Defendant Tetot used the Enterprise to engage in a pattern of racketeering.  Defendant Tetot disseminated numerous false statements concerning the Terra Ecosystem, and the stability and demand for the UST stablecoin and its sister coin Luna.  The pattern of racketeering actions he committed include: (i) concealing Defendant Kwon's involvement with the failed stablecoin, Basis Cash; (ii) creating the Luna Foundation Guard to appease skeptics and mislead consumers into believing that the Terra Ecosystem would be safe in a market downturn; (iii) siphoning off billions of dollars of bitcoin from the Luna Foundation Guard to his private wallets; and (iv) issuing ongoing and repeated false statements through his and Terraform Labs' Twitter accounts, and through other social media and other media outlets, during the Class Period designed to mislead consumers.

G.   DELPHI / MACEDO

230.   Defendants Delphi and Macedo are "persons" as that term is defined in 18 U.S.C. § 1961(3).  Defendant Macedo has been involved in, and held positions of responsibility with respect to, the planning and execution of the scheme to defraud Plaintiff and the Class, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise.

231.   Defendant Macedo conducted and participated in the operation and management of the Enterprise and its affairs through his position of authority at Delphi and on the Governing Council at the Luna Foundation Guard. Through these positions, Defendant Macedo has exercised control over the Enterprise.

232.   Defendant Macedo used the Enterprise to engage in a pattern of racketeering since 2021 and with the substantial threat that the Enterprise's racketeering activities would continue past these acts.  On July 7, 2021, Defendants Macedo and Kwon appeared together on RealVisionTV discussing, among other things, stablecoins and the purported advantages for investors over holding fiat currency, how algorithmic stablecoins such as UST can avoid death spirals, Terraform Labs' potential solution for UST, and how a stable demand base is needed to keep the UST peg.  During the discussion, Defendant Macedo states that stablecoins are much more useful for people than fiat currency and that UST is the only truly decentralized stablecoin out there.

233.   Defendant Macedo continued to make false statements that contributed to publicly bolstering UST, Luna, the Anchor Protocol, and the Terra Ecosystem. With the motive the motive to funnel profits directly to himself and opportunity to commit this fraud, Defendant Macedo was an intentional participant in the scheme to defraud Plaintiff.

234.   Defendant Macedo also benefited from the scheme's funneling of profits.

235.    Directly and through its agent officers, directors, board members, and employees, Delphi has been an active participant and central figure in the operation and management of the Enterprise and its affairs, and in the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiff and the Class for years.

236.    Delphi conducted and participated in the operation and management of the Enterprise and its affairs.  Delphi, through Defendant Macedo and his position of authority within the Terra Ecosystem, participated in directing the Enterprises affairs.

237.    Delphi used the Enterprise to engage in a pattern of racketeering since 2021 and with the substantial threat that the Enterprise's racketeering activities would continue past these acts.  Specifically, on or about July 16, 2021, Terraform Labs announced a $150 million fund commitment from major investors, including Delphi, to drive growth and development of projects building on its rapidly growing ecosystem.

238.    After contributing to Terraform Labs, Delphi continued to facilitate the RICO scheme by falsely bolstering the public's confidence in UST, Luna, and the Terra Ecosystem by participating in the funding of the Luna Foundation Guard and making public statements regarding the purpose of the Luna Foundation Guard and its protections against severe market risks. Delphi also hosted a podcast called "Terra Autumn" where Defendant Macedo talks with Defendant Kwon. On the podcast, Defendant Kwon downplays the de-pegging that occurred earlier that year in May 2021 stating "[w]e handled our prices pretty well. So as swaps were happening we saw the price peg of TerraUSD [UST] seep 6 and 7% for a period of few days, but then it recovered as redemptions started to smooth out in the open market." Defendant Kwon claimed that UST was able to withstand this de-pegging because "Terra is more resilient than other types of algorithmic

stablecoins [] because there's a vibrant economy that is being built on the Terra blockchain. I think that's the best defense that algorithmic stablecoins can have against [death] spirals."

239.    Thus, Defendants Delphi and Macedo used the Enterprise to engage in a pattern of racketeering.  Defendants Delphi and Macedo made numerous false statements concerning the Terra Ecosystem, and the stability and demand for the UST stablecoin and its sister coin Luna. Their pattern of racketeering activities includes: (i) creating the Luna Foundation Guard to appease skeptics and mislead consumers into believing that the Terra Ecosystem would be safe in a market downturn; (ii) siphoning off billions of dollars of UST from the Terra Ecosystem to private wallets; (iii) siphoning off billions of dollars of bitcoin from the Luna Foundation Guard to his private wallets; and (iv) issuing ongoing and repeated false statements through his and Terraform Labs' Twitter accounts, and through other social media and other media outlets, during the Class Period designed to mislead consumers.

## X.   CLASS ALLEGATIONS

240.    Plaintiff brings this action individually and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), defined as follows:

> All persons who, during the Class Period, purchased UST and/or Luna coins and were damaged thereby.

241.    The Class Period is defined as the period between May 1, 2019 and June 15, 2022.

242.    Excluded from the Class are Defendants and their affiliates, agents, employees, officers, and directors, and any members of their immediate families. Plaintiff reserves the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

243.    The Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is currently unknown, upon

information and belief, there are at least thousands of Class members. The number of Class members can be determined based on Terraform Labs' and other third parties' records.

244.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

245.    whether Defendants are persons within the meaning of the RICO statute;

246.    whether Defendants formed an enterprise that engages in interstate commerce;

247.    whether Defendants violated federal laws regarding mail and wire fraud;

248.    whether Defendants violated federal laws regarding money laundering;

249.    whether Defendants falsely promoted UST and the Anchor Protocol;

250.    whether Defendants' promotion of UST and the Anchor Protocol occurred via mail or wire;

251.    whether Defendants conspired to artificially inflate the price of UST and Luna and then sell the same to unsuspecting users; and

252.    whether Plaintiff and Class members have suffered damages, and, if so, the nature and extent of those damages.

253.    Plaintiff's claims against Defendants are typical of the claims of the members of the Class because all members sustained damages arising out of the Company's wrongful conduct as detailed herein. Plaintiff's and the Class members' claims all arise out of Terraform Labs' uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of UST and Luna.

254.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action lawsuits.  Plaintiff has no interests antagonistic to or in conflict with those of the Class and therefore is an adequate representative for the Class.

255.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual members of the Class may in some instances be relatively small, the expense and burden of individual litigation make it impossible for such Class members individually to redress the wrongs done to them.  Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

256.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

XI.    **COUNTS**

**FIRST CAUSE OF ACTION**
**Violations of RICO, 18 U.S.C. §§1962(c)**
**(Against all Defendants)**

257.    Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

258.    At all relevant times, Plaintiff was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

259.    At all relevant times, Defendants Kwon, Platias, Terraform Labs, the Luna Foundation Guard, Kariya, Jump, Macedo, Delphi, and Tetot were and are each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

260.    At all relevant times, each of the Defendants, is, and was, a person that exists separate and distinct from the RICO Enterprise, described below.

### A.    THE RICO ENTERPRISE

261.    Defendants Kwon, Platias, Terraform Labs, the Luna Foundation Guard, Kariya, Jump, Macedo, Delphi and Tetot constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  These individual persons have bonded together to form a distinct enterprise through which they could conduct a pattern of racketeering activity.

262.    Defendants are a group of persons associated together in fact for the common purpose of carrying on an ongoing criminal enterprise. In particular, the Enterprise has the common goal of defrauding Plaintiff and the Class of hundreds of millions (if not billions) of dollars through a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive conduct and material misrepresentations made in connection with the UST, Luna, and the Terra Ecosystem, in order to funnel its ill-gotten gains from Plaintiff and the Class, and thereby promote and conduct their criminal activities, reward and incentivize participation in the scheme, and frustrate the efforts to recover Defendants' illicit profits.

263.    The members of the Enterprise have long-standing and ongoing relationships rooted in common ownership, common control, ongoing business dealings, and a mutual interest and participation in common (criminal) activities.

264.    The Enterprise has longevity sufficient to permit the Defendants to pursue the Enterprise's goal of defrauding Plaintiff and the Class to the Defendants' profit. The scheme at the heart of the Enterprise has been in operation since at least 2018.

265.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure with international operation.  The Enterprise has been

structured to operate as a unit in order to accomplish the common goals and purposes of their criminal scheme.

266.    Each of the Defendants knew of the existence of, and conducted or participated in the operation of management of, the Enterprise and its affairs.

267.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).  The Enterprise regularly participated in the multi-billion-dollar international cryptocurrency industry, purchased or facilitated the purchase of UST and Luna, and held and transferred funds and assets.

**B.    PATTERN OF RACKETEERING ACTIVITY**

268.    Defendants conducted or participated in, directly or indirectly, the management or operation of the Enterprise and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit, they have consistently and regularly committed multiple acts of racketeering activity spanning a period since at least 2018, and with the substantial threat of continuing racketeering activities beyond this period, which multiple acts shared a common or related purpose, goal, result, participants, victim, and method of commission, which are described below:

**1.    Multiple Instances of Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343**

269.    Defendants engaged in a wide-ranging scheme to defraud Plaintiff concerning the Defendants' facilitation of purchases and sales of UST and Luna, and deceptive business practices regarding the true value of UST and Luna purchased by or on behalf of Plaintiff, and to funnel their ill-gotten gains from Plaintiff to the other RICO Defendants, in order to promote and conduct their criminal activities, reward and incentivize participation in the scheme, and frustrate efforts to recover the Defendants' illicit profits by making it difficult or impossible to trace and collect the

funds.  The ultimate objective of Defendants' scheme to defraud was and is to deceive and induce Plaintiff and the Class into purchasing hundreds of millions of dollars in UST and Luna, which directly benefitted Defendants individually and collectively.

270.    Defendants accomplished their scheme to defraud Plaintiff and the Class by regularly and systematically misrepresenting, concealing, and/or failing to disclose material information from Plaintiff and the Class, falsifying transaction and financial records, engaging in and facilitating sham transactions, and systematically deceiving Plaintiff and the Class about their activities, their coordination between one another, and the true nature of their fraudulent business practices.

271.    In furtherance of their scheme, and as described herein, Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in a post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

> a.    Emails, telephone calls, and other communications by wire and mail from or caused to be sent by Defendants Kwon, Platias, Terraform Labs, the Luna Foundation Guard, Kariya, Jump, Macedo, Delphi and Tetot to Plaintiff and the Class (i) encouraging or facilitating the purchase of UST and Luna; (ii) including or incorporating false or misleading statements, or omitting material information about such coins, the RICO Defendants' business practices, or the relationships and connections between and among the Defendants; and (iii) otherwise promoting or furthering the scheme to defraud;

b. Emails, telephone calls, and other communications by wire and mail between and among each of the Defendants (i) facilitating the sale of UST and Luna to Plaintiff and the Class in furtherance of the fraudulent scheme; and (ii) otherwise promoting or furthering the scheme to defraud;

c. Funds transferred between and among the Defendants as payment and reward for participation in the scheme, as incentive and motivation for continuing and future participation in the scheme, with the intent that the funds be used to promote, conduct, or engage in the Defendants' criminal activities, to frustrate anticipated and/or actual efforts to recover the Defendants' ill-gotten gains by making it difficult or impossible to trace and/or collect the funds, or otherwise promoting or furthering the scheme to defraud;

d. Funds transferred between and among the Defendants and Plaintiff and the Class in furtherance of the scheme to defraud; and

e. Funds transferred between and among the Defendants and third parties, with the intent that those funds be used to promote, conduct, or engage in the RICO Defendants' criminal activities, or otherwise promote or further the scheme to defraud, with or without those third parties' knowledge of the true purpose of those transactions.

272.    The RICO Defendants' misrepresentations, individually and in the aggregate, have caused Plaintiff and the Class substantial damages.  The damages to Plaintiff and the Class were contemplated and intended by the RICO Defendants.

### 2. Multiple Instances of Money Laundering in Violation of 18 U.S.C. §§ 1341, 1343

282. Defendants engaged in numerous financial transactions in the course of operating and managing their scheme to defraud Plaintiff and the Class, including (i) financial transactions constituting predicate acts of mail and wire fraud; and (ii) financial transactions by which the Defendants funneled the proceeds of their scheme from Terraform Labs and the Luna Foundation Guard to their private crypto wallets.

283. Specifically, Defendants engaged in financial transactions which resulted in siphoning funds away from the Terra Ecosystem and the Luna Foundation Guard. The purpose of these financial transactions has been to profit Defendants and to hide their scheme, and to conceal funds from recovery by Plaintiff and the Class.

284. The financial transactions involved the proceeds of the specified unlawful activities, namely mail and wire fraud. At times, these financial transactions were part of a set of parallel or dependent transactions, at least one of which involved the proceeds of specified unlawful activity, and which were part of a single plan or arrangement.

285. Defendants knew that the property involved in these financial transactions represented the proceeds of unlawful activities, namely, mail and wire fraud. Defendants' knowledge was obtained through their orchestration, operation, and management of the scheme to defraud Plaintiff and the Class.

286. Defendants conducted these financial transactions with the intent to promote the carrying on of the specified unlawful activity, and knowing that the financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity and to prevent recovery of the proceeds by Plaintiff and the Class.

287.     Plaintiff and the Class have been harmed by these financial transactions.

**3.     Multiple Instances of Obstruction of Justice in Violation of 18 U.S.C. § 1503**

289.     On information and belief, in multiple instances, Defendants have unlawfully obstructed justice by hiding their criminal scheme from law enforcement, including the SEC, and international law enforcement authorities, including without limitation, Interpol.

**C.     INJURY AND CAUSATION**

290.     Plaintiff and the Class have been and will continue to be injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial. The injuries to Plaintiff and the Class directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, hundreds of millions of dollars in UST and Luna; lost opportunities; and attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting Defendants' fraudulent activities.

291.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff and the Class are entitled to recover treble damages, plus costs and attorneys' fees from Defendants.  The Court should also enter such equitable relief as it deems just and proper to unwind the parties' relationship going forward and permit Plaintiff and the Class to control the wind-down of this operation, without having to continue to do business with Defendants.

**<u>SECOND CAUSE OF ACTION</u>**
**Conspiracy to Violate RICO, 18 U.S.C. §1962(d)**
**(Against all Defendants)**

292.     Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

293.    Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. §1962(c) as described above, in violation of 18 U.S.C. §1962(d).

294.    By and through each of the Defendants' close business relationships with one another, and their close coordination with one another in the affairs of the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise existed beyond the Defendant's individual role.   Moreover, through the same connections and coordination, each Defendant knew that the Defendants were engaged in a conspiracy to commit predicate acts, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

295.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiff and the Class.  In the absence of agreement, the Enterprise could not have operated as it did. Further evidence of an agreement among the Defendants is particularly within the control of the Defendants.

296.    The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.

297.    Plaintiff and the Class have been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. §1962(d), in an amount to be determined at trial.  The injuries to Plaintiff and the Class directly, proximately, and reasonably

foreseeably resulting from or caused by these violations of 18 U.S.C. §1962(d) include, but are not limited to, hundreds of millions of dollars in UST and Luna; lost opportunities; and attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting the RICO Defendants' fraudulent, criminal activities.

298.    Pursuant to 18 U.S.C. §1964(c), Plaintiff and the Class are entitled to recover treble damages, plus costs and attorneys' fees from Defendants.  The Court should also enter such equitable relief as it deems just and proper to unwind the parties' relationship going forward and permit Plaintiff and the Class to control the wind-down of this operation, without having to continue to do business with the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B.    Award all actual, general, compensatory, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

C.    Treble damages according to statute;

D.    Award post-judgment interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief;

F.    Award reasonable attorneys' fees and costs; and

G.    Grant such further relief that this Court deems appropriate.

**JURY DEMAND**

Plaintiff, individually and on behalf of the putative Class, demand a trial by jury on all issues so triable.

DATED:  November 11, 2022

**GRANT & EISENHOFER P.A.**
/s/ Daniel L. Berger
Daniel L. Berger
Caitlin M. Moyna
Vincent J. Pontrello
485 Lexington Avenue, Floor 29
New York, NY 10017
Telephone: (646) 722-8500
Email: dberger@gelaw.com

*Attorneys for Plaintiff and the Proposed Class*

79