# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

MATTHEW ALBRIGHT, Individually and
on Behalf of All Others Similarly Situated,

                Plaintiff,

    v.

TERRAFORM LABS, PTE. LTD., JUMP
TRADING LLC, DELPHI DIGITAL
CONSULTING, INC., DO KWON,
NICHOLAS PLATIAS, LUNA
FOUNDATION GUARD LTD., JOSE
MACEDO, KANAV KARIYA, and REMI
TETOT,

                Defendants.

Case No. 1:22-cv-07281-JSR-BCM

The Honorable Jed S. Rakoff

The Honorable Barbara C. Moses

<u>CLASS ACTION</u>

## OMNIBUS MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

Daniel L. Berger
Caitlin M. Moyna
Vincent J. Pontrello
GRANT & EISENHOFER, P.A.
485 Lexington Avenue, Floor 29
New York, NY 10017
Tel: 646-722-8500
Email: dberger@gelaw.com
      cmoyna@gelaw.com
      vpontrello@gelaw.com

*Attorneys for Plaintiff*

Date: December 19, 2022

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

FACTS ............................................................................................................................ 7

I.     KWON SEEKS TO FILL THE DEMAND FOR A STABLECOIN ................................. 7

II.    KWON'S FIRST ALGORITHMIC STABLECOIN VENTURE – BASIS CASH –
FAILS ........................................................................................................................ 8

III.   DEFENDANTS DEVELOP AND PROMOTE THE UST-LUNA ALGORITHM,
WHICH THEY KNEW WAS DESTINED TO FAIL ................................................. 9

IV.   DEFENDANTS LAUNCH UST IN A BULL MARKET TO MAXIMIZE
FRAUDULENT GAINS ......................................................................................... 11

V.    DEFENDANTS LURE CRYPTO ENTHUSIASTS TO PURCHASE UST AND
LUNA THROUGH MATERIALLY FALSE STATEMENTS AND OMISSIONS .......... 12

VI.   DEFENDANTS DROVE DEMAND TO THE UNSTABLE TERRA
ECOSYSTEM THROUGH THE ANCHOR PROTOCOL AND FALSE
STATEMENTS ....................................................................................................... 13

VII.  DEFENDANTS CREATE THE LUNA FOUNDATION GUARD TO GIVE THE
ILLUSION OF STABILITY .................................................................................... 17

VIII. DEFENDANTS PROFIT AS THE TERRA ECOSYSTEM COLLAPSES ...................... 21

STANDARD OF REVIEW ........................................................................................ 23

I.    STANDARD FOR DISMISSAL UNDER FED. R. CIV. P. 12(B)(2) .............................. 23

II.    STANDARD FOR DISMISSAL UNDER FED. R. CIV. P. 12(B)(6) .............................. 23

ARGUMENT ............................................................................................................... 25

I.    THE COURT HAS PERSONAL JURISDICTION OVER THE TFL
DEFENDANTS ....................................................................................................... 25

       A.    TERRAFORM LABS AND DO KWON ........................................................ 27

       B.    THE LUNA FOUNDATION GUARD ......................................................... 31

II.    THE COMPLAINT PLEADS A RICO CLAIM ........................................................ 32

i

A.   THE COMPLAINT ALLEGES PREDICATE ACTS ........................................ 32

    1.   Mail and Wire Fraud ........................................................... 32

        a.   Scheme or Artifice to Defraud .......................................... 33
        b.   Scienter ..................................................................... 37

    2.   Money Laundering ................................................................ 42

B.   THE COMPLAINT ALLEGES AN ASSOCIATION-IN-FACT AMONG DEFENDANTS ...... 44

C.   THE COMPLAINT ALLEGES THAT DEFENDANTS OPERATED AND MANAGED THE RICO ENTERPRISE ...................................................................... 47

D.   THE COMPLAINT ALLEGES A PATTERN OR CONTINUITY OF ACTIVITY .................. 51

    1.   Closed-Ended Continuity ...................................................... 52

    2.   Open-Ended Continuity ........................................................ 54

E.   DEFENDANTS' STANDING ARGUMENTS FAILS ....................................... 56

    1.   Injury .............................................................................. 56

    2.   But-For Causation ............................................................... 58

    3.   Proximate Causation ............................................................ 60

F.   DEFENDANTS' EXTRATERRITORIALITY ARGUMENT FAILS ........................ 63

III.   THE COMPLAINT ALLEGES A RICO CONSPIRACY CLAIM .................................. 66

IV.   PLAINTIFF'S CLASS CLAIMS ARE NOT BARRED BY THE ANCHOR TERMS OF SERVICE ...................................................................... 70

V.   THE RICO AMENDMENT OF THE PSLRA DOES NOT APPLY BECAUSE UST AND LUNA ARE NOT SECURITIES ...................................................... 71

A.   THE RICO AMENDMENT APPLIES ONLY TO CONDUCT CONCERNING THE PURCHASE AND SALE OF SECURITIES ................................................ 71

B.   THE UST AND LUNA COINS ARE NOT SECURITIES ............................... 73

CONCLUSION .................................................................................... 75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCER Group, Inc.*,
    47 F. 3d 47 (2d Cir. 1995)...............................................................35, 36

*Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*,
    No. CV-042934, 2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005)..........................44, 48, 49, 60

*Allstate Ins. Co. v. Lyons*,
    843 F. Supp. 2d 358 (E.D.N.Y. 2012) .........................................................55

*Allstate Ins. Co. v. Nazarov*,
    No. 11 CV 6187, 2015 WL 5774459 (E.D.N.Y. Sept. 30, 2015)..........................37

*Allstate Ins. Co. v. Valley Physical Medicine & Rehab.*,
    2009 WL 3245388 (E.D.N.Y. Sept. 30, 2009) .............................................58, 60

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................23

*Atuahene v. City of Hartford*,
    10 F. App'x 33 (2d Cir. 2001) ...............................................................39

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F. 3d 779 (2d Cir. 1999)...............................................................23

*Barry v. Cboe Glob. Markets, Inc.*,
    42 F. 4th 619 (7th Cir. 2022) ...............................................................35

*Bascuñán v. Elsaca*,
    874 F. 3d 806 (2d Cir. 2017)...............................................................63, 65

*Benedetti v. Nissenbaum*,
    No. 90 CIV. 7206, 1993 WL 118489 (S.D.N.Y. Apr. 12, 1993)..........................61

*Best Van Lines, Inc. v. Walker*,
    490 F. 3d 239 (2d Cir. 2007)...............................................................26, 27

*In re Bibox Group Hldgs. Ltd. Sec. Litig.*,
    534 F. Supp. 3d 326 (S.D.N.Y. 2021)........................................................73

*Blockchange Ventures I GP, LLC. v. Blockchange, Inc.*,
    No. 20 CIV. 6866, 2021 WL 308277 (S.D.N.Y. Jan. 29, 2021)..........................31

*Board of Managers of Trump Tower at City Center Condominium by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432 (S.D.N.Y. 2018) ...................................................................67

*Bridge v. Phoenix Bond & Indemn. Co.*,
553 U.S. 639 (2008) ...................................................................................................58

*Capital Records, LLC v. VideoEgg*,
611 F. Supp. 2d 349 (S.D.N.Y. 2009) ......................................................................30

*Casio Computer Co., Ltd. v. Sayo*,
98CV3772, 2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) .......................................42

*Chambers v. Time Warner, Inc.*,
282 F. 3d 147 (2d Cir. 2002) ...............................................................................24, 25

*Childers v. New York & Presbyterian Hosp.*,
36 F. Supp. 3d 292 (S.D.N.Y. 2014) .........................................................................23

*Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*,
187 F. 3d 229 (2d Cir. 1999) .....................................................................................55

*D'Addio v. L.F. Rothschild Inc.*,
697 F. Supp. 698 (S.D.N.Y. 1988) ...........................................................................57

*Dale v. Banque SCS Alliance S.A.*,
No. 02 Civ. 3592, 2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005) ...........................42

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F. 3d 677 (2d Cir. 2009) .....................................................................................39

*Dennis v. JPMorgan Chase & Co.*,
343 F. Supp. 3d 122 (S.D.N.Y. 2018) ...........................................................45, 63, 64

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*,
7 N.Y. 3d 65, 818 N.Y.S. 2d 164, 850 N.E. 2d 1140 (2006) ...................................26

*Dodona I, LLC v. Goldman, Sachs & Co.*,
847 F. Supp. 2d 624 (S.D.N.Y. 2012) .......................................................................25

*Dornberger v. Metro. Life ins. Co.*,
961 F. Supp. 506 (S.D.N.Y. 1997) ...........................................................................57

*Dunlop v. City of New York*,
No. 06 Civ. 0433, 2008 WL 1970002 (S.D.N.Y. May 6, 2008) ...............................69

*Elsevier Inc. v. Pierre Grossman, IBIS Corp.*,
No. 12 Civ. 5121, 2017 WL 5135992 (S.D.N.Y. Nov 2, 2017) ...............................65

*Elsevier Inc. v. W.H.P.R., Inc.*,
    692 F. Supp. 2d 297 (S.D.N.Y. 2010)........................................................45, 46, 47

*Entretelas Americanas S.A. v. Soler*,
    No. 19 Civ. 3658, 2020 WL 9815186 (S.D.N.Y. Feb 3, 2020) .........................................43, 49

*Essar Steel Algoma Inc. v. Nevada Holdings, Inc.*,
    No. 17MISC360, 2020 WL 2539031 (S.D.N.Y. May 18, 2020)........................................43

*Farkas v. Farkas*,
    36 A.D. 3d 852, 830 N.Y.S. 2d 220 (2d Dep't 2007)...........................................27

*Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019).......................................................64

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F. 3d 159 (2d Cir. 2004)...............................................39, 48, 53, 66

*First Nationwide Bank v. Gelt Funding, Corp.*,
    20 F. Supp. 89 (S.D.N.Y. 1993).............................................................56

*Fischbarg v. Doucet*,
    9 N.Y. 3d 375 949 N.Y.S. 2d 501, 880 N.E. 2d 22 (2007).......................................26

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
    640 F. Supp. 2d 300 (S.D.N.Y. 2009)........................................................24

*Fund Liquidation Holdings LLC v. UBSS AG*,
    15 Civ. 5844, 2021 WL 4482826 (S.D.N.Y. Sept. 30, 2021)....................................64

*GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*,
    67 F. 3d 463 (2d Cir. 1995)..............................................................55

*Goldman v. Belden*,
    754 F. 2d 1059 (2d Cir. 1985).............................................................39

*Grenader v. Spitz*,
    537 F. 2d 612 (2d Cir. 1976)..............................................................75

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989)....................................................................51, 55

*Heinrich v. Waiting Angels Adoption Servs.*,
    668 F. 3d 393 (6th Cir. 2010) .............................................................55

*Holmes v. Parade Place, LLC*,
    No. 12 CIV. 6299, 2013 WL 5405541 (S.D.N.Y. Sept. 26, 2013)................................59

*Jund v. Town of Hempstead*,
    941 F.2d 1271 (2d Cir. 1991)................................................................62

*Katzman v. Victoria's Secret Catalogue*,
    167 F.R.D. 649 (S.D.N.Y. 1996) .........................................................41

*Kinra v. Chicago Bridge & Iron Co.*,
    No. 17 CIV. 4251, 2018 WL 2371030 (S.D.N.Y. May 24, 2018)........39

*Kirwin v. Price Commc'ns Corp.*,
    391 F. 3d 1323 (11th Cir. 2004) ..........................................................69

*Kuczynski v. Ragen Corp.*,
    732 F. Supp. 378 (S.D.N.Y. 1989) ......................................................36

*Kurins v. Silverman*,
    No. 08CIV6886, 2009 WL 321011 (S.D.N.Y. Feb. 10, 2009)..............50

*Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*,
    No. 21-CV-9336, 2022 WL 4815615 (S.D.N.Y. Sept. 30, 2022).........49

*Lavastone Cap. LLC v. Coventry First LLC*,
    No. 14-CV-7139, 2015 WL 1939711 (S.D.N.Y. Apr. 22, 2015) ........48, 49, 51, 52

*Lerner v. Colman*,
    26 F.4th 71 (1st Cir. 2022)...................................................................72

*Lerner v. Fleet Bank, N.A.*,
    459 F. 3d 273 (2d Cir. 2006)................................................................37

*Levine v. Torino Jewelers, Ltd.*,
    No. 05 Civ. 3159, 2006 WL 709098 (S.D.N.Y. March 22, 2006)..............23, 56, 60

*Lima LS PLC v. PHL Variable Ins. Co.*,
    No. 3:12-CV-1122, 2013 WL 12286066 (D. Conn. Dec. 17, 2013) ......................55

*Mackin v. Auberger*,
    59 F. Supp. 3d 528 (W.D.N.Y. 2014) ..................................................44

*Maersk, Inc. v. Neewra, Inc.*,
    554 F. Supp. 2d 424 (S.D.N.Y. 2008)..................................................37

*Mahoney v. Sony Music Ent.*,
    No. 12 CIV. 5045, 2013 WL 491526 (S.D.N.Y. Feb. 11, 2013)...........24

*Mason Tenders Dist. Council Pension Fund v. Messera*,
    No. 95 CIV. 9341, 1996 WL 351250 (S.D.N.Y. June 26, 1996)..............52

*Metro. Transp. Auth. v. Contini,*
  04-cv-104, 2005 WL 1565524 (E.D.N.Y. July 6, 2005) ...................................................54, 67

*MLSMK Inv. Co. v. JP Morgan Chase & Co.,*
  651 F. 3d 268 (2d Cir. 2001)......................................................................................72

*Monterey Bay Military Housing, LLC v. Ambac Assurance Corporation,*
  531 F. Supp. 3d 673 (S.D.N.Y. 2021)..........................................................................41

*Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.,*
  165 F. Supp. 2d 514 (S.D.N.Y. 2001)..........................................................................68

*Nastasi & Associates, Inc. v. Bloomberg, L.P.,*
  No. 20-CV-5428, 2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022)...................................66, 67

*Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.,*
  74 F. Supp. 2d 221 (E.D.N.Y. 1999) .......................................................................56, 60

*Newman v. L.F. Rothschild, Unterberg, Towbin,*
  651 F. Supp. 160 (S.D.N.Y. 1986) ...............................................................................36

*Nollah v. New York City,*
  No. 17-CV-634, 2018 WL 4636847 (S.D.N.Y. Sept. 27, 2018)......................................69

*Ouaknine v. MacFarlane,*
  897 F. 2d 75 (2d Cir. 1990).........................................................................................38

*Patterson v. Terraform Labs, Pte. Ltd.,*
  No. 3:22-cv-03600 (N.D. Cal. June 17, 2022).....................................................7, 71, 73, 74

*Penguin Grp. (USA) Inc. v. Am. Buddha,*
  609 F. 3d 30 (2d Cir. 2010).........................................................................................26

*Petroff Amshen LLP v. Alfa Rehab PT PC,*
  2022 WL 480475 (2d Cir. Feb. 17, 2022)......................................................................57

*Petroleos Mexicanos v. SK Eng'g & Const. Co.,*
  572 F. App'x 60 (2d Cir. 2014) ...................................................................................64

*Picard v. Kohn,*
  907 F. Supp. 2d 392 (S.D.N.Y. 2012)...........................................................................72

*Reich v. Lopez,*
  38 F. Supp. 3d 436 (S.D.N.Y. 2014).........................................................................69, 70

*Related Companies, L.P. v. Ruthling,*
  No. 17-cv-4175, 2018 WL 3315728 (S.D.N.Y. July 5, 2018)...............................................66

*Revak v. SEC Realty Corp.*,
    18 F. 3d 81 (2d Cir. 1994) ............................................................74, 75

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) .........................................................47, 48, 51

*Rohland v. Syn-Fuel Associates-1982 Ltd. Partnership*,
    879 F. Supp. 322 (S.D.N.Y. 1995) ...............................................39

*Rosenheck v. Rieber*,
    932 F. Supp. 626 (S.D.N.Y. 1996) ...........................................39, 40

*Royalty Network Inc. v. Dishant.com, LLC*,
    638 F. Supp. 2d 410 (S.D.N.Y. 2009) .........................................30

*SEC v. Mut. Benefits Corp.*,
    408 F. 3d 737 (11th Cir. 2005) ....................................................75

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) .........................................................73, 74, 75

*In re Security Cap. Assurance Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569,597 (S.D.N.Y. 2010) ...................................36

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    806 F.3d 71 (2d Cir. 2015) ...........................................................59

*Serin v. N. Leasing Sys., Inc.*,
    No. 06 Civ. 1625, 2009 WL 7823216 (S.D.N.Y. Dec. 18, 2009) ...........67

*Shaw v. Rolex Watch U.S.A., Inc.*,
    745 F. Supp. 982 (S.D.N.Y. 1990) ...............................................60

*SKS Constructors, Inc. v. Drinkwine*,
    458 F. Supp. 2d 68 (E.D.N.Y. 2006) ...........................................54

*Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*,
    17 F. Supp. 3d 207 (E.D.N.Y. 2014) .....................................48, 56, 57

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
    366 F. Supp. 3d 516 (S.D.N.Y. 2018) ...........................................64

*Special Situations Fund III QP, L.P. v Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014) ...........................................23

*Spiegel v. Schulmann*,
    604 F. 3d 72 (2d Cir. 2010) ...........................................................26

*Suedrohrbau Saudi Co. Ltd. v. Bazzi*,
   19-CV-5130, 2021 WL 980883 (E.D.N.Y. Mar. 16, 2021)...................................................65

*Sun Life Assurance Co. of Canada v. Imperial Premium Finance, LLC*,
   904 F. 3d 1197 (11th Cir. 2018) .......................................................................................69

*Town of Hartford v. Operation Rescue*,
   915 F. 2d 92 (2d Cir. 1990)................................................................................................32

*Tymoshenko v. Firtash*,
   57 F. Supp. 3d 311 (S.D.N.Y. 2014)..................................................................................43

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
   916 F. 3d 143 (2d Cir. 2019)..............................................................................................26

*UFCW Loc. 1776 v. Eli Lilly & Co.*,
   620 F. 3d 121 (2d Cir. 2010)..............................................................................................58

*United States Fire Ins. Co. v. United Limousine Serv., Inc.*,
   303 F. Supp. 2d 432 (S.D.N.Y. 2004)................................................................................48

*United States Securities and Exchange Commission v. Terraform Labs Pte. Ltd.*,
   Case No. 0:2022cv00368 (2d Cir. June 8, 2022) .......................................................27, 30, 72

*United States v. Aulicino*,
   44 F. 3d 1102 (2d Cir. 1995)..............................................................................................55

*United States v. Autuori*,
   212 F. 3d 105 (2d Cir. 2000)..............................................................................................41

*United States v. Indelicato*,
   865 F.2d 1370 (2d Cir. 1989)..............................................................................................54

*United States v. Zichettello*,
   208 F. 3d 72 (2d Cir. 2009)................................................................................................66

*West Virginia v. E.P.A.*,
   142 S. Ct. 2587 (2022)........................................................................................................73

*Whitaker v. Am. Telecasting, Inc.*,
   261 F. 3d 196 (2d Cir. 2001)..............................................................................................23

*Williams v. Affinion Grp., LLC*,
   889 F. 3d 116 (2d Cir. 2018)..............................................................................................33

**Statutes**

18 U.S.C. §§ 1341, 1343 ...........................................................................................................32, 42

18 U.S.C. § 1956 ...................................................................................................42

18 U.S.C. § 1961(4) .............................................................................................44

18 U.S.C. § 1962(c) ......................................................................................32, 47

18 U.S.C. § 1962(d) .............................................................................................66

18 U.S.C. § 1964(c) .................................................................................7, 32, 71

N.Y. C.P.L.R. § 302(a) .......................................................................................26

Fed. R. Civ. P. 8 ............................................................................................ *passim*

Fed. R. Civ. P. 12(b)(2) .......................................................................................23

Fed. R. Civ. P. 12(b)(6) .......................................................................................23

Fed. R. Evid. 702 ...........................................................................................25, 43

Fed. R. Civ. P. 9(b) .......................................................................................24, 37

**Other Authorities**

SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3.
      2019), https://www.sec.gov/news/public-statement/statement-framework-
      investment-contract-analysis-digital-assets ...........................................73, 74

Plaintiff Matthew Albright, individually and on behalf of all others similarly situated, submits this *omnibus* memorandum of law in opposition to the three motions to dismiss filed by the defendants: (1) Defendants Terraform Labs, Pte. Ltd. ("Terraform Labs"), Luna Foundation Guard, Ltd. ("Luna Foundation Guard" or "LFG") and Do Kwon (collectively the "TFL Defendants"), *see* ECF No. 58 (the "TFL Br."); (2) Defendants Jump Trading, LLC ("Jump") and Kanav Kariya (together, the "Jump Defendants"), *see* ECF No. 62 ("Jump Br."); and (3) Delphi Digital Consulting, Inc. ("Delphi") and Jose Macedo (together, the "Delphi Defendants," and with the TFL and Jump Defendants, "Defendants") *see* ECF No. 67 ("Delphi Br."). For the foregoing reasons, Defendants' motions to dismiss should be denied.

## PRELIMINARY STATEMENT

The conspiracy at issue in this RICO action has several sophisticated components, including the creation and sale of an algorithmic stablecoin (UST) and its sister coin (Luna); the formation of a type of savings bank, the Anchor Protocol, which promised 19.5% returns on deposits; secret cash infusions to paint a false picture of stability; a consortium of investors (the Luna Foundation Guard) to silence skeptics; and a series of false statements and omissions by all Defendants. But these various components all shared the same simple goal: to entice members of the cryptocurrency community to purchase UST and Luna coins under the false pretense that the UST coin would maintain a stable value of $1.00. The proceeds of this scheme would enrich Do Kwon, Kanav Kariya, Jose Macedo, Nicholas Platias, and Remi Tetot[1] and the entities with which

---

[1] Nicholas Platias is the Head of Research and a founding member of Terraform Labs, a creator of the Anchor Protocol, and a member of the Governing Council of the Luna Foundation Guard. ¶ 25. Remi Tetot is a member of the Governing Council of the Luna Foundation Guard. ¶ 29. Platias and Tetot are defendants in this action, but despite Plaintiff's best efforts, they have not been served with the complaint. References to "¶ __" are to paragraphs in the Amended Class Action Complaint for Violations of the Federal Racketeering Laws ("Complaint"), ECF No. 42.

they are affiliated.  Each of the Defendants here had a unique and important role to play in constructing and maintaining the illusion that Kwon had finally created an algorithmic stablecoin that the crypto community was desperately demanding.  In truth, his creations – the UST "stablecoin" and its sister coin Luna – were no different than many stablecoins which had failed.

The crypto community had been wanting a stablecoin for many years.  ¶¶ 38–44.  A frequent  criticism of cryptocurrencies in general is that their values fluctuate too dramatically to be used as a medium of exchange for transacting in ordinary goods and services.  ¶¶ 38–39.  Anyone who could develop a cryptocurrency with a stable value would be sure to reap massive financial rewards, as the utility in such a currency would send it to the top of a field crowded with flawed currencies.

Like others, Kwon and Platias recognized the tremendous profits to be gained from convincing the crypto market that a stablecoin had been developed.  They therefore devised the UST algorithmic stablecoin.  They claimed that they had developed an algorithm so sophisticated that it could process basic economic principles of supply and demand to ensure that UST would always be worth $1.00.  ¶¶ 6, 51.  They explained that their algorithm worked because they had also developed an arbitrage system, whereby UST coins could be exchanged for $1.00 worth of Luna coins.  ¶¶ 55–58.  The algorithm would modulate the supply of both UST and Luna coins depending on demand, so that UST coins would always be worth $1.00.  *Id*.

If this seems too simple to work, that is because it was.  Kwon knew this.  He had already attempted to launch an algorithmic stablecoin – Basis Cash – that failed before it even got off the ground.  But Kwon hid his involvement in Basis Cash, operating that system under the pseudonym "Rick Sanchez."  ¶¶ 45–47.

The failure of Basis Cash taught Kwon that a purely algorithmic stablecoin like UST would never succeed.  To begin, because the algorithm was premised on an arbitrage system with the Luna coin, UST's success depended on there always being a liquid market for Luna, which could not be guaranteed.  ¶¶ 8, 51, 59.  Further – as with any monetary system – sharp market downturns would disrupt demand for both UST and Luna, and would require sophisticated monetary experts to intervene and regulate the supply of these coins.  ¶¶ 74, 92, 94.  The algorithm simply could not handle these complex situations.  Indeed, the algorithm – which minted more and more Luna coins as its price declined, and thereby increased downward pressure on the value of the Luna coins – is what caused the collapse of the UST-Luna system, and the rest of the Terra Ecosystem,[2] in May of 2022.  ¶¶ 162–64.

Despite knowing that the UST-Luna algorithmic stablecoin would fail as had Basis Cash, through their company Terraform Labs, Kwon and Platias launched Luna in 2019 and UST in 2020.  ¶¶ 62–63.  These were timed to take advantage of predictable bull and bear run cycles in the crypto market.  ¶¶ 67–73.  The launch was accomplished through the Terra White Paper, which contained fraudulent statements, including promises that the stablecoin would not be de-pegged, purportedly demonstrated by "stress tests" depicted in charts, meant to convince skeptics that the stablecoin would not become de-pegged from its $1.00 valuation, even in a severe market downturn.  ¶¶ 7, 61, 86.

Throughout the Class Period (May 1, 2019 through June 15, 2022), Defendants engaged in a series of fraudulent actions to drive demand for UST and Luna coins in order to perpetuate the

---

[2] The "Terra Ecosystem" refers to the UST and Luna coins and its algorithm, the Anchor Protocol, and other currencies and digital assets that Kwon and Platias formed that are not at issue in this action.

illusion that the UST-Terra algorithm was functioning properly to keep UST at a constant $1.00 valuation. *First*, Kwon falsely claimed that Terraform Labs had a close relationship with Chai, a Korean payment application, and that consumers could soon pay for goods and services with UST through the Chai payment system. ¶¶ 118–22. *Second*, when UST became de-pegged from its $1.00 valuation in May 2021, Kwon, Platias, and Terraform Labs secured a secret cash infusion from Jump (and Kariya, the president of Jump Crypto (¶ 27)) to stabilize the value of UST, but never disclosed this arrangement, instead allowing the public to believe that the algorithm had self-corrected as advertised. ¶¶ 123–24. *Third*, because they knew that demand for Luna was critical to the functioning of the arbitrage system (and thus the algorithm overall), Kwon, Platias and Terraform Labs created the Anchor Protocol, a savings vehicle with promises of 19.5% interest payments. ¶ 95. Kwon had been told by an Anchor Protocol developer that the system was designed to sustain a rate of only *3.6%*. ¶ 173. Kwon ignored this and instead launched the Anchor Protocol with false promises that the 19.5% interest was sustainable. But the Anchor Protocol's entire existence was itself fraudulent, designed to drive demand for UST and Luna. ¶¶ 96, 98–100, 112–15. *Fourth*, in early 2022, knowing that the crypto bull run would imminently fade, and thus cause a decline in demand for Luna that would expose the failure of the algorithmic stablecoin, Kwon, Platias, Terraform Labs, Kariya and Jump enlisted additional investors – including Delphi, Macedo and Tetot – to form the Luna Foundation Guard. ¶¶ 125–26, 138. Its supposed purpose was to provide a reserve that would act as a backstop should UST become de-pegged, but in actuality, it was just another front to silence skeptics, and to continue driving demand for UST and Luna. ¶¶ 126, 128–29. Meanwhile, during the period when demand for UST and Luna was high, Defendants were quietly siphoning funds out of the Terra Ecosystem and into secret wallets.

¶¶ 174–87.  They siphoned billions of dollars from the Terra Ecosystem, as other participants in the Terra Ecosystem watched their life savings evaporate.  *Id*.

Against these well-pled facts, Defendants launch a classic kitchen sink attempt at dismissing the Complaint.  But none of their scattershot arguments succeed.

To begin, the majority of the allegations Defendants attack are governed by Fed. R. Civ. P. 8.  Plaintiff thus only needs to satisfy notice pleading to allege, for example, that Defendants engaged in an association-in-fact; that the RICO enterprise was continuous; that Defendants each participated in the operation and management of the RICO enterprise; and that Plaintiff's and other class members' damages were caused by the fraudulent enterprise.  Not only do Defendants fail to apply Rule 8, but they cite to several *securities* fraud decisions which apply the PSLRA – a standard that is heightened above even Rule 9.  TFL Br. at 11, 28–30.  Their attempts to turn this into a securities fraud action should be ignored.  Further, while a common defense tactic is to assert facts implicitly into a complaint that are not there, Defendants here explicitly ask the Court to consider materials outside the four-corners of the Complaint, including an expert report commissioned by their counsel and the Terms of Service of the Anchor Protocol.  TFL Br. at 8; Declaration of Douglas W. Henkin ("Henkin Decl.") at Exs. F and K (ECF No. 59-6, 59-11).  Their admission that the Court needs to consider facts, not to mention expert opinions, outside the Complaint for their arguments to work is telling.

Defendants' specific attacks on the merits of the Complaint fail.  *First*, the TFL Defendants argue that the Court lacks personal jurisdiction over Kwon and Terraform Labs.  TFL Br. at 11– 18.  But the Second Circuit has already found such jurisdiction exists, on facts similar to those presented here.  To the extent there is any question of jurisdiction, the Court should allow Plaintiff to take discovery.  *See infra* Argument, Section I.

5

*Second*, the Defendants argue that the Complaint does not allege a predicate act under RICO.  TFL Br. at 27–35; Jump Br. at 6–15; Delphi Br. at 7–14.  That is wrong.  The Complaint alleges facts sufficient to satisfy the elements of mail and wire fraud (*see infra* Argument, Section II (A)(1)) and money laundering (*see infra* Argument, Section II (A)(2)).[3]

*Third*, Defendants ask the Court to apply an inappropriately heightened standard to Plaintiff's allegations that Defendants formed an association-in-fact (TFL Br. at 36–37); that Defendants participated in the operation and management of the RICO enterprise (TFL Br. at 37–39); and that there was a pattern of continuity (TFL Br. at 39–40; Jump Br. at 16–19; Delphi Br. at 14–17).  The Complaint alleges each of these elements according to the low bar that exists.  *See infra* Argument, Sections II (B)–(D).

*Fourth*, framing their arguments in terms of "standing," Defendants argue that Plaintiff has not sufficiently pled reliance or loss causation.  TFL Br. at 21–24; Jump Br. at 19–26; Delphi Br. at 18–20.  But Defendants misconstrue the requirements for alleging causation, which are only subject to Rule 8's pleading standards.  These highly fact-intensive issues are not appropriately resolved on a motion to dismiss.  *See infra* Argument, Section II (E).

*Fifth*, the TFL Defendants argue that the conduct of the RICO enterprise was extraterritorial.  TFL Br. at 24–27.  But it misapplies the law, which allows for RICO claims to be brought where, as here, Defendants directed their activities at the United States, by, among other things, choosing the U.S. Dollar as the currency to which UST would be pegged, and recruiting from within the United States Jump and Delphi as additional RICO participants.  *See infra* Argument, Section II (F).

---

[3] The Complaint also alleges obstruction of justice as a predicate act for the RICO violation, ¶ 289, but Plaintiff hereby withdraws that allegation.

*Sixth*, Defendants argue that Plaintiff did not state a claim for RICO conspiracy.  TFL Br. at 41; Jump Br. at 26–29; Delphi Br. at 20–21.  But the standard for alleging a RICO conspiracy is low, and Plaintiff meets it here.  *See infra* Argument, Section III.

*Seventh*, the TFL and Jump Defendants argue that the terms of the Anchor Protocol bar claims by anyone who staked assets on the Anchor Protocol.  TFL Br. at 42; Jump Br. at 29–30.  But even if that were correct, which it is not, it is not a basis for dismissal where, as here, Plaintiff and many other class members did not stake on Anchor.  *See infra* Argument, Section IV.

*Eighth*, even though they recognize that arguing that UST and Luna coins are securities would subject them to violations of the securities laws, the TFL Defendants assert that Plaintiff's claims here are barred by Section 107 of the PSLRA.  TFL Br. at 18–20.  But that fails because the PSLRA pre-emption only applies to "conduct that would have been actionable as fraud in the ***purchase or sale of securities***." 18 U.S.C. § 1964(c).  Conduct surrounding the sale and promotion of UST and Luna coins – which the parties here agree are not securities (¶¶ 201–05; TFL Br. at 21, n. 9) – cannot form the basis of a securities fraud claim, and it does not matter that another plaintiff has made such assertion in the United States District Court for the Northern District of California. *Patterson v. Terraform Labs, Pte. Ltd.*, No. 3:22-cv-03600 (N.D. Cal. June 17, 2022).  In fact, the UST and Luna coins are *not* securities.  *See infra* Argument, Section V.

## FACTS

## I.   KWON SEEKS TO FILL THE DEMAND FOR A STABLECOIN

Although cryptocurrencies have become more widely adopted, nearly all of them have experienced unstable demand, causing extreme fluctuations in the value of any given cryptocurrency.  Without a stable value, it is nearly impossible to use cryptocurrencies as a

currency for transacting in ordinary goods and services.  ¶¶ 38–39.  Thus, there is strong demand among the crypto community for a cryptocurrency whose value can remain relatively stable.  *Id.*

Cryptocurrency developers have honed in on the idea of a "stablecoin" to solve this problem.  Stablecoins are "pegged" to an external asset class, such as fiat currencies.  ¶ 40.  Several stablecoins had been launched prior to the creation of the Terra Ecosystem.  ¶¶ 41–43.  But stablecoins by their nature must be backed by other assets.  Those that were backed by other cryptocurrencies, such as BitUSD and NuBits, have failed to maintain stability.  ¶¶ 41–42.  Tether, which is backed by the U.S. dollar, has maintained its stability.  ¶ 43.

Kwon and Platias, among others, offered a new solution: an "algorithmic" stablecoin.  This would not be backed by fiat currency or another crypto asset, but instead would maintain its value by modulating its supply according to demand.  ¶ 51–52.  When demand declined, coins would be "burned," thereby reducing supply and increasing prices.  ¶ 58, 63.  When demand increased, coins would be "minted," to lower prices.  *Id*.  The stablecoin could be exchanged with a "sister" coin, whose value would be allowed to fluctuate, in order to create arbitrage incentives that would stimulate demand.  ¶¶ 54–55.  This idea was eventually hatched as the UST (the stablecoin) and Luna (the sister coin) algorithm, which sits at the heart of the Terra Ecosystem.  ¶¶ 55–60.

## II.   KWON'S FIRST ALGORITHMIC STABLECOIN VENTURE – BASIS CASH – FAILS

Aware that his algorithmic stablecoin had flaws, Kwon set out to test his theory before going public with the UST-Luna algorithm.  Under the pseudonym, "Rick Sanchez," Kwon and a partner who used the pseudonym "Morty" developed and launched "Basis Cash."  ¶¶ 45–50.  Each unit of Basis Cash would be equal to $1.00.  Basis Cash relied on a "bonding" mechanism to maintain its peg to the U.S. dollar.  ¶ 47.  New coins would be minted when the price was too high

and distributed to participants in the Basis system.  It was hypothesized that the increase in supply would drive down demand, and thus, price.  ¶ 47.

Flaws in the design were identified almost immediately.  For example, there was nothing that required Basis participants to sell the newly minted Basis coins.  If they held onto them, the price would go up even further.  Solutions could be implemented, but they required input and deliberations by sophisticated monetary policy experts, not an algorithm.  ¶ 48.

Basis Cash was a spectacular failure.  It never even achieved the $1.00 valuation that had been promised.  ¶ 49.  The project was terminated even before it began.  ¶ 49.  Its creators cited "regulatory concerns," but crypto experts believe it was canceled because its creators could never demonstrate that the algorithm worked.  ¶ 46.

Kwon has never acknowledged that he was the "Rick Sanchez" behind Basis Cash, but at least one reliable crypto publication has identified him as such.  ¶ 45.

## III.   DEFENDANTS DEVELOP AND PROMOTE THE UST-LUNA ALGORITHM, WHICH THEY KNEW WAS DESTINED TO FAIL

In April 2019, Kwon and Platias authored a white paper titled "Terra Money: Stability and Adoption," (the "Terra White Paper"), in which they claimed to have created an algorithmic stablecoin which would maintain a steady price via an algorithm.  ¶ 51.  But this was destined to fail from the start.

The Terra White Paper set forth an algorithmic protocol for burning and minting cryptocurrencies that would purportedly allow the stablecoin component – Terra – to maintain a value of $1.00.   Essentially, the Terra White Paper proposed that the stablecoin would be exchangeable with a "bond", which is a token whose supply could be adjusted in order to stabilize the price of the stablecoin.  ¶ 75.  In the Terra Ecosystem, the "bond" was the Luna coin.  ¶ 76.  In

algorithmic protocols, the stablecoin (here, UST) can be exchanged for the "bond" (here, the Luna coin), allowing arbitrageurs to profit when the price of the stablecoin becomes even just slightly de-pegged from its currency (here, the U.S. dollar).

For example, if UST was selling on the market for $0.95, it could be exchanged for $1.00 worth of Luna, which could then be sold immediately, providing the arbitrageur with a profit of $0.05. In the process, Luna would be minted, and UST would be burned. The expanding of the Luna supply would bring the price of Luna down, and the contracting of the UST supply would raise that price up. ¶¶ 52–53, 58. Thus, the $1.00 equilibrium would be maintained. The algorithm was the sole arbiter of the burning and minting of UST and Luna. ¶ 55.

Luna coins began trading in May 2019 shortly after the Terra White Paper was issued, and the first UST coins were made available on September 21, 2020 (around the same time that Basis Cash had proven to be a failure). ¶¶ 62–63. Thus, there was a pre-existing market for Luna.

The key component to the arbitrage stablecoin is that there must always be demand for the "bond," i.e., Luna. If demand for Luna evaporated, then so too would its price. When a UST holder went to exchange his UST for $1.00 worth of Luna coins, more Luna coins would have to be minted to be worth $1.00. But as more Luna coins were minted, the price would decline even further. The entire system depended on there being steady demand for the Luna coin, and it was susceptible to collapse if demand for Luna declined. ¶¶ 76–78.

An algorithmic stablecoin could only potentially succeed if two important safeguards are implemented, neither of which was present in the Terra Ecosystem. First, there must be adequate reserves of a stable asset class, such as fiat currency, which could be activated if the price of a stablecoin exceeded an upper amount. In that case, new stablecoins would be minted and exchanged for the fiat currency, or another reserve asset class. ¶¶ 83–89. Second, there must be

a human governance mechanism, experts with sophisticated monetary backgrounds, who can step in and regulate supply and demand in periods of extreme volatility.  ¶¶ 90–92.  In other words, the very structure of a pure algorithmic stablecoin would make it impossible to succeed.

The designers of the Terra White Paper and its UST-Luna algorithm, Kwon and Platias, knew that it was destined to fail.  They personally designed the UST-Luna algorithm and knew of its limitations.  They purportedly ran "stress tests" to demonstrate that the UST-Luna algorithm would work under extreme recessive conditions, but they provide no support for their conclusions.  ¶¶ 87–89.  Further, Kwon's experience with Basis Cash provided him with the experience to know that an algorithmic stablecoin was destined to fail when demand for the "bond" currency declined.  ¶¶ 49–50.

## IV.   DEFENDANTS LAUNCH UST IN A BULL MARKET TO MAXIMIZE FRAUDULENT GAINS

Terraform Labs, Kwon and Platias timed the launch of UST to coincide with an anticipated crypto bull market so that they could maximize their profits.  ¶ 67.  The crypto community has come to recognize regular and predictable patterns of price fluctuation in Bitcoin, which then ripple across the broader crypto market.  *Id*.  Specifically, under the Bitcoin Protocol, miners receive Bitcoin as rewards for their work.  The amount of Bitcoin a miner can receive for the same amount of work is divided in half every few years.  Therefore, the supply of Bitcoin, while still increasing, is doing so at a slower rate with each successive halving occurrence.  ¶ 68.

Decelerating the supply-side growth of Bitcoin results in higher Bitcoin prices.  For example, immediately following the halving events in 2012, 2016, and 2020, there was a surge in the price of bitcoin.  ¶ 69.  Furthermore, at least in the years leading up to 2021, the price of Bitcoin has had an outsized effect on the price of other cryptocurrencies.  ¶¶ 67, 72.  Thus, when Bitcoin's

price surges, so too do the prices of currencies across the broader crypto market. As time passes after a halving event, though, demand for Bitcoin levels off, or even declines, leading to a decline in its price. ¶ 72. Other cryptocurrencies also follow this pattern, as can be seen by the decline in their prices shortly after Bitcoin's price decline. *Id.*

The crypto community generally acknowledges the effects of Bitcoin's halving events on the broader crypto market. ¶ 72. Defendants here thus timed the launch of the UST and Luna coins when the price of Bitcoin was on an upswing, and they pulled their profits out when it was at highs, just as Bitcoin's price had begun to decline. ¶ 73.

## V.   DEFENDANTS LURE CRYPTO ENTHUSIASTS TO PURCHASE UST AND LUNA THROUGH MATERIALLY FALSE STATEMENTS AND OMISSIONS

The statements Defendants made – both in the Terra White Paper and more generally – were false and misleading, and designed with the specific intent to entice crypto enthusiasts into participating in the Terra Ecosystem.

In the Terra White Paper specifically, Kwon and Platias promised that the Terra stablecoin was "both price-stable and growth-driven," and that it could "achieve[] price-stability via an elastic money supply." ¶ 51. It further stated, "[w]e have presented Terra, a stable digital currency that is designed to complement both existing fiat and cryptocurrencies as a way to transact and store value." ¶ 60. These statements were false. Kwon and Platias knew that Terra (i.e., UST) would not achieve price-stability because it was based on a pure algorithm.

Further, to allay fears that the UST-Luna algorithm would not survive a market downturn, the Terra White Paper purported to run "stress tests" to demonstrate that the stablecoin would maintain its peg to the U.S. dollar even in a severe market dislocation. ¶¶ 86–89. It explained that the charts show "how the protocol adjusts its stability levers in response to economic conditions,

and how those adjustments in turn shape unit mining rewards," over a ten-year period.   ¶ 86.   One

of the charts purported to show "simulated weekly transaction volume and its annual moving

average" and to demonstrate that the stablecoin could endure a "severe multi-year recession that

wipes out 93% of GDP over 3 years."   ¶ 87.   Two other charts echoed this sentiment.   ¶ 88.   But

these charts were false, as was later demonstrated when the system collapsed.   So was the

conclusion in the Terra White Paper that "[w]hile we think that Terra's adoption-driven demand

will be far more stable than Bitcoin's speculation-driven demand, the stability mechanism has been

designed to confidentially withstand Bitcoin-level volatility."   ¶ 89.

The Terra White Paper also failed to disclose that flexible governance principles –

implemented by human beings, not algorithms – were necessary to ensure any long-term stable

currencies and to address inevitable market changes.   Instead, they falsely assured purchasers that

the algorithm was more trustworthy than human "validators."   ¶¶ 90–94.   Kwon and Platias knew

that the algorithm could not operate on its own given their experience in Basis Cash.   But they

disclosed neither their prior involvement in Basis Cash, nor the need for a governance system, to

the crypto community.

## VI.   DEFENDANTS DROVE DEMAND TO THE UNSTABLE TERRA ECOSYSTEM THROUGH THE ANCHOR PROTOCOL AND FALSE STATEMENTS

To further maximize profits from their scheme, and to maintain the illusion of the UST-

Luna algorithm, Defendants needed to ensure that there would be consistent and growing demand

for their coins.   ¶ 95.   In June 2020, Platias published the Anchor White Paper discussing the

features and rewards of the Anchor Protocol which offered a "passive income opportunity" for

users who deposited their UST in the Terra Ecosystem. ¶ 96.   Throughout the Anchor White Paper

and in other publications, Defendants repeatedly described the Anchor Protocol as an over-

collateralized, principal-protected savings product with a stable interest rate.  ¶¶ 98–100.  In a blog post titled "Introducing Anchor," Platias claimed the Anchor Protocol could "become the gold standard for passive income on the blockchain."  ¶ 100.

In March 2021, following Defendants' release of UST and public praise of the protocol, the Anchor Protocol was launched on the Terra blockchain operating as a savings bank that would pay reliable and steady outsized returns of 19.5% APY.  ¶ 95.  The Anchor Protocol generated depositors' returns by i) lending the deposited UST to borrowers, who in turn put up specialized "bAssets"[4] as collateral; and ii) collecting interest on the borrowers' loans.  ¶ 105.  Given the lofty 19.5% APY, the Anchor Protocol became an important factor in maintaining UST's popularity. ¶ 95.  But Kwon had been told by an Anchor Protocol developer that it was actually designed only to enable interest payments of 3.6%.  ¶ 175.  Tetot also admitted he knew that the lofty interest payments were not sustainable in the aftermath of its collapse.  ¶¶ 169–71.

Defendants continuously encouraged depositors to place assets in the Anchor Protocol by promoting the protocol and touting its high returns as a means of increasing traffic on the Terra blockchain and temporarily stabilizing the value of UST.  ¶ 110.  Defendants' marketing of UST and Anchor was so effective that approximately $14 billion of UST's market capitalization value was deposited into Anchor at its peak.  *Id.*

On March 17, 2021, the official Twitter account for the Anchor Protocol bragged that "Anchor is not your ordinary money market.  ***The protocol offers stable, 20% APY interest to depositors*** and only accepts liquid staking derivatives as posted collateral by borrowers."  ¶ 112.

---

[4] bAssets are derivative coins that represent underlying coins that have been "staked" on their native blockchains.  ¶ 106.  Staking allows holders to pledge coins towards the functioning and development of the blockchain in exchange for rewards.  *Id.*  The Anchor Protocol passed the bAsset rewards to depositors to help generate returns.  ¶ 105.

About a month later, on April 23, 2021, the Anchor Twitter account again promoted the stability of Anchor's 20% APY: "Markets go down, $UST deposits on Anchor go up . . . Stable 20% APY is a ***high-yield safe-haven*** in uncertain market conditions." ¶ 113.  A few weeks later, on May 11, 2021, the Anchor Twitter account posted a series of tweets promoting the Anchor Protocol as the "gold standard for savings" and its "stable" 20% yields. ¶ 114.  These statements were false.  The foundation of the Anchor Protocol was anything but "stable." ¶ 111.

Kwon falsely dismissed concerns that UST and the Anchor Protocol were unstable and unstainable by insulting and mocking the individuals expressing those concerns. ¶ 116.  For example, on July 1, 2021, Kwon mocked British economist Frances Coppola who criticized the algorithmic stablecoin model. *Id.*  Rather than addressing Coppola's concerns that the algorithmic stablecoin model could not defend against a bank run, Kwon was dismissive and condescending, stating "I don't debate the poor on Twitter, and sorry I don't have any change on me for her at the moment." *Id.*

Further, on December 2, 2021, Tetot published an article titled "Terra – An Emerging Ecosystem" where he described Luna as a "volatility absorber that stabilizes the price of UST." ¶ 117.  Tetot further explained that "Anchor can pay its lenders such high rates partly because borrowers must forgo their collateral staking yields when a loan is initiated" and that "Anchor can sustain its 20% rate for the time being as the gross borrow rate is ~22% APY." *Id.*

Defendants also attempted to increase demand for their UST-Luna coins by claiming a false alliance with Chai Corporation ("Chai"). ¶ 118.  Chai, founded by Terraform Labs co-founder Daniel Shin who later cut ties with Terraform Labs, is a Korean payment network system that was designed to make payments from the Terra Ecosystem to ordinary vendors seamless. ¶¶ 118–19.  In the summer of 2019, Terraform Labs announced a partnership with Chai that, if

successful, would allow ordinary consumers to use their cryptocurrencies in everyday transactions. ¶ 119. However, according to an article on techinasia.com published on May 22, 2022, this relationship was short-lived as Chai severed ties with Terraform Labs in 2020. *Id*. But Kwon claimed that the relationship still existed in order to drive demand to UST and Luna. ¶¶ 119–20.

Despite the dissolution of the relationship between Terraform Labs and Chai, Kwon – in an effort to continue driving mass public demand to UST and the Terra Ecosystem – publicly claimed that the relationship was intact. ¶ 120. In 2020, Kwon touted that Chai had processed more than $2 billion in transaction volume with more than 2.5 million users – "making it one of the most successful and widely adopted applications that uses blockchain technology and is not purely speculative in nature."

Further, on March 19, 2021, Kwon described Chai as "one of South Korea's most popular payment apps that recently raised a $60 million Series B." *Id.* Chai, he explained, "enables merchants to accept payments via 20 different options with low fees and fast settlement. On the back-end, ***Chai uses Terra's blockchain (stablecoins) to settle transactions faster and cheaper than legacy counterparts***." *Id.* On May 24, 2021, Terraform Labs posted on Twitter that "CHAI has more than 2 million active users in Korea," making the case that there was strong demand for UST due to Chai's integration with the Terra blockchain. ¶ 121.

Defendants' statements were false because the relationship between TFL and Chai had been severed in 2020. The statements were designed to i) drive demand to the Terra Ecosystem and ii) mislead consumers into believing that they would be able to use UST and Luna to transact in ordinary goods over the Chai platform and to drive further demand for UST and Luna. ¶ 122.

**VII.    DEFENDANTS CREATE THE LUNA FOUNDATION GUARD TO GIVE THE ILLUSION OF STABILITY**

Defendants knew that the UST-Luna algorithm could not work.  ¶ 123.  Thus, even minor de-pegging events caused them concern.  For example, on May 24, 2021, UST lost its peg to the U.S. dollar, and Kwon arranged for Jump to bail out UST.  *Id*.  This maneuver, which was concealed from the public, was designed to maintain the illusion that there was a strong, organic demand base that was keeping UST at a stable price.  *Id*.  Specifically, on May 24, 2021, Terraform Labs' official Twitter account posted that "[a]s long as we create useful applications that people use on top of Terra [UST], a strong locus of demand will always exist." ¶ 124.  However, this was false.  Jump's infusion of money into UST was an important facet of the RICO scheme, designed to allay fears and give the false impression that the algorithm had solved the problem of UST's de-peg.  *Id*.  Defendants never disclosed Jump's involvement in stabilizing UST in 2021, and the crypto community was left with the impression that the algorithm was working as advertised.

The Jump bail-out in 2021 was a band-aid that fixed a minor de-pegging event and set the crypto community's fears to rest, temporarily.  Kwon, Platias, Terraform Labs, Jump, and Jump's president, Kariya, knew that it would need a more robust solution to stabilize the value of UST in the event of real market headwinds.  ¶ 125.   Defendants also knew that such headwinds would likely materialize sometime in 2022, given their familiarity with the Bitcoin cycles.  ¶¶ 67-75. Thus, on January 19, 2022, Terraform Labs announced the formation of the Luna Foundation Guard for the purpose of "facilitating the growth of the Terra ecosystem" and "improving the sustainability and stability of Terra's algorithmic stablecoins."  ¶ 126.  Kariya promoted this introduction by retweeting Terraform Labs' introductory thread.  *Id*.  The Luna Foundation Guard

17

is overseen and operated by a Governing Council including Kwon, Platias, Kariya, Tetot, and Macedo. ¶ 132.

The formation of the Luna Foundation Guard was a central component of Defendants' RICO scheme and efforts to bolster public confidence in UST. ¶ 128. Defendants' announcement of the creation of the Luna Foundation Guard downplayed the purported "misconception" that algorithmic stablecoins are "unsustainable" and claimed that the May 2021 de-pegging of UST was not a sign that UST was unstable. *Id*.

With the Luna Foundation Guard in place, Defendants continued to tout the reliability of UST, Luna, and the Anchor Protocol. ¶ 134. On January 28, 2022, Jump's President and Luna Foundation Guard Governing Council member, Kariya, posted a thread on Twitter discussing the "confusion and panic" concerning UST and the Anchor Protocol stating that "[i]t's difficult to imagine a sustained mass exodus to UST given the circumstances." *Id*.

On February 10, 2022, following criticism that the Yield Reserve would be unable to sustain the Anchor Protocol, Kwon announced that the Luna Foundation Guard's Governing Council had voted to capitalize the Anchor Yield Reserve by 450 million UST. ¶ 136. Less than a week later, on February 16, 2022, Governing Council member Macedo of Delphi tweeted that "Anchor's 20% fixed rate is an incredible meme and the ideal way to drive $UST growth and onboard users to the Terra economy." ¶ 137.

To further bolster confidence in UST, on February 22, 2022, the Luna Foundation Guard announced that it had raised $1 billion through a Luna token sale to establish a bitcoin-denominated reserve for UST and to subsidize the 19.5% yield on the Anchor protocol deposits when staking revenues were inadequate. ¶¶ 130–31, 138. Funding for the reserve came from

Jump and Delphi, among others, who purchased Luna tokens in a private sale from the Luna Foundation Guard.  ¶ 138.

On February 22, 2022, the Defendants uniformly touted the Terra Ecosystem and creation of the Luna Foundation Guard.  ¶¶ 138–40, 144–45.  Platias bragged that the Luna Foundation Guard reserve "eliminated" the main counter-argument for the "sustainability of algorithmic stablecoin."  ¶ 139.  Similarly, Kariya proclaimed that the reserve "further strengthens confidence in the peg of the market's leading decentralized stablecoin UST…This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions."  *Id.*  Jump endorsed Kariya's comments regarding the Luna Foundation Guard reserve and promoted its relationship with Terraform Labs by consistently retweeting the Company when it was touting its ecosystem.  ¶¶ 140, 143.  Macedo retweeted the Luna Foundation Guard touting a "big day for [Terraform Labs]" and promoting that UST has achieved the demand needed to raise collateral reserves.  ¶ 144.  Macedo also posted a threat on twitter discussing why the Luna Foundation Guard reserve is such a big deal for Terraform Labs' resilience and that the cost of an attack on the UST peg went up by $1 billion in bitcoin.  *Id.*  Kwon also actively promoted UST and Luna on Twitter touting the "$1B BTC reserve for $UST" as the "[l]argest ever cap formation in crypto" and how the Luna Foundation Guard had "plans to scale reserve to larger numbers."  ¶ 145.

Defendants continued touting the Terra Ecosystem, UST, and the Luna Foundation Guard. On March 1, 2022, Kariya and Kwon appeared live together on The Ship Show – a twitter spaces talk show by Jump and Jump backed Wormhole – promoting the longstanding relationship between Kariya and Kwon dating back to at least 2019; how Jump and Kariya "helped scale the UST floor"; the burning and minting mechanism behind UST-Luna and how that "absorbs

volatility of Terra stablecoins"; and the security and stability of UST and how the Luna Foundation Guard bolsters the same.  ¶ 146.

On March 9, 2022, Macedo posted an "LFG meme" in response to Kwon's post stating that "[the Luna Foundation Guard] has just added $418M to its reserves – current balance around 1.5B."  ¶ 148.  The Luna Foundation Guard doubled down on its resolve.  On or about March 10, 2022, Luna Foundation Guard Governing Council members Kariya of Jump and Macedo of Delphi *opposed* a proposal to cut the yield rate in the Anchor Protocol.  ¶ 149.  The next day, Macedo again echoed Kwon by retweeting that "BTC thrives in chaos. An orange light to endure in the darkness – which will bring $UST to millions."  ¶ 150.

On or around the same time that Defendants were promoting the demand for UST and voting against reducing the Anchor yield rate, a popular crypto trading personality "Algod" pointed out vulnerabilities regarding the sustainability of UST and Luna, noting that more UST creates "more pressure on Luna" and that at a certain point Luna will no longer be able to sustain UST's price if users redeem their UST for Luna in large quantities.  ¶ 151.  In response, Kwon – rather than disclosing that Algod was correct – undermined Algod's criticism with mockery and bravado, offering to place a $1 million bet with Algod on whether or not Luna's price would be higher in a year.  ¶ 152.

On March 15, 2022, following the Luna Foundation Guard Council's vote to burn another 4 million Luna to mint roughly $372 million worth of UST, Macedo continued touting UST stating that "[t]he cost of attacking the $UST peg has increased by another $372M."  ¶ 153.  Two days later, on March 17, 2022, Macedo posted a thread on Twitter downplaying the potential UST "death spiral" stating that "$UST already defied the odds by not just surviving but thriving as a

pure algo stable" and that as UST "moves to exogenous collateral, it will become far more resilient while still enabling fast growth…" ¶ 155.

On March 28, 2022, Eric Wall, the Chief Investment Officer at Arcane Assets tweeted that "Terra is making a mistake to use Luna funds that originated from the ICO to build the [Luna Foundation Guard] reserve.  The goal of $UST is to be (i) decentralized and (ii) sustainable.  This reserve is neither of those two things." ¶ 156.  Again, Kwon – rather than addressing the merits of Wall's statements – sarcastically retorted "I like to say things that are true and well informed, and i think after all this we can both agree this is neither of those things: But you know, you do you." *Id*.

On April 6, 2022, Macedo again piggybacked Kwon in touting the Terra Ecosystem to the public by retweeting that the 20% "Anchor rate is now available to 30+M Binance users." ¶ 157.  The next day, on April 7, 2022, the Luna Foundation Guard announced that it had acquired $100 million in AVAX tokens (another cryptocurrency) to "help bolster its UST Decentralized [] Reserve." ¶ 158.  With each successive infusion into the Luna Foundation Guard, some skeptics grew more concerned that the algorithm would not work.  But Defendants continued to silence them with their false statements concerning the efficacy of the UST-Luna algorithm and the Anchor Protocol. ¶ 159.

## VIII.   DEFENDANTS PROFIT AS THE TERRA ECOSYSTEM COLLAPSES

In May 2022, the broader crypto market experienced a sharp downturn, leading to disastrous consequences for holders of UST and Luna. ¶ 162.  Specifically, on May 7, 2022, over $2 billion worth of UST was removed from the Anchor Protocol and hundreds of millions of dollars worth of assets were quickly liquidated. ¶ 163.  This sell-off depressed the price of UST

to $0.91 per coin resulting in droves of UST holders seeking to redeem their coins for $1.00 in Luna coins, in order to make a quick, sizeable profit. *Id.*

As more and more UST holders exchanged their coins for Luna, the minting of Luna coins quickly ballooned, as the algorithm designed. ¶ 164. This created a tremendous glut in Luna coins, which further depressed the price of Luna. *Id.* Consequently, the Anchor Protocol saw the value of its deposits **fall by $11 billion** between May 9, 2022 and May 11, 2022. *Id.* Within days, both Luna and UST were essentially worthless resulting in significant financial loss to the crypto community. *Id.* And the losses continued in the weeks that followed, with approximately $300 billion in value disappearing. ¶ 165.

The Anchor Protocol was also unsustainable, and Defendants knew this all along. ¶¶ 169–70. Specifically, in a "post-mortem analysis" of the Terra Ecosystem, Tetot admitted what Terraform Labs and the Defendants had denied: that the Anchor Protocol's 20% yield was neither sustainable nor stable. ¶ 169. "20% yield was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't sustainable." ¶ 170.

Defendants had a two-part exit strategy in place to capitalize on the UST-Luna algorithm and the Terra Ecosystem while the value of the UST and Luna coins were inflated. ¶ 174. First, they pulled their funds out of the Terra Ecosystem gradually during the bull market run, months before the crash. *Id.* Defendants pulled 100 billion won blocks, or $80 million, out of Terraform Labs' funds and siphoned it off to multiple cryptocurrency wallets. ¶ 175. They cashed out over $2.7 billion over the span of mere months using a separate borrowing protocol, Abracadabra. ¶¶ 178–86. Second, they transferred billions of dollars from the Luna Foundation Guard reserve to unidentified wallets on the Gemini and Binance exchanges rather than using those funds for their intended purpose. ¶¶ 188–97.

## STANDARD OF REVIEW

### I. STANDARD FOR DISMISSAL UNDER FED. R. CIV. P. 12(B)(2)

Where a "court [has chosen] not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F. 3d 779, 784 (2d Cir. 1999). Accordingly, when "the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Whitaker v. Am. Telecasting, Inc.*, 261 F. 3d 196, 208 (2d Cir. 2001).

### II. STANDARD FOR DISMISSAL UNDER FED. R. CIV. P. 12(B)(6)

To survive a 12(b)(6) motion, a plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss the court "accepts as true all well-pleaded factual allegations" and draws all inferences in a light most favorable to the plaintiff. *See Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 301 (S.D.N.Y. 2014).

Other than some of the allegations concerning mail and wire fraud, Plaintiff's allegations are subject to the low pleading bar imposed by Fed. R. Civ. P. 8(a), which simply requires that the opposing party be provided with "fair and reasonable notice," and "is not meant to impose a great burden upon a plaintiff." *Levine v. Torino Jewelers, Ltd.*, No. 05 Civ. 3159 (DLC), 2006 WL 709098, at * 2 (S.D.N.Y. March 22, 2006) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 337 (2005)). Defendants erroneously attempt to cast Plaintiff into the heighted pleading standard of the PSLRA by continuously citing to securities fraud cases in support of dismissal. *See, e.g., Special Situations Fund III QP, L.P. v Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 423 (S.D.N.Y. 2014) ("A complaint alleging securities fraud must satisfy the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b) and the [PSLRA] by stating the circumstances constituting fraud with particularity."); (TFL Br. at 11, 28–30). Their efforts should be denied; the majority of Defendants' arguments are subject only to the Fed. R. Civ. P. 8 standard and, given that they are heavily fact-dependent, should not be decided on a motion to dismiss. Even Plaintiff's mail and wire fraud allegations are subject only to Fed. R. Civ. P. 9, and not the PSLRA. *See Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 310 (S.D.N.Y. 2009).

In reviewing a motion to dismiss, the Court must "limit its analysis to the four corners of the complaint." *Mahoney v. Sony Music Ent.*, No. 12 CIV. 5045 RJS AJP, 2013 WL 491526, at *5 (S.D.N.Y. Feb. 11, 2013). Here, in direct contradiction to this well-established principle, Defendants attempt to insert their preferred facts into Plaintiff's complaint. Attempting to cast this action as securities fraud, the TFL Defendants assert that the Court should analyze any public information even if it is not in the Complaint. TFL Br. at 11. In an attempt to support this proposition, Defendants argue that cryptocurrency-related complaints are "often based entirely on cherry-picked quotes from public project documents and social media," *id.*, yet, fail to point to any examples of this.

Defendants do not cite any cases to support their proposition that courts may consider information not relied on in the Complaint. Indeed, this proposition is incorrect. *Id.* The Second Circuit clarifies that, "because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a *necessary* prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *See Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 153 (2d Cir. 2002) (emphasis added). This is in order to protect against "the harm to the plaintiff when a court considers material extraneous to a complaint" that is caused by "lack of notice that the

material may be considered." *Id.*; *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 649 (S.D.N.Y. 2012) (stating that on a motion to dismiss and "prior to discovery, the Court will not hazard a guess regarding … the import of publicly available information").  Defendants have not provided any reason to deviate from the well-established principles of motion to dismiss practice when cryptocurrencies are involved.

The TFL Defendants also ask the Court to consider an expert report that purportedly supports dismissal.  *See* TFL Br. at 8; Henkin Decl. Ex. F (ECF No. 59-6) ("Analysis – Terraform Labs' and Luna Foundation Guard's Defense of the UST Price Peg," November 9, 2022).  This report, which was commissioned by the TFL Defendants' counsel, (*id.* at 3), smacks of desperation and cannot be considered at the motion to dismiss phase.  Expert reports are only permitted if they will assist the "trier of fact," and by definition cannot be considered on a motion to dismiss, which assesses whether a complaint can be dismissed as a matter of law.  *See* Fed. R. Evid. 702 ("A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if: (a) the expert's . . . specialized knowledge will help the *trier of fact* to *understand the evidence* or to *determine a fact in issue*.")  Likewise, Defendants' arguments based on the terms of service of the Anchor Protocol (TFL Br. at 42; Jump Br. at 29) – a document which is not relied upon or even referenced in the Complaint – fail.

## **ARGUMENT**

## I.   **THE COURT HAS PERSONAL JURISDICTION OVER THE TFL DEFENDANTS**

For a court to exercise specific jurisdiction over non-residents, three conditions must be satisfied.  "First, the [non-resident] must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State.  Second, the plaintiff's claim must arise out of or relate to the [non-resident's] forum

conduct.  Third, the exercise of jurisdiction must be reasonable under the circumstances." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.,* 916 F. 3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).  "A district court's personal jurisdiction is determined by the law of the state in which the court is located." *See Spiegel v. Schulmann*, 604 F. 3d 72, 76 (2d Cir. 2010).  In New York, C.P.L.R.  §  302(a) provides, in pertinent part, that a court "may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... transacts any business within the state," so long as the plaintiff's "cause of action aris[es] from" that "transact[ion]."  In determining whether personal jurisdiction may be exercised under Section 302(a)(1), "a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F. 3d 239, 246 (2d Cir. 2007) (citing *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y. 3d 65, 71, 818 N.Y.S. 2d 164, 166, 850 N.E. 2d 1140, 1142 (2006)).  Here, Plaintiff satisfies both the statutory and constitutional requirements for personal jurisdiction.

"In order to survive a motion to dismiss, a plaintiff must make a prima facie showing that jurisdiction exists by alleging facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Penguin Grp. (USA) Inc. v. Am. Buddha,* 609 F. 3d 30, 34 (2d Cir. 2010).  "Although it is impossible to precisely fix those acts that constitute a transaction of business ... it is the quality of the defendants' New York contacts that is the primary consideration." *Fischbarg v. Doucet*, 9 N.Y. 3d 375, 380 949 N.Y.S. 2d 501, 505, 880 N.E. 2d 22, 26 (2007).  In some circumstances, a single act within New York can satisfy the requirements of section 302(a)(1).  *See, e.g., Deutsche Bank,* 7 N.Y. 3d at 72, 818 N.Y.S. 2d at 167, 850 N.E. 2d at 1143 ("[W]hen the requirements of due process are met, as they are here, a sophisticated institutional trader knowingly entering our state—whether electronically or otherwise—to

negotiate and conclude a substantial transaction is within the embrace of the New York long-arm statute"). Courts considering jurisdictional issues may assess the "totality of the circumstances." *Farkas v. Farkas,* 36 A.D. 3d 852, 853, 830 N.Y.S. 2d 220, 221 (2d Dep't 2007); *accord Best Van Lines*, 490 F. 3d at 246.

The TFL Defendants here did not act "entirely abroad" with "sporadic or indirect contacts with the United States" as they assert. TFL Br. at 13. Each of them knowingly created and promoted the Terra Ecosystem through contacts with New York, effectuated transactions related thereto in New York, conducted business with people and entities in New York, and, through the alleged conspiracy, decimated the finances of residents in this District. ¶¶ 33–37. Exercising personal jurisdiction over any of the named Defendants does "not offend traditional notions of fair plain and substantial justice" where, as here, Terraform Labs, its creators and related entities purposely availed themselves of the United States market. Residents of this District, and the entire country, have lost billions of dollars as a result of the TFL Defendants' transactions within the District.

### A.   TERRAFORM LABS AND DO KWON

On June 8, 2022, in the context of an SEC proceeding captioned *United States Securities and Exchange Commission v. Terraform Labs Pte. Ltd.*, Case No. 0:2022cv00368 (2d Cir. June 8, 2022) (ECF No. 109), the Second Circuit affirmed Judge Oetken's conclusion that the Southern District of New York had personal jurisdiction over Terraform Labs and Kwon. *See* Declaration of Caitlin M. Moyna, Ex. A. That ongoing SEC investigation of Kwon and Terraform Labs concerns the creation, promotion and sale of assets related to a certain blockchain technology. The finding of personal jurisdiction over both Terraform Labs and Kwon hinged on the cumulative import of several factors including: i) that Terraform Labs and Kwon, among other things, were

promoting digital assets to U.S.-based consumers; ii) that Terraform Labs retained U.S.-based employees and entered into agreements with U.S. based entities; (iii) that Terraform Labs knew that its customers were in the U.S.; and (iv) that  the exercise of jurisdiction was reasonable under the circumstances because the challenged conduct was "purposefully directed toward residents of the [the U.S.] and, and the suit arose from and related directly to those [forum] contacts." *See id.* at 7–9 (citing *Balestra v. ATBCOIN LLC,* 380 F. Supp. 3d 340, 350–51 (S.D.N.Y. 2019) (exercising specific personal jurisdiction over founders of a "blockchain" company based on conduct "target[ing] the U.S. market in an effort to promote the sale of . . . the very unregistered security at issue in [the] litigation")).   The Second Circuit further noted that, consistent with precedent, Terraform Labs' contacts within the forum are properly imputed onto Kwon.  *Id.* at 7 (citing *EMI Christian Music Grp, Inc. v. MP3tunes, LLC,* 844 F. 3d 79, 98 (2d Cir. 2016)).

Here, Plaintiff has alleged comparable facts.[5]   Specifically, Plaintiff has alleged that Terraform Labs regularly transacts business within the United States, contracts with U.S.-based companies, and has employees in the United States. ¶ 23.[6]  Plaintiff alleges that Kwon co-authored two white papers underlying the Terra Ecosystem and the Anchor Protocol both of which were circulated in the United States, and in New York, and intended to create and maintain a market for

---

[5] The SEC investigation involved something called the "Mirror Protocol" which was a different blockchain technology.  While the Second Circuit was considering facts specific to the Mirror Protocol, many of the allegations are equally relevant here or the analogous facts alleged in the Amended Complaint are applicable to and/or specific to the scheme alleged in this Action.

[6] The TFL Defendants fail to explain why these facts are entitled to less weight because they were originally pled by the SEC.  TFL Br. at 11–12.  Plaintiff is not incorporating the SEC's allegations by reference but merely noting that these same facts have been alleged by the SEC and accepted by the Second Circuit as providing a sound basis for the exercise of jurisdiction over Terraform Labs and Kwon.  Moreover, the suggestion that Plaintiff did not independently investigate the SEC's allegations is unavailing.  Defendants themselves do not assert that any of these alleged facts are untrue.

UST, Luna and other related Terra coins within the forum state.  ¶¶ 24, 34.  Defendants further directed marketing and promotional efforts to all U.S. residents through social media and other web-based mails and channels, including Twitter, for example.  Kwon has travelled to the United States to conduct business, including to speak at a digital asset and blockchain conference held in New York,[7] appears on podcasts that are produced and broadcast throughout the United States, and otherwise directs promotional and marketing activities to all U.S. consumers.  ¶ 34.  Terraform Labs' financial products are made available to U.S. citizens through Terraform Labs' website, on trading platforms, and through other U.S. social media.  ¶ 35.  These facts, taken together, provide a sound basis for this Court's exercise of specific jurisdiction over Terraform Labs and Kwon.[8]

Defendants cannot ignore the recent Second Circuit's holding and choose instead to attempt to downplay it, first by questioning its precedential weight, and then by parsing Plaintiff's allegations to lessen their import.  Defendants first fail to explain why their appeal of the Second Circuit's affirmance of jurisdiction in the SEC proceeding, based on a similar set of factual

---

[7] The TFL Defendants assert that Kwon's participation in a particular panel at a cryptocurrency did not relate to the claims asserted here.  TFL Br. at 17.  This improper factual assertion is not borne out by the blog post which they cite.  That post contains "highlights" from a three-day conference; more specifically, two half-hour clips from a three-day conference.  Plaintiff has pled facts sufficient to support an inference that Kwon's appearance on industry panels as the cofounder and CEO of Terraform Labs relates to the marketing of Terraform Labs' products, including his "greatest invention."  For pleading purposes, Kwon's participation in a three-day cryptocurrency conference in New York, less than year after launching the first UST coins and the Anchor Protocol, supports a nexus between New York and the alleged conspiracy.

[8] In *SPV OSUS Ltd. v. UBS AG*, cited repeatedly by Defendants, the defendants were "foreign banks alleged to have provided services to foreign investment funds, acting entirely abroad and with only sporadic or indirect contacts with the United States," with no employees in the United States, and which did not "directly or purposefully solicit, market, or otherwise seek out business from potential customers located in the United States."  114 F. Supp. 3d 161, 168–70 (S.D.N.Y. 2015).

allegations, should lessen or impact the precedential value of the decision at this time.  TFL Br. at 12.

Defendants also ignore that the Second Circuit considered the interplay of seven different allegations in rendering its opinion.  *SEC v. Terraform Labs, Do Kwon*, Slip. Op. at 7.  Contrary to that approach, Defendants fail to consider the cumulative import of the facts alleged and instead attack them piecemeal.  For example, Plaintiff does not rely *solely* on Kwon's visit to New York to promote Terra products to create a standalone "jurisdictional hook" as Defendants claim.  TFL Br. at 14.  Plaintiff does not rely *solely* on the existence of a website for jurisdiction.[9]  Nor does Plaintiff rely on any one fact as the *sole* basis for jurisdiction.  It is the cumulative import, or "quality," of those contacts that go to whether jurisdiction would be reasonable under the circumstances.  And the contacts alleged are not all "random, fortuitous or attenuated" as Defendants claim – they are all related to the marketing, promotion and sale of the underlying products and the maintenance of the alleged conspiracy to support the entire Terra Ecosystem.  ¶¶ 33–37.

---

[9] In *Alibaba Grp. Holding Ltd. v. Alibabacoin Found*, cited by the TFL Defendants, the Court did not exercise jurisdiction in part because plaintiff did not establish that the only link to the forum (a website) had "actually [been] used to effect commercial transactions with customer in New York." No. 18-CV-2897 (JPO), 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018). The same is true of *Royalty Network Inc. v. Dishant.com, LLC,* in which the Court found no jurisdiction when the only alleged contact with New York was a website and the plaintiff had "no evidence that any New York resident actually engaged in any [ ] transactions" on the website. *Royalty Network Inc. v. Dishant.com, LLC,* 638 F. Supp. 2d 410, 420 (S.D.N.Y. 2009). Here, the question of jurisdiction does not hinge solely on the existence of a website but rather on several cumulative factors.  In *Capital Records, LLC v. VideoEgg*, 611 F. Supp. 2d 349 (S.D.N.Y. 2009), also cited, TFL Br. at 15, the Court found, after discovery regarding the jurisdictional questions, that a website can in fact form the basis for jurisdiction in New York.

B.   THE LUNA FOUNDATION GUARD

The basis for jurisdiction of the Luna Foundation Guard is the same as that for Terraform

Labs.  As with Terraform Labs, the Luna Foundation Guard purposely directed its conduct into

the forum State; Plaintiff's claims against the Luna Foundation Guard arise out of its conduct

within the United States and; the exercise of jurisdiction is reasonable under the facts presented.

As alleged in the Complaint, the Luna Foundation Guard's "core mandate" was to "buttress the

stability of the UST peg and foster the growth of the Terra ecosystem."  ¶ 129.  Its conduct was

therefore directed, in part, at holders of UST and Luna in the United States and in the District.  ¶

129.  The Governing Council that oversees and operates the Luna Foundation Guard includes

Kariya, whose company, Jump, is incorporated in Delaware and headquartered in Chicago, and

Macedo whose company, Delphi, is headquartered on Broad Street in New York City.  ¶¶ 26–27,

30–31.  Thus, the Luna Foundation Guard is governed by the heads of U.S. based companies,

several of whom are named Defendants in this action and were actively involved in the alleged

conspiracy.[10]  ¶ 132.  Indeed, Jump was one of the primary players that raised funds for the Luna

Foundation Guard from American people and from Delphi, a New York based company.  ¶ 141.

Macedo of New York based Delphi invested in the Luna Foundation Guard and regularly promoted

UST and Luna over Twitter.  ¶¶ 144, 148, 150, 153, 155.  Additional members of the Luna

Foundation Guard include Republic Capital, a limited liability company with its headquarters in

---

[10] Defendants assert that the receipt of funding from two domestic entities does not support specific jurisdiction.  TFL Br at 15.  But in the case they cite, the defendant had "submitted sworn testimony to refute" the claim of any association with a New York business.  *Blockchange Ventures I GP, LLC. v. Blockchange, Inc.,* No. 20 CIV. 6866, 2021 WL 308277, at *2 (S.D.N.Y. Jan. 29, 2021). Here, Macedo and Kariya are members of the Governing Council of the Luna Foundation Guard and are named co-conspirators who actively funded and promoted UST, Luna, the Anchor Protocol, and the Terra Ecosystem.  Defendants cannot disclaim any association with them.

New York City, ¶ 15, Tribe Capital, a limited liability headquartered in San Francisco, ¶ 17, and

Pantera Capital, a venture capital fund headquartered in Menlo Park, CA, ¶ 22.; *see also* ¶ 133

(listing Republic and Tribe as entities recruited to the Luna Foundation Guard).[11]   Terraform Labs

contributed the vast majority of funds to the Luna Foundation Guard and the Luna Foundation

Guard was, in turn, an integral part of Terraform Labs scheme to bolster confidence in UST.   The

Luna Foundation Guard ultimately became a vehicle that Defendants used to siphon value out of

the Terra Ecosystem.   ¶ 188.   Thus, to the extent the Court exerts jurisdiction over Terraform Labs,

it follows that jurisdiction over the Luna Foundation Guard exists as well.

## II.   THE COMPLAINT PLEADS A RICO CLAIM

To state a RICO claim under § 1962(c), a plaintiff must plausibly allege: "(1) that the

defendant (2) through the commission of two or more acts" (i.e., predicate acts) "(3) constituting

a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest

in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign

commerce."   *Town of Hartford v. Operation Rescue*, 915 F. 2d 92, 100 (2d Cir. 1990) (quoting 18

U.S.C. § 1962(a)-(c)).   Plaintiff must also allege injury to business or property by reason of a RICO

violation.   18 U.S.C. § 1964(c).

### A.   THE COMPLAINT ALLEGES PREDICATE ACTS

#### 1.   Mail and Wire Fraud

The Complaint alleges that Defendants committed wire fraud under 18 U.S.C. §§ 1341,

1343.   The elements of mail or wire fraud are "(i) a scheme to defraud (ii) to get money or property

---

[11] Although Plaintiff has chosen not to name Republic Capital, Tribe Capital and Pantera Capital in his Amended Complaint, he stands by the allegations concerning their geographic locations. None of these entities, or anyone associated with them, serve on the Luna Foundation Guard Governing Council.

(iii) furthered by the use of interstate mail or wires."[12]  *Williams v. Affinion Grp., LLC*, 889 F. 3d 116, 124 (2d Cir. 2018).  A scheme or artifice to defraud exists if there has been "a material misrepresentation."  *Id*. at 124.

### a.  Scheme or Artifice to Defraud

The Complaint pleads with particularity that Defendants engaged in a scheme or artifice to defraud, which consisted of the following material misrepresentations and components.  *First*, Defendants concealed that Kwon was behind the failed Basis Cash venture.  ¶¶ 45–57.

*Second*, Defendants made false statements in the Terra White Paper, falsely claiming to have created a growth-driven algorithmic stablecoin that would maintain price stability, misrepresenting the premise of the algorithmic design by failing to explain that more nuanced decision making would be required to maintain price stability, and including fabricated "stress" tests designed to assuage the concerns of skeptics.  The Terra White Paper also omitted to explain that a functioning governance system would be necessary to intervene in the case of a severe market downturn.  ¶¶ 51, 61, 74, 80, 86–89, 91–94.

*Third*, in June 2020, Terraform Labs released the Anchor White Paper which falsely described the Anchor Protocol as an over-collateralized, principal-protected stablecoin savings product that pays depositors a stable interest rate protected from volatility.  ¶¶ 98–100.  Kwon and Terraform Labs, through Twitter and other media, touted the Anchor Protocol by making false

---

[12] None of the Defendants argue that the Complaint fails to allege use of the mail and wires.  Indeed, the Complaint satisfies this element.  ¶¶ 269–71.  The Delphi Defendants state that "Plaintiff fails to allege how Delphi used the United States mails or interstate wires to further the alleged fraudulent scheme," Delphi Br. at 9, but their argument is actually that Delphi's funding commitment to Terraform Labs does was not "in furtherance of a fraudulent scheme."  *Id.*  For the reasons discussed *infra* Argument, Section (A)(1)(b), Delphi's cash infusions and participation in the Luna Foundation Guard constitute mail and wire fraud.

statements regarding its stability even in "uncertain market conditions". ¶¶ 112–14, 117. Kwon also knew that the 19.5% guarantee was impossible to maintain. ¶ 173.

*Fourth*, Kwon and Terraform Labs made false statements regarding Terraform Labs' association with Chai in order to maximize demand for UST and, in turn, profits for the Defendants. ¶¶ 118–22.

*Fifth*, on May 24, 2021, in connection with a de-pegging of UST, Terraform Labs falsely stated that the Terra Ecosystem's "useful applications" and "strong locus of demand" were responsible for USTs ability to remain stable and concealed the fact that an investment from Jump was actually the temporary fix designed to prolong the Defendants' scheme. ¶¶ 123–24. Jump was complicit in this material misrepresentation by concealing its investment in Terraform Labs and contributing to the illusion that UST stabilized through the algorithm rather than through Jump's cash infusion. *Id*.

*Sixth*, Defendants made false statements and misrepresentations regarding the Luna Foundation Guard and its effect on the Terra Ecosystem. Terraform Labs claimed the purpose of the Luna Foundation Guard was to "improv[e] the sustainability and stability of Terra's algorithmic stablecoins." ¶¶ 126, 128–29. In reality, the Luna Foundation Guard was nothing more than a podium to prop up the Terra Ecosystem and quell the crypto community's justified concerns that the UST-Luna algorithm would fail. ¶¶ 123–26, 128–29, 133–34.

*Seventh*, following implementation of the Luna Foundation Guard, Defendants continued to make false statements and misrepresentations regarding UST, Luna, and the Anchor Protocol. Kariya, President of Jump Crypto, posted a twitter thread downplaying the confusion and panic concerning a de-pegging of UST and the resulting impact on the Anchor Protocol. ¶ 134. Jump tweeted regarding the confidence users should have in the Luna Foundation Guard's UST reserve

and compared the same to reserves held by central banks.  ¶ 140.  Jump consistently promoted its relationship with Terraform Labs and their effort in making UST more accessible.  ¶¶ 140, 142–43.  Macedo of Delphi published a tweet regarding the Anchor Protocol's yield, growth and stability of UST, the resilience of Terraform Labs, and the cost of attacking the UST peg.  ¶¶ 137, 144, 153, 155.  Kariya and Kwon made false statements concerning the security and stability of UST and how the Luna Foundation Guard bolsters security while appearing together on The Ship Show.  ¶ 146.

In response, Defendants ignore multiple components of the fraudulent scheme, including Kwon's concealed involvement in Basis Cash; the charts in the Terra White Paper purporting to demonstrate that the algorithm would work even during extremely poor economic conditions; Jump's infusion of capital into the Terra Ecosystem to fix the May 2021 de-pegging event; Kwon's false statements regarding a relationship with Chai; and the fraudulent basis for the Luna Foundation Guard.  Instead, they focus on a few particular alleged false statements and argue that these material misrepresentations do not withstand scrutiny because they were mere optimistic statements and an intervening cause changed the circumstances.  But the cases they cite in support are inapposite.  The TFL Defendants cite to *Barry v. Cboe Glob. Markets, Inc.*, 42 F. 4th 619 (7th Cir. 2022), which was a securities fraud action, in which the court, applying the heightened PSLRA standard, held that the defendants did not have the requisite intent under the Securities Exchange Act where the alleged manipulation was performed by a third-party.  TFL Br. at 28, 30.  They also rely on *Acito v. IMCER Group, Inc.*, 47 F. 3d 47, 53 (2d Cir. 1995), another securities fraud-action, the court held that defendants' failure to anticipate future events (the success of a manufacturing plant in passing an inspection) did not constitute securities fraud.  TFL Br. at 29.

Unlike *Acito* and *Barry*, Defendants here not only anticipated, but actually expected, the change in circumstances referenced by the Defendants. ¶¶ 67–73. Specifically, based on predictable patterns in Bitcoin valuations, and resulting impact on the crypto market overall, Defendants anticipated that there would be a softening of demand for cryptocurrencies in 2022. *Id*. Further, based on Kwon's experience with Basis Cash, he knew that the algorithm would not be able to maintain a stable price for UST during that period. ¶¶ 45–50. In light of the above, Defendants' statements about the sustainability and stability of UST and the Terra Ecosystem were false, not simply optimistic. *See also Kuczynski v. Ragen Corp.*, 732 F. Supp. 378, 384–85 (S.D.N.Y. 1989) (holding that plaintiffs RICO claim, based in part on defendants' misrepresentative optimistic statements, was plead with particularity).

The Jump Defendants also argue that the material misrepresentations are only predictions and statements of optimism. Jump Br. at 7–8[13]. That is incorrect. They knew with certainty that that the UST-Luna algorithm would not work because it was their cash contribution, not the algorithm, that re-pegged UST at $1.00 in May 2021. ¶¶ 123–24. Their involvement in this coverup – enacted during a crypto *bull* market, and to correct a *minor* de-pegging event – demonstrate that, like Kwon, Platias and TFL, Kariya and Jump knew that the algorithm would not be successful when more extreme conditions presented, as they did in May 2022. Thus, Jump and Kariya made statements about the stability and security of UST and the Terra Ecosystem while knowing the same were false. ¶¶ 134, 139–40, 146.

---

[13] The statements they rely on are distinguishable. *In re Security Cap. Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569,597 (S.D.N.Y. 2010) is a securities fraud action in which the court held that statements that general statements of optimism and expectations were inactionable puffery. In *Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160, 162 (S.D.N.Y. 1986), the plaintiff failed to plead the time, place and contents of the alleged false statements.

### b. Scienter

Plaintiff sufficiently alleged that Defendants acted with intent to defraud. Intent may be alleged generally. *See* Fed. R. Civ. P. 9(b); *see also Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008). The scienter element is satisfied by "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F. 3d 273, 290-91 (2d Cir. 2006).

Here, as explained below, the Complaint alleges both: that each Defendant had both motive and opportunity to commit fraud, and strong circumstantial evidence of conscious misbehavior or recklessness. Each defendant participated in this scheme to defraud with the motive to funnel profits directly to themselves. ¶¶ 15, 20, 174–97; *see Allstate Ins. Co. v. Nazarov*, No. 11 CV 6187, 2015 WL 5774459, at *15 (E.D.N.Y. Sept. 30, 2015) (holding that plaintiffs adequately alleged intent where they showed "financial motive").

The TFL and Jump Defendants argue that Plaintiff fails to raise a strong inference of scienter because it "lumps all Defendants together." TFL Br. at 31; Jump Br. at 9–10. As demonstrated by the facts below evidencing each Defendant's scienter, that is not correct.

### The TFL Defendants' Scienter

The scienter of Kwon, Terraform Labs and the Luna Foundation Guard can be inferred from the following facts. *First*, Kwon and other employees from Terraform Labs had experienced failure with an algorithmic stablecoin (Basis) that operated on a nearly identical algorithm as the one underlying UST and Luna. ¶¶ 9, 45–50. In fact, Kwon actively concealed his involvement in Basis Cash to preserve his reputation in the crypto community and, ultimately, his project with Terraform Labs and Defendants. ¶¶ 47, 50. *Second*, Kwon authored the Terra White Paper, which

contains numerous false statements, including results of phony stress tests designed to convince the crypto community that an algorithm could modulate the supply and demand of a currency to create a stable monetary system.  ¶¶ 7, 61, 86.  Given that there was a minor de-pegging event in 2021 during a bull market, and that the algorithm eventually failed in 2022, the results of the stress test – if it had been performed at all – were false.  *Third*, Kwon affirmatively lied in telling the public that Terraform Labs had a close relationship with Chai, maker of the popular Korean payment application, so that consumers would buy UST and Luna coins.[14]  ¶¶ 118–22.  *Fourth*, when UST became slightly de-pegged from the U.S. dollar in 2021, Terraform Labs, through Kwon, secured a cash infusion from Jump and Kariya. ¶¶ 123–24.  There would have been no need to obtain cash from another partner – particularly during this period which was, overall, a crypto bull market – if Kwon truly believed that the algorithm would work during more stressful economic times.  *Fifth*, Terraform Labs, through Kwon, launched the Anchor Protocol, promising an impossible 19.5% interest rate on deposits.  ¶¶ 95, 110.  The purpose of this was to drive demand for UST and Luna coins.  This demonstrates their knowledge that the algorithm depended on there being strong demand for Luna coins, something which was not disclosed.  *Sixth*, Kwon, Terraform Labs, Jump and Kariya worked together to form the Luna Foundation Guard for the express purpose of silencing skeptics who believed that the algorithm would fail in an economic downturn. ¶¶ 128, 132, 133–34.  These facts evidence the scienter of the TFL Defendants.  *See Ouaknine v. MacFarlane*, 897 F. 2d 75, 80–81 (2d Cir. 1990) ("Allegations of scienter are not subjected to the more exacting consideration applied to the other components of fraud. They are sufficient where

---

[14] The TFL Defendants claim that the Amended Complaint does not allege that Kwon knew that the relationship with Chai had been terminated. TLF Br. at 29 n.14.  But the inference that Kwon, the CEO and founder of Terraform Labs, was unaware of the Company's termination of its relationship with one of South Korea's most popular payment applications is not compelling.

... the allegations lie peculiarly within the opposing parties' knowledge and are accompanied by information that raises a strong inference of fraud") (internal citation omitted); *Goldman v. Belden*, 754 F. 2d 1059, 1070 (2d Cir. 1985) (One method of pleading scienter "is to allege facts showing a motive for committing fraud and a clear opportunity for doing so."  Plaintiff sufficiently alleged scienter where the defendants "failure to qualify the[ir] bullish statements was intended to permit individual defendants to profit from an inflated market price before the truth became known."); *see also Rohland v. Syn-Fuel Associates-1982 Ltd. Partnership*, 879 F. Supp. 322, 333 (S.D.N.Y. 1995) (holding that Plaintiff sufficiently alleged scienter because the "defendants knew that the [written document] contained material misstatements and omissions designed to defraud plaintiffs.").

The TFL Defendants have no answer for these allegations.  Their sole argument regarding scienter is that Plaintiff "lumps" the Defendants together.  TFL Br. at 31.  But the cases they cite are distinguishable.[15]

---

[15] *Kinra v. Chicago Bridge & Iron Co.*, No. 17 CIV. 4251 (LGS), 2018 WL 2371030, at *1 (S.D.N.Y. May 24, 2018) (a breach of fiduciary duty case that is distinguishable because the complaint offers nothing more than "[d]efendants knew or should have known" about artificially inflated stock prices without more); *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (a constitutional and state common law case that is distinguishable because the complaint fails to allege which defendants where responsible for which violations); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F. 3d 677, 695 (2d Cir. 2009) (an antitrust case that is not relevant because the Court found the Plaintiff sufficiently alleged scienter); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F. 3d 159, 179 (2d Cir. 2004) (distinguishable because the plaintiff failed to plead scienter for bankruptcy fraud); *Rosenheck v. Rieber*, 932 F. Supp. 626, 628 (S.D.N.Y. 1996) (distinguishable because the complaint fails to distinguish any particular act of racketeering and fails to allege any facts that demonstrate scienter).

**The Jump Defendants' Scienter**

The Jump Defendants' scienter can be inferred by the fact that, when there was a slight de-pegging event in 2021, they provided funding to stabilize the value of UST.  ¶¶ 123–24.  That alone demonstrates that they knew, at least as of the time of their cash infusion, that the UST-Luna algorithm did not work.  Yet they did not disclose this fact, and thus participated with the TFL Defendants in a scheme to defraud the crypto community that the algorithm was what stabilized the value of UST.

Further, Jump was integral in the process of forming the Luna Foundation Guard.  Despite knowing that the algorithm did not work, they recruited several additional participants to contribute funds to a reserve fund, which was designed to quell debate about the feasibility of the UST-Terra algorithm.  ¶¶ 132, 222.

Finally, despite knowing that the algorithm did not work, Jump, through Kariya, continued to tout the stability of UST, the Anchor Protocol, the Luna Foundation Guard, and the Terra Ecosystem.  ¶¶ 123–24, 134, 139–40, 146.

The Jump Defendants rely on *Rosenheck v. Rieber*, 932 F. Supp. 626, 628 (S.D.N.Y. 1996) (Rakoff, J.) in support of its proposition that Plaintiff failed to allege a strong inference of scienter. Jump Br. at 10, 11, 13.  In *Rosenheck*, this Court dismissed the RICO claims where the plaintiff's allegations were wholly conclusory.  Here, as noted above, Jump's May 2021 cash infusion into the UST-Terra algorithm, along with Kariya's longtime relationship with Kwon, form a solid basis to infer scienter.

The Jump Defendants erroneously argue that their failure to disclose the May 2021 cash infusion into UST to correct the de-peg does not give rise to an inference of scienter because they never "had a duty to disclose the investment."  Jump Br. at 12.  Where "a plaintiff's 'theory of

[RICO] fraud' is premised on both affirmative misrepresentations and material omissions, a plaintiff need not plead or prove the existence of a fiduciary duty." *Monterey Bay Military Housing, LLC v. Ambac Assurance Corporation*, 531 F. Supp. 3d 673, 703 (S.D.N.Y. 2021); *see also Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 656 (S.D.N.Y. 1996) (internal citations omitted) ("An omission of a material fact can constitute fraud under RICO if either there exists a duty to disclose the information or the defendant makes statements of half-truths or affirmative misrepresentations.").[16]   Further, whether they had a duty to disclose the investment or not, the fact of the investment demonstrates the Jump Defendants' knowledge.

### The Delphi Defendants' Scienter

The Delphi Defendants also argue that Plaintiff failed to allege scienter (Delphi Br. at 10), but this too fails. The Delphi Defendants bolstered the public's confidence in the Terra Ecosystem by investing and joining the Governing Council of the Luna Foundation Guard; touting the stability of UST, the Anchor Protocol, the Luna Foundation Guard, and the Terra Ecosystem to the market; and hosting a podcast called "Terra Autumn" downplaying the de-pegging of UST and its purported "stability."   ¶¶ 132, 137–38, 141, 144, 150, 153, 155, 238.   Macedo's position on the Luna Foundation Guard's governing council allows for an inference that he knew that the Luna Foundation Guard was designed solely to engender misplaced trust among the crypto community.

---

[16] The Jump Defendants' reliance on *United States v. Autuori*, 212 F. 3d 105 (2d Cir. 2000) is misplaced.  To begin, *Autuori* is a decision assessing the verdict of a *jury trial*, and was thus made on a full evidentiary record.  Further, it held that the evidence did not support a reasonable inference that the defendant made partial or ambiguous statements that required further disclosure in order to avoid being misleading.  *See* 212 F. 3d at 119–20.  Unlike *Autuori*, the Jump Defendants' statements to the market regarding the security and stability of UST and the Terra Ecosystem are misleading without disclosing that the May 2021 de-pegging of UST was stabilized by Jump's investment, not Terraform Labs' algorithm.  This is enough at the motion to dismiss phase.

Further, as a Governing Council member, he knew that the Luna Foundation Guard's funds were transferred out of the publicly disclosed Luna Foundation Guard wallet to an anonymous wallet in the midst of the Terra Ecosystem meltdown in May 2022.  ¶ 193.

The Delphi Defendants argue that Macedo's knowledge cannot be imputed to Delphi. Delphi Br. at 9–10.  Macedo is a Founding Partner at Delphi Ventures and the Head of Delphi Labs.  ¶ 31.  His scienter can be imputed to Delphi.  *See infra* at 67 (and cases cited).

### 2.  Money Laundering

The Complaint alleges that Defendants committed money laundering under 18 U.S.C. §§ 1956.[17]  To establish the violation, Plaintiff must allege "(1) the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7); (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds."  *Dale v. Banque SCS Alliance S.A.*, No. 02 Civ. 3592, 2005 WL 2347853, at *5 n.2 (S.D.N.Y. Sept. 22, 2005) (citing *United States v. Maher*, 108 F. 3d 1513, 1527–28 (2d Cir. 1997)).  Plaintiff "need not allege money laundering with great particularity." *Casio Computer Co., Ltd. v. Sayo,* 98CV3772, 2000 WL 1877516, at *16 (S.D.N.Y. Oct. 13, 2000).

The Complaint alleges these facts.  Specifically:  Kwon pulled $80 million out of Terraform Labs funds and siphoned it to multiple cryptocurrency wallets months before the collapse, ¶ 175; Kwon cashed out $2.7 billion over the span of mere months through Abracadabra DeFi, ¶¶ 178,

---

[17] Plaintiffs' reference to 18 U.S.C. §§ 1341, 1343 was an inadvertent error.

180–87); Terraform Labs transferred and exchanged a significant amount of UST from the Terra Ecosystem for non-Terra stablecoins backed by fiat currency, ¶ 179; the Luna Foundation Guard (lead investor Jump, investor Delphi and Governing Council members Kariya and Macedo) transferred $1.66 billion worth of bitcoin (52,189 BTC) to a single, unidentified wallet address on the Gemini platform, ¶ 193; and the Luna Foundation Guard transferred its remaining 28,206 BTC to a wallet on Binance, ¶ 194.

In response, the TFL Defendants try to conceal the illegal siphoning of money to themselves as an attempt to defend the UST peg. TFL Br. at 8. But this argument rests on an expert report that their counsel commissioned. Henkin Decl. Ex. F at 3 (ECF No. 59). This is inappropriate on a motion to dismiss and must not be considered. *See Essar Steel Algoma Inc. v. Nevada Holdings, Inc.*, No. 17MISC360ATRWL, 2020 WL 2539031, at *2 (S.D.N.Y. May 18, 2020) (finding that where an expert report "is neither a document 'upon which the complaint relies,' nor 'integral' to the SAC" the Court will not consider it). Indeed, simply by submitting this expert report – which is only appropriate to "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a) – the TFL Defendants concede that the facts *in the Complaint* state a claim for money laundering against them.

The TFL and Jump Defendants also argue that the Complaint does not allege that Defendants *knew* the property they siphoned out of the Terra Ecosystem was the proceeds of crime. That is incorrect. The Complaint alleges that these Defendants in fact, committed the crimes of mail and wire fraud to induce purchasers of cryptocurrencies into parting with their personal funds in exchange for a "stablecoin" destined to fail.[18]

---

[18] Cases that the TFL and Jump Defendants rely on are inapposite. TFL Br. at 32–33; Jump Br. at 14. In *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 322–33 (S.D.N.Y. 2014), the plaintiff did not

### B.   THE COMPLAINT ALLEGES AN ASSOCIATION-IN-FACT AMONG DEFENDANTS

The RICO Act defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  In *Boyle v. United States*, the Supreme Court held that "[t]he term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive."  556 U.S. 938, 944 (2009) (internal citations omitted).  This expansive statement, in addition to the Supreme Court's instruction that the RICO act be "liberally construed to effectuate its remedial purposes," allows for a broad interpretation of the term "association-in-fact."  *Id.  Boyle* thus establishes a low threshold for pleading an association-in-fact sufficient for a RICO enterprise.  *See Mackin v. Auberger*, 59 F. Supp. 3d 528, 542 (W.D.N.Y. 2014).

A plaintiff can meet this low burden by pleading "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. 938, 945 (2009).  An "association-in-fact enterprise must have at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Id.* at 946.

The Complaint alleges an association-in-fact among Defendants.  The "purpose" of the Enterprise is Defendants' intent to defraud Plaintiff and other crypto enthusiasts through a scheme of deceptive conduct and material misrepresentations related to UST, Luna and the Terra

---

allege who conducted the transfer.  Here, in contrast, the Complaint alleges that Kwon and TFL conducted transfers.  ¶¶ 175–87.  *Entretelas Americanas S.A. v. Soler*, No. 19 Civ. 3658 (LAK) (RWL), 2020 WL 9815186, at *10 (S.D.N.Y. Feb 3, 2020), involved the unusual situation where the *plaintiff* was a corporation alleged to be a member of the RICO enterprise, bringing claims against its CEO.  The claim failed because the plaintiff did not know the funds were the product of illegal activity.  *Id.* at *6, 10.  Here, the Complaint alleges that *Defendants* themselves committed the illegal activities.

Ecosystem.  ¶ 262; *see Aiu Ins. Co. v. Olmecs Med. Supply, Inc.,* No. CV-042934, 2005 WL 3710370, at *7-8 (E.D.N.Y. Feb. 22, 2005) (finding a common purpose among defendants where they worked together to defraud the plaintiffs).

The Complaint also alleges interpersonal relationships among the Defendants.  Facts that tend to demonstrate a relationship among the Defendants through their participation in the affairs of the Enterprise are sufficient to show an interpersonal relationship. *See Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 306–07 (S.D.N.Y. 2010) (holding that "no additional relationship is necessary" beyond a showing that the defendants participated in the "affairs of the association in fact enterprise" as long as the plaintiff alleges something more than "parallel conduct of the same nature and in the same time frame by different actors in different locations.").

Here, each of the Defendants worked together to make decisions for the Enterprise. ¶¶ 132, 149.  For example, "[i]n a tweet on September 14, 2021, Terraform Labs admitted itself that 'Jump had quietly played a pivotal role in the Terra ecosystem for a long time…'"  ¶ 220. Numerous other tweets, interviews, and online appearances also demonstrate that they were working together and had interpersonal relationships.  ¶¶ 126, 140–50, 153-55, 157–60, 220–21. Jump was complicit in concealing its intervention in 2021 to stabilize the UST coin in the face of the de-pegging event, which was important in convincing the crypto community that the UST-Luna algorithm was working properly.  ¶¶ 26, 123–25, 222.  Defendants' shared position on the Luna Foundation Guard's Governing Council and numerous interconnected tweets also demonstrates more than just "parallel conduct" of the Defendants.  ¶¶ 126, 140–50, 153-55, 157–60, 220-21.  It demonstrates interpersonal relationships.

Finally, the Enterprise has a longevity sufficient to permit these associates to pursue its purpose.  The Complaint alleges that Defendants' activities continued for the duration of the Class

Period, which began in 2019.  This is sufficient to plead longevity.  *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 185 (S.D.N.Y. 2018) (finding that longevity was satisfied when the complaint alleges that the activities were ongoing for the duration of the class period).

The TFL Defendants argue that Plaintiff has failed to allege "facts suggesting any relationship beyond the alleged predicate acts or otherwise suggesting unity amongst the various alleged members of the enterprise."  TFL Br. at 36.  This argument fails.  The evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce."  *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2529; *see also Boyle*, 556 U.S. 938, 947 (2009) (holding that the same evidence may establish a pattern of racketeering activity and an enterprise).

The TFL Defendants incorrectly argue that Plaintiff's Amended Complaint fails to allege a structure behind the Enterprise.  TFL Br. at 37.  But Plaintiff need not allege a detailed structure within the enterprise.  *See Boyle*, 556 U.S. at 948 (2009) ("Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods… Members of the group need not have fixed roles; different members may perform different roles at different times.  The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies.").  The Supreme Court emphasizes the "breadth" of the concept of an enterprise and therefore only requires a showing of a "continuing unit that functions with a common purpose." *Id.* at 948-49.  More than alleging a "group of entities connected through arms-length commercial transactions," TFL Br. at 37, the Complaint that the Enterprise is a "continuing unit that functions with a common purpose" by demonstrating Defendants' common purpose and interpersonal relationships.

46

The TFL Defendants also argue that the Enterprise does not have sufficient longevity because the Luna Foundation Guard joined the Enterprise at a later date. TFL Br. at 37. This fact is of no consequence. The Enterprise had been operating for years before the Luna Foundation Guard was formed, and in fact, the members of the Enterprise created the Luna Foundation Guard. Despite the later addition of other associates, the Enterprise as a whole had a sufficient longevity. *See Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 306 (S.D.N.Y. 2010) (stating that "the fact that not every individual defendant is alleged to have engaged in fraudulent activity for that entire period is of no moment for longevity purposes, since (as is well known) a person can join in some ongoing fraudulent activity at any point."). Contrary to Defendants' assertions, Plaintiff need not allege that the Luna Foundation Guard was "planned in advance" or that "LFG failed to fulfill its stated purpose." TFL Br. at 37. The Enterprise existed for long enough to allow Defendants to effectuate its purpose, namely, to defraud Plaintiff and the Class out of billions of dollars.

## C.   THE COMPLAINT ALLEGES THAT DEFENDANTS OPERATED AND MANAGED THE RICO ENTERPRISE

A RICO plaintiff must demonstrate that a defendant, "conduct[ed] or participate[d] directly or indirectly, in the conduct of [an] enterprise's affairs." 18 U.S.C. § 1962(c). In order to show that the defendant conducted the enterprise, a plaintiff must show a defendant participated "in the operation or management" of the enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise..." *Reves,* 507 U.S. at 179. To plead conduct, a plaintiff has to show only that the

defendant play "*some* part" in the operation or management of the enterprise.  *See Lavastone Cap. LLC v. Coventry First LLC,* No. 14-CV-7139, 2015 WL 1939711, at *8 (S.D.N.Y. Apr. 22, 2015) (Rakoff, J.).   While Defendants argue that the operation and management test is an "extremely rigorous test," TFL Br. at 38, this Court had held that pleading conduct is a low bar for plaintiffs to meet.  *See id.; see also Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 224 (E.D.N.Y. 2014) (quoting *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F. 3d 159, 176 (2d Cir. 2004) ("In this Circuit, the 'operation or management' test typically has proven relatively low hurdle for plaintiffs to clear, especially at the pleading stage.").

The TFL Defendants argue that *Reves* supports dismissal here, TFL Br. at 38, but that case was applying a summary judgment standard.  *Reves*, 507 U.S. at 176.  The standard on a motion to dismiss is far lower, which courts recognize.  *See Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. CV-042934ERK, 2005 WL 3710370, at *8 (E.D.N.Y. Feb. 22, 2005) ("[I]t is not always reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether a defendant … participated in the 'operation or management' of the enterprise.  Thus, where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question.").  Here, Plaintiff has alleged enough to establish that each Defendant plays *some* part in the operation or management of the Enterprise, which is all that is required, but even if not, Plaintiff is entitled to discovery on Defendants' roles in the Enterprise.

At a minimum, each of the Defendants participated in the operation or management of the Enterprise by making false statements that publicly bolstered UST, Luna, and the Anchor Protocol. These false statements were designed to, and did, induce Plaintiff and the Class to purchase hundreds of millions of dollars in UST and Luna, ¶ 269.  *See United States Fire Ins. Co. v. United*

*Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004) (holding that Defendants participated in the operation or management of the enterprise where they were "key participants" that made "critical misrepresentations" about their business); *Aiu Ins. Co.*, 2005 WL 3710370, at *9 (finding that Defendants operated or managed the enterprise where they "enabled the scheme" by providing misleading information to Plaintiff).

Each Defendant participated in the operation and management of the Enterprise through other acts in addition to making false statements. Defendant Kwon created the Terra Ecosystem, the principal tool used to defraud the public. Kwon had final say on Terraform Labs' business decisions and had been the chief executive and operator behind all of its functions. ¶ 208. Through his position of authority, he exercised control over the Enterprise and participated in the operation and management of the Enterprise. *See Entretelas Americanas S.A. v. Soler*, No. 19CIV03658, 2020 WL 9815186, at *6 (S.D.N.Y. Feb. 3, 2020) (finding that where Plaintiff pled that the Defendant was an executive at a company that comprises the enterprise, and the defendant engaged in various bad acts while working there, the operation or management test was met); *See also Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, No. 21-CV-9336, 2022 WL 4815615, at *43 (S.D.N.Y. Sept. 30, 2022) (finding a defendant participated in the operation and management of an enterprise where he was the "'owner and mastermind' who had 'final say on all financial decisions of the Enterprise…'").

The TFL Defendants argue that the fact that Kwon was the CEO and a co-founder of Terraform is not enough to allege operation or management. TFL Br. at 39. But they cite to a case where this Court denied the defendant's motion to dismiss a RICO claim against them. *See Lavastone Cap. LLC v. Coventry First LLC*, No. 14-CV-7139, 2015 WL 1939711 (S.D.N.Y. Apr. 22, 2015) (Rakoff, J.). Further, even if their invented proposition were true, the Complaint alleges

more than the fact that Kwon was the CEO and co-founder of Terraform.  Kwon, among other things, hid involvement in Basis Cash, issued the fraudulent Terra White Paper, created the Anchor Protocol and the Luna Foundation Guard, two tools responsible for the continued operation of the Enterprise, and accepted and concealed a cash infusion form Jump, all of which also contributed to the continued operation of the Enterprise.  ¶ 208.

Terraform Labs and the Luna Foundation Guard also participated in the operation or management of the Enterprise.  In addition to its false statements, Terraform Labs hosted the Terra Ecosystem, including the Anchor Protocol, which directly facilitated the criminal activities of the Enterprise.  ¶ 3.

The Luna Foundation Guard also contributed to the operation and management of the Enterprise.  It was created specifically to "facilitate the growth of the Terra ecosystem."  ¶ 224. Not only did the Luna Foundation Guard raise funds for the Enterprise, but it also decided how to disperse those funds, thereby exercising direct control over the Enterprise.  ¶ 224.  *See Kurins v. Silverman*, No. 08CIV6886, 2009 WL 321011, at *3 (S.D.N.Y. Feb. 10, 2009), *as amended* (Feb. 13, 2009) (Plaintiff's allegations that Defendants controlled and dispersed the funds of the Enterprise were sufficient to show operation and management).[19]

Jump and Kariya do not contest that the Amended Complaint alleges that they participated in the operation or management of the Enterprise, nor could they.  Terraform Labs' own tweets evidence Jump's participation in the operation and management of the Enterprise.  On September

---

[19] The TFL Defendants argue that because the Luna Foundation Guard (1) did not devise the scheme and (2) did not direct other members of the Enterprise it could not have operated or managed the Enterprise.  TFL Br. at 38.  While these facts are sufficient to show operation or management of the Enterprise, neither of these facts are *required* by the operation and management test and Defendants do not point to any authority that says otherwise.  *Kurins*, 2009 WL 321011, at *3.

14, 2021, Terraform Labs tweeted that "Jump has quietly played a pivotal role in the Terra ecosystem for a long time…", that "Jump is a consummate Terra partner" and that the "Terra economy is magnified significantly with Jump Crypto by its side." ¶ 220.  Terraform Labs admits that Jump had participated in the operation and management of the Enterprise through its partnership and "pivotal role" in the Terra ecosystem.  *Id.*  Further, Jump participated in the Enterprise's affairs through its president, Kariya, and his position of authority.

Kariya also participated in the operation and management of the Enterprise.  He contributed funds to the Luna Foundation Guard and exercised control through his position on the Governing Council for the Luna Foundation Guard.  *See Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) (stating that a Defendant that "exerts control" over an enterprise participates in the operation or management of the enterprise).  The Governing Council voted on whether or not to fund certain projects within the Terra Ecosystem.  ¶ 135.  Kariya's position on the Governing Council allowed him to contribute to its operation and management.

Delphi similarly does not contest that the Amended Complaint alleges it participated in the operation and management of the Enterprise.  Delphi, through its founding partner, Macedo, and his position of authority within the Terra Ecosystem, participated in directing the Enterprise's affairs.  ¶ 236.  Specifically, it was a major funder in the Luna Foundation Guard, a key component of the fraudulent scheme.  ¶¶ 237.

### D.   THE COMPLAINT ALLEGES A PATTERN OR CONTINUITY OF ACTIVITY

In order to establish a pattern of racketeering that is required by RICO, a plaintiff must show "that the predicates themselves amount to … *continuing* racketeering activity." *See Lavastone Cap. LLC v. Coventry First LLC,* No. 14-CV-7139, 2015 WL 1939711, at *7 (S.D.N.Y. Apr. 22, 2015) (Rakoff, J.) (citing *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 240 (1989).

Continuity can be close-ended or open-ended. *Mason Tenders Dist. Council Pension Fund v. Messera*, No. 95 CIV. 9341 (RWS), 1996 WL 351250, at \*7 (S.D.N.Y. June 26, 1996).  The Complaint alleges both.

### 1.    Closed-Ended Continuity

Closed-ended continuity requires allegations of a "series of related predicates extending over a substantial period of time."  *Lavastone Cap. LLC*, 2015 WL 1939711, at \*7.  Here, the Complaint alleges a closed-ended pattern of racketeering for Kwon, Platias, Terraform Labs, and Jump/Kariya.  Kwon, Platias, and Terraform Labs engaged in a pattern of racketeering activity since at least 2019.  ¶¶ 209, 212, 215.  Defendants made numerous false statements and material omissions, accepted cash infusions, created the Anchor Protocol to drive demand, and created the Luna Foundation Guard all in order to foster an illusion of UST's stability.  *Id.*  Kwon and Platias siphoned off billions of dollars from the Terra Ecosystem and the Luna Foundation Guard into their own private wallets.  *Id*.

Kwon and TFL both contributed to a continuous pattern of racketeering that lasted longer than two years.  *See Lavastone Cap. LLC*, 2015 WL 1939711, at \*7 (finding that a period of more than two years counts as substantial period of time for closed-ended continuity purposes).  The first predicate act occurred in April 2019, when Kwon, Platias and Terraform Labs released the Terra White Paper, containing numerous false statements.  Predicate acts continued until the Terra Ecosystem collapsed in May 2022.  ¶¶ 13, 51.  Between these two dates, Defendants continuously committed other predicate acts.  ¶¶ 209, 215.[20]

---

[20] The TFL Defendants' argument that the Anchor Protocol did not relate to Plaintiff's injury and therefore could not relate to continuity, TFL Br. at 40, fails.  Defendants created the Anchor Protocol solely to drive demand for UST and Luna, which in turn helped to create the illusion of

The TFL Defendants rely on the inapposite *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.* 385 F. 3d 159, 182 (2d Cir. 2004); TFL Br. at 40.  There, the defendant's final predicate act occurred over a year after his most recent one and did not directly injury Plaintiff, which precluded a finding of continuity.  *Id.* at 182.  Here, there were no such lengthy spans disrupting the commission of Defendants' predicate acts.  The numerous and consistent predicate acts perpetrated by Defendants include concealing Kwon's involvement with Basis Cash, making false statements in the Terra White Paper, making false statements in the Anchor White Paper, making false statements regarding Terraform Labs' association with Chai, concealing Jump's cash infusion into Terraform Labs, making false statements and misrepresentations regarding the Luna Foundation Guard, and making false statements and misrepresentations regarding UST, Luna, and the Anchor Protocol.  *See supra* Section II(A)(1).  Each of these predicate acts come together to demonstrate a pattern of racketeering activity that takes place for a substantial period of time.  As a result, Plaintiff has sufficiently alleged closed-ended continuity for Kwon and Terraform Labs.

The Jump Defendants also participated in a closed-ended pattern of racketeering activity. On September 14, 2021, Kariya tweeted that it has been, "a real pleasure working with [Do Kwon] and the Terra team over the last couple of years."  ¶ 218.  Further, on that same day, Terraform labs tweeted that Jump had played "a pivotal role" in the Enterprise for "a long time."  ¶ 220. These facts plausibly allege that Jump and Kariya were involved in the Enterprise for at least two years.

---

the UST's stability.  ¶ 8.  Therefore, issuing the Anchor White Paper with its numerous false statements and material omissions counts towards Defendants' pattern of racketeering activities.

### 2.    Open-Ended Continuity

In order to establish open-ended continuity, "it need not be shown that predicate acts were engaged in over an extended period of time." *See SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006). Instead, a plaintiff must show a "threat of continuing criminal activity" that "extend[s] 'beyond the period during which the predicate acts were performed.'" *Id.* Further, "[i]f the enterprise alleged is engaged in 'inherently unlawful' acts," the court will presume that "a threat of continuing criminal activity and open-ended continuity exists." *Id.; See also United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) ("Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business *automatically* carries with it the threat of continued racketeering activity.") (emphasis added).

Here, the Amended Complaint plausibly alleges open-ended continuity for each of the Defendants. The Enterprise regularly conducted business in an "inherently unlawful" way. In fact, the Enterprise's model was predicated on mail and wire fraud and money laundering. ¶¶ 15–20, 282–87. Delphi argues that the Enterprise's alleged business was simply "cryptocurrency" and therefore not inherently unlawful. Delphi Br. at 17. But the business of Enterprise was not a *legitimate* cryptocurrency; rather, it was the creation and sale of a cryptocurrency which its members knew would fail. It is akin to, for example, the creation of counterfeit money. Defendants used the Enterprise to launder the proceeds from the fraud. ¶¶ 282–87. *See Metro. Transp. Auth. v. Contini*, 04-cv-104, 2005 WL 1565524, at *4 (E.D.N.Y. July 6, 2005) (finding money laundering to be inherently unlawful). As a result of these acts of inherently unlawful activity, there is a presumed threat of continued racketeering activity.

Defendants argue that there is no alleged "threat of continued criminal activity" now that UST and Luna have collapsed. Jump Br. at 17, n.7; Delphi Br. at 17. This argument also fails.

Open-ended continuity does not require a currently-existing threat of racketeering activity. *See Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 370 (E.D.N.Y. 2012) (holding that "[i]t is sufficient that a threat of continuity inhered in the alleged racketeering activity, even if that activity lasted only a brief time and is indisputably over."); *see also H.J.*, 492 U.S. at 241, 109 S.Ct. 2893 (holding that open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition"); *Heinrich v. Waiting Angels Adoption Servs.*, 668 F. 3d 393, 410–11 (6th Cir. 2010) ("Subsequent events are irrelevant to the continuity determination … because 'in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred.").

Relatedly, despite their assertions, the fact that Defendants knew that the collapse of UST and Luna was a certainty does not preclude a threat of continued criminal activity. Jump Br. at 17, n.7. Open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition," but does not insinuate that the conduct will never end. *See Lima LS PLC v. PHL Variable Ins. Co.*, No. 3:12-CV-1122 (WWE), 2013 WL 12286066, at *6 (D. Conn. Dec. 17, 2013) (citation omitted). Delphi argues that Defendants' scheme was "inherently terminable" and therefore cannot constitute a threat of continued racketeering activity. Delphi Br. at 17. However, Delphi relies on inapposite law. In *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F. 3d 229, 244 (2d Cir. 1999), the scheme ended when the defendant, who was defrauding an insurance company, maxed out his policy's limits. In *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F. 3d 463, 466 (2d Cir. 1995), the scheme was aimed at depriving only one person of his assets; once that was accomplished, the scheme ended. Here, in contrast, Defendants would have continued the scheme for as long as demand for the Luna coin could support it. *See United States v. Aulicino*, 44 F. 3d 1102, 1112 (2d Cir. 1995) (citing *United States v. Coiro*, 922 F.2d 1008 (2d Cir.), cert.

denied, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991)) (defendants' predicate acts

"which were 'part of a consistent pattern that was likely to continue for the indefinite future, absent

outside intervention,' was 'more than ample to establish … continuity.'").

E.   **DEFENDANTS' STANDING ARGUMENTS FAILS**

A plaintiff has standing under RICO where (1) the plaintiff suffered an injury and (2)

Defendants' RICO violation was both the "but-for" and the proximate cause of their injury.  *Sky*

*Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 230, 234 (E.D.N.Y.

2014).  Causation is subject only to the low pleading bar imposed by Fed. R. Civ. P. 8.  *Levine v.*

*Torino Jewelers, Ltd.*, 2006 WL 709098, at * 2 (S.D.N.Y. March 22, 2006).  Rule 8 simply requires

that the opposing party be provided with "fair and reasonable notice," and "is not meant to impose

a great burden upon a plaintiff."  *Id.* (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47

(2005)).

1.   **Injury**

In order to recover under RICO, a plaintiff must show that "'he has been injured in his

business or property by the conduct constituting the [RICO] violation[,]' and only when his or her

'actual loss becomes clear and definite.'"  *Id.* (citations omitted).   Plaintiff here alleges a direct

pecuniary loss from Defendants' racketeering activities.  ¶ 290.  This is enough to survive a motion

to dismiss.  *See Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 229

(E.D.N.Y. 1999) ("Victims of racketeering who have been deprived of their monetary resources

as a direct result of racketeers' predicate acts should, under the most natural interpretation of the

phrase "business or property," recover their pecuniary losses.").

In arguing that Plaintiff did not allege injury, Defendants cite to cases which are

distinguishable.  TFL Br. at 21.  For example, in *First Nationwide Bank v. Gelt Funding, Corp.*,

820 F. Supp. 89, 95 (S.D.N.Y. 1993), the injury asserted was that the plaintiff was forced to recognize loan loss reserves, an injury the court found too speculative to constitute a RICO injury. In *Petroff Amshen LLP v. Alfa Rehab PT PC*, 2022 WL 480475, at *2 (2d Cir. Feb. 17, 2022), similarly, the court found the alleged damages – damage to reputation and the risk of loss profits in the future – were too speculative. Here, in contrast, the Complaint alleges that Defendants' fraudulent actions have actually, already, caused losses to the class of hundreds of millions, if not billions of dollars. ¶ 290.[21]

The TFL Defendants also argue that Plaintiff's injury is "based on the notion that UST and Luna were riskier to purchase than he originally believed" and that "belief cannot support a RICO claim." TFL Br. at 22. This mischaracterizes the Amended Complaint. It is not that UST and Luna were simply "risky"; rather, the UST-Luna algorithm was destined, by design, to fail, which Defendants knew. But they took affirmative steps to silence skeptics and generate confidence in the algorithm.

---

[21] The TFL Defendants also rely on *Dornberger v. Metro. Life ins. Co.*, 961 F. Supp. 506, 522 (S.D.N.Y. 1997), TFL Br. at 22, which is also distinguishable. There, MetLife illegally sold insurance policies to European citizens. *Id.* at 514. Plaintiff, who had purchased two life insurance policies, demanded that MetLife confirm that her policies had the same protections as all valid and legal policies, but MetLife failed to do so. *Id.* at 515. However, MetLife continued to honor her policies, and thus Plaintiff received what she bargained for. *Id.* Here, Plaintiff and the Class were promised that the UST-Luna algorithm would work to maintain UST's value at $1.00, but Defendants knew it would not work. And indeed, UST is now essentially worthless. The Jump Defendants rely on *D'Addio v. L.F. Rothschild Inc.,* 697 F. Supp. 698, 706 (S.D.N.Y. 1988), but there, the plaintiff failed to allege any transaction or money lost. In contrast, the Complaint alleges a transaction (the purchase of Luna and UST coins) and lost funds (hundreds of millions of dollars). ¶ 290. The Complaint here alleges "clear and definite damages." *Sky Med. Supply Inc.*, 17 F. Supp. 3d 207, 231 (E.D.N.Y. 2014).

## 2.  But-For Causation

In order to demonstrate but-for causation, a plaintiff needs to show that "but for the RICO violation, Plaintiff would not have been injured."  *UFCW Loc. 1776 v. Eli Lilly & Co.*, 620 F. 3d 121, 132 (2d Cir. 2010).  Here, Plaintiff has sufficiently alleged but-for causation.  Plaintiff and the Class relied on and trusted Defendants' public statements about UST's stability.  ¶ 1.  Without these statements, Plaintiff and the Class would not have purchased UST and would not have suffered an injury from this purchase.  As with other elements of RICO, whether or not Plaintiff relied on Defendants' statements is a question of fact not properly decided on a motion to dismiss.  *Allstate Ins. Co. v. Valley Physical Medicine & Rehab.*, 2009 WL 3245388, at *5 (E.D.N.Y. Sept. 30, 2009).

In 2008, the Supreme Court held that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite of its to establishing proximate causation, that it relied on the defendant's alleged misrepresentation."  *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639, 661 (2008).  Despite that it is not required, the Complaint alleges facts that, construed in the light most favorable to Plaintiff, shows that UST and Luna coin purchasers relied on Defendants' fraudulent conduct.  ¶ 50 ("Nobody in their right minds would have entrusted Defendant Kwon with their life savings…"); ¶ 86 (charts generated to "appease skeptical purchasers of Luna and/or UST"); ¶ 89 (charts generated to "allay skepticism among potential purchasers of UST or Luna coins"); ¶ 116 (dismissing concerns of those skeptical of the Anchor Protocol); ¶¶ 118–22 (false statements about Terraform Labs' alliance with Chai made to drive demand to UST and Terra); ¶ 125 (Jump's cash infusion designed to hide flaws in the Terra Ecosystem); ¶ 138 (Luna Foundation Guard formed to "bolster confidence in UST"); ¶ 161 ("The promise of fixed high-double-digit yields on deposits combined with the general hype

around crypto that continued from UST's launch through the end of 2021 drove rapid growth for both the Anchor Protocol and the Terra Ecosystem."); ¶ 167 (in the midst of the Terra Ecosystem's collapse, UST and Luna coinholders believed Kwon when he promised to "rebuild UST"). This is enough, at the pleading stage, to allege reliance.[22]

The TFL Defendants assert that the risks about UST were "publicly available" and "widely discussed," and therefore the Defendants' misrepresentations about UST could not have been the but-for cause of the Plaintiff's injury. TFL Br. at 22. This argument fails for several reasons. *First*, Defendants' argument relies on public discussions that exist outside the four corners of Plaintiff's complaint. As with the myriad other instances when Defendants attempt to do this, materials outside the four corners of the Complaint cannot be considered here. *See supra* at 23– 25. *Second*, whether or not this information was "publicly available" and Plaintiff should have known about it is a question of fact that cannot be resolved on a motion to dismiss. *Id.*

*Third*, even if the Court were to consider this extraneous information, and even assuming that it was publicly available, Defendants' argument still fails. The mere fact that some information might have been "publicly available" does not mean that Plaintiff or other UST and Luna coin purchasers should have known about it. *See Holmes v. Parade Place, LLC*, No. 12 CIV. 6299, 2013 WL 5405541, at *13 (S.D.N.Y. Sept. 26, 2013) ("Merely because hindsight shows that Plaintiff *could* have discovered his alleged RICO injury from publicly available documents does not mean that he reasonably *should* have discovered his injury."). Defendants' argument also fails because Defendants *themselves* never publicly disclosed the risk that UST would de-peg. In fact,

---

[22] The TFL Defendants rely on *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015), but that case was deciding class certification and summary judgment motions.

they consistently stated the opposite, that UST would remain stable.   Even with the so-called "public" information about UST's risks available, Defendants' affirmative lies to Plaintiff and the Class that the UST-Luna algorithm could succeed undermined any purported public debate on the topic. *See Shaw v. Rolex Watch U.S.A., Inc.*, 745 F. Supp. 982, 986 (S.D.N.Y. 1990) (finding sufficient causation where Plaintiff learned of Defendants' fraud through a third-party but it was still plausible for Plaintiff to believe Defendant's affirmative misrepresentations). As the developers of the algorithm, the statements of Kwon, Platias and Terrafom Labs would trump any statements made by skeptics who had no involvement.   Whether or not Defendants think this reliance was reasonable given the alleged availability of public information about UST's risk is not appropriate on a motion to dismiss. *See Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. CV-042934, 2005 WL 3710370, at *14 (E.D.N.Y. Feb. 22, 2005) ("[T]he defendants' related claim that any reliance by the plaintiffs was unreasonable is a question of fact and not one to be resolved on a motion to dismiss."); *Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*, No. 05-5934, 2009 WL 3245388, at *5 (E.D.N.Y. Sept. 30, 2009) ("Reliance is not a matter appropriately decided on a motion to dismiss.").

### 3.     Proximate Causation

A defendant is liable to those plaintiffs "with respect to whom [defendant's] acts were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence." *Levine v. Torino Jewelers*, Ltd., No. 05 CIV. 3159, 2006 WL 709098, at *3 (S.D.N.Y. Mar. 22, 2006) (citation omitted).   The proximate cause analysis must be "guided by a flexible, case-by-base approach." *Nat'l Asbestos*, 74 F. Supp. 2d at 225 (citing *Associated General Contractors v. California State Council of Carpenters*, 459 U.S.

519, 536-37 (1983).   Further, the proximate cause analysis is "highly fact specific," *id.* at 226, which makes it improper to resolve on a motion to dismiss.

Here, Plaintiff's injury was a reasonably foreseeable and natural consequence of Defendants' racketeering activities.  The various components of the scheme were designed to, and did, induce crypto enthusiasts to purchase UST and Luna coins.  ¶¶ 3, 19, 269.  Defendants knew that the UST-Luna algorithm depended on existence of a liquid market for Luna. ¶ 7.  Defendants also knew that demand for Luna would decline in tandem with Bitcoin's halving cycles. ¶¶ 67–73.  Demand for UST and Luna coins increased, as Defendants intended.  This caused the price of Luna to increase, and caused more and more UST coins to be minted and sold to purchasers like Plaintiff.  The collapse of the Terra Ecosystem was likewise caused by Defendants' actions – their design and promotion of the flawed algorithm.  The Complaint plausibly alleges that it is reasonably foreseeable that Plaintiff or a member of the Class would have relied on these statements and purchased UST.  Further, it is reasonably foreseeable that UST would have crashed and caused Plaintiff and the Class to lose money.

Defendants argue that Plaintiff does not allege that he directly interacted with Terraform Labs, LFG, Kwon, Jump, Kariya or Delphi and therefore these Defendants could not have proximately caused his injury.  TFL Br. at 23; Jump Br. at 23; Delphi Br. at 19.  However, whether or not the Plaintiff had any contact with Defendants is not relevant on a motion to dismiss:  "[T]he proximate causation inquiry does not require [courts] to determine whether the plaintiff was harmed, or even whether she was harmed by something done by the defendant.  Rather, it requires them to determine only, as a matter of law, whether RICO authorizes recovery for a plaintiff whose claimed injury has the alleged connection to the alleged predicate acts." *Benedetti v. Nissenbaum*, No. 90 CIV. 7206, 1993 WL 118489, at *1 (S.D.N.Y. Apr. 12, 1993).  In *Bendetti*, the court found

that an employee fired from a company whose bankruptcy was caused by alleged RICO violations had not alleged standing because it was not foreseeable that the mail fraud at issue would cause her loss of employment.  In contrast here, the actions comprising mail and wire fraud – false statements designed to elicit participants in the Terra Ecosystem – did have that effect, which resulted in their loss of funds.

The Jump Defendants also assert that they could not have caused Plaintiff's injury.  Jump Br. at 22.  Since UST and Luna were launched two years before any of the Jump Defendants' predicate acts, they argue that Plaintiff and the Class likely purchased the coins before Jump got involved.  *Id.*  However, Jump secretly infused cash into the UST-Luna system to hide its algorithmic flaws in 2021, with the purpose of allaying fears that the algorithm would not work. ¶ 26.  It is more than plausible that members of the Class purchased UST after these actions. Further, but-for Jump's actions, the flaws in the UST-Luna algorithm would have been exposed in 2021, and fewer people, if any, would have purchased UST or Luna after that point.[23]

Defendants also argue that they could not have been the proximate cause of Plaintiff's injury because there were intervening causes that broke the causal chain.  TFL Br. at 23; Jump Br. at 24-5; Delphi Br. at 19-20.  Specifically, they assert that outside forces of supply and demand intervened and broke the causal chain.  *Id.*  However, an intervening act can only break the causal nexus if it is "extraordinary under the circumstances, not foreseeable in the normal course of events."  *See Jund v. Town of Hempstead*, 941 F.2d 1271, 1286 (2d Cir. 1991).  Here, the fact that

---

[23] While Delphi barely contests its but-for causation, Delphi Br. at 18 (simply stating "the Amended Complaint is bereft of any specific factual allegations that establish a causal link … between Delphi's alleged conduct and Plaintiff's alleged damages," and nothing more), it is still worth nothing that, similar to Jump, Delphi's actions helped prop up the Enterprise's fraud which in turn caused Plaintiff's injury.

the crypto market would hit a downturn was foreseeable, especially when looking at the bitcoin cycles.  ¶¶ 67–73.  The additional fact that a sharp decline in demand for Luna would render the algorithm unworkable was also foreseeable.  ¶ 9.  Therefore, even if the market's supply and demand can count as an intervening cause, it was reasonably foreseeable and did not break the casual chain.

### F.   DEFENDANTS' EXTRATERRITORIALITY ARGUMENT FAILS

A RICO claim is domestic where it (1) adequately alleges predicate acts directed to the United States, and (2) alleges domestic injury.  *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 188–191 (S.D.N.Y. 2018); *see also Bascuñán v. Elsaca*, 874 F. 3d 806 (2d Cir. 2017). Plaintiff's RICO claims are domestic because the Amended Complaint pleads predicate acts of domestic wire fraud and domestic injury on its property.[24]

The Amended Complaint plausibly alleges domestic conduct because the Defendants' scheme was "directed to" the United States.  First, the fiat currency that UST was pegged to is the United States dollar.  Defendants could have chosen any fiat currency, and their choice of the U.S. dollar demonstrates that they were directing their conduct to United States citizens, who are most familiar with the value of $1.00.

Further, Defendants used interstate wires to direct their scheme to the United States and its citizens through the creation and marketing of UST.  ¶¶ 269–71. This includes traveling to New York for business, appearing on podcasts produced and broadcasted within the United States, and employing people within the United States.  ¶¶ 19, 24, 34–35.  The purpose of Defendants' scheme was to increase demand for the U.S. dollar-pegged stablecoin (UST), the Anchor Protocol (the

---

[24] The TFL Defendants do not contest the extraterritorial application of the money laundering or obstruction of justice statutes.

high yield savings bank for UST holders), and the Terra Ecosystem to maximize its anticipated profits during the crypto bull market.  ¶¶ 67–73, 95, 118, 122.

*Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 188–191 (S.D.N.Y. 2018) is instructive.  There, the Court determined that the plaintiff alleged sufficient domestic conduct where the defendants were either located in the United States or crossed its borders through electronic servers located in the United States.  *See Dennis*, 343 F. Supp. 3d at 189.  This scheme was "directed to" the United States even though the alleged conduct of the conspiracy generally occurred in Australia.  *See Dennis*, 343 F. Supp. 3d at 191.  The court concluded it was "not now in a position to dismiss plaintiffs' RICO claims as extraterritorial" where "Defendants' alleged scheme at least plausibly was directed at the United States, and the amended complaint therefore states a plausible domestic RICO claim."  *Id*.  Here too, the Complaint plausibly alleges transmission of funds and other information through U.S. mail and wires.

The TFL Defendants argue that the Complaint does not plead facts sufficient to escape the bar on extraterritorial conduct.  TFL Br. at 25–26.  But they rely on cases that are inapposite because they involve foreign actors and foreign currencies, and were not directed to the United States.  First, in *Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*, 368 F. Supp. 3d 681 (S.D.N.Y. 2019), plaintiffs' RICO claims concerned manipulation of interest rates of foreign currency.  Here, in contrast, the UST and Luna coins are not foreign, and indeed, the UST coins are pegged to the U.S. dollar.  *Fund Liquidation Holdings LLC v. UBSS AG*, 15 Civ. 5844 (GBD), 2021 WL 4482826, at *11 (S.D.N.Y. Sept. 30, 2021) and *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 539 (S.D.N.Y. 2018) also involved foreign currencies, and in *Sonterra*, the false rates were sent from abroad to a bank located abroad, never crossing the U.S. border.  Finally, in *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 60–61

(2d Cir. 2014)) the pleadings failed to allege that the scheme was directed from (or to) the United States.  Here, in contrast, Defendants chose to peg UST to the U.S. dollar, thereby directing their scheme to the United States.

In *Bascuñán*, the court held that plaintiffs can bring civil RICO claims against foreign actors to recover for injuries to domestic "business or property."  *See id.*, 874 F. 3d 806.  This holding "furthers the principles animating the presumption against extraterritoriality" because applying civil RICO to domestic injuries does not risk "international friction."  *Id.* at 821; *cf. RJR Nabisco Inc. v. European Cmty.*, 136 S. Ct 2090, 2107 (2016) ("[a]llowing recovery for ***foreign injuries*** in a civil RICO action…presents [a] danger of international friction.") (emphasis added).  Courts applying *Bascuñán* have confirmed that plaintiffs may proceed under civil RICO to recover for domestic RICO injuries, even where the bulk of the alleged misconduct occurred abroad.  *See Elsevier Inc. v. Pierre Grossman, IBIS Corp.*, No. 12 Civ. 5121, 2017 WL 5135992, at *4 (S.D.N.Y. Nov 2, 2017) (holding that plaintiff's RICO claim against defendant that violated a licensing agreement by distributing academic journals for profit in Brazil was not impermissibly extraterritorial under *Bascuñán*).  As in *Elsevier*, Plaintiff seeks recovery solely for domestic RICO injuries that he and members of the proposed class suffered when they lost money in the United States in cryptocurrency transactions.  Together with the allegations of domestic wire fraud, Plaintiff states domestic RICO claims.[25]

---

[25] The TFL Defendants also rely on *Suedrohrbau Saudi Co. Ltd. v. Bazzi*, 19-CV-5130, 2021 WL 980883, at *5 (E.D.N.Y. Mar. 16, 2021), TFL Br. at 26-27, which is inapposite because it applied the presumption against extraterritoriality to bar recovery for ***foreign injuries***.  *Suedrohrbau Saudi Co.*, 2021 WL 980883, at *5.  Unlike *Suedrohrbau Saudi Co*, applying civil RICO to Plaintiff and the proposed Class's domestic injuries is wholly consistent with the presumption against extraterritoriality.  *Bascuñán*, 874 F. 3d at 822 (permitting plaintiffs to recover under civil RICO for injuries to domestic property "*reduces* the possibility of international discord.").  Nevertheless, the location and nature of the injuries presents a question of fact.

## III.   THE COMPLAINT ALLEGES A RICO CONSPIRACY CLAIM

The RICO statute provides that "it shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

To sufficiently plead a RICO conspiracy under 18 U.S.C. § 1962(d), "a plaintiff must allege the existence of an agreement to violate RICO's substantive provisions." *Nastasi & Associates, Inc. v. Bloomberg, L.P.*, No. 20-CV-5428, 2022 WL 4448621, at *18 (S.D.N.Y. Sept. 23, 2022) (internal citations omitted). "[T]he requirements for RICO's conspiracy charges under § 1962(d) are less demanding than those for substantive violations." *Id.* (quoting *City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014). As such, it is well established that a "plaintiff is not required to plead a cognizable, substantive RICO claim against defendants in order to allege a claim for RICO conspiracy." *Nastast & Associates*, 2022 WL 4448621 at *18 (quoting *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 150–51 (E.D.N.Y. 2005)); *see also United States v. Zichettello*, 208 F. 3d 72, 99 (2d Cir. 2009) (a RICO conspiracy claim does not require that the defendant have operated or managed the Enterprise). Plaintiff need only plausibly allege that a defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F. 3d 159, 178 (2d Cir. 2004). This has been interpreted as a straightforward requirement that the defendant know what the other members of the conspiracy "were up to." *Zichettello*, 208 F. 3d at 99.

In the context of a motion for summary judgment, this Court has noted that a plaintiff need only show that defendants agreed to commit a RICO violation that was "manifested by words or actions." *Related Companies, L.P. v. Ruthling*, No. 17-cv-4175, 2018 WL 3315728, at *12 (S.D.N.Y. July 5, 2018) (Rakoff, J.) (internal citations omitted). "[A] defendant's agreement to

join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise". *Bd. of Managers of Trump Tower at City Center Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 464 (S.D.N.Y. 2018) (internal citation omitted).  Furthermore, an individual defendant's knowledge can be imputed to a corporate defendant. *See Metro. Transp. Auth. V. Contni*, No. 04-cv-104, 2005 WL 1565524, at *5 (E.D.N.Y. July 6, 2005); *see also Serin v. N. Leasing Sys., Inc.*, No. 06 Civ. 1625, 2009 WL 7823216, at *14 (S.D.N.Y. Dec. 18, 2009).

The TFL and Jump Defendants argue that Plaintiff's RICO conspiracy claim must fail because Plaintiff has failed to adequately plead a substantive violation of RICO.  TFL Br. at 41; Jump Br. at 26.  But Plaintiff is not required to plead a substantive RICO claim against Defendants in order to allege a claim for RICO conspiracy.  *See Nastasi & Associates*, 2022 WL 4448621 at *18.  Further, Plaintiff adequately alleges substantive RICO violations against Defendants.

Defendants also argue that Plaintiff fails to allege a conscious agreement among the defendants.  TFL Br. at 41; Jump Br. at 27; Delphi Br. at 21.  But they misunderstand both the standard and the allegations.  In *Board of Managers of Trump Tower*, this Court found that plaintiff sufficiently pleaded RICO conspiracy by alleging facts supporting an inference that such an agreement existed between defendants and "that each Defendant benefited financially from the scheme in the form of profits and income derived directly from their participation in the scheme." 346 F. Supp. 3d at 464.  This supports an inference that Defendants knowingly participated in the conspiracy.  *Id*.

Kwon, the principal authority figure of the Enterprise, has taken actions and directed other members to take actions necessary to accomplish the aims of the Enterprise.  ¶ 208.  Kwon's knowledge of the same can be imputed to Terraform Labs and the Luna Foundation Guard.  ¶ 24. Kwon and Terraform Labs derived profits from Defendants' scheme.  ¶¶ 174–97.

Jump and Kariya have taken actions to further the Enterprise by agreeing to: provide (and conceal) a cash infusion into the Terra Ecosystem in 2021 and mislead consumers regarding the stability of UST and the Terra Ecosystem; help form the Luna Foundation Guard to appease skeptics and mislead consumers into believing the Terra Ecosystem would be safe in a market downturn; siphon billions of dollars of UST from the Terra Ecosystem to private wallets and billions of dollars of bitcoin from the Luna Foundation Guard to private wallets; and issue ongoing and repeated false statements through their twitter accounts and other media outlets to mislead and appease the crypto community.  ¶¶ 26, 123–125, 132, 134, 138, 140, 142–43, 146, 221–22.  Kariya and Jump derived profits from Defendants' scheme.  ¶¶ 174–97.

Delphi and Macedo have taken actions to further the Enterprise by agreeing to: help form the Luna Foundation Guard to appease skeptics and mislead consumers into believing the Terra Ecosystem would be safe in a market downturn; siphon billions of dollars of bitcoin from the Luna Foundation Guard to private wallets; and issue ongoing and repeated false statements through their twitter accounts and other media outlets, including "Terra Autumn" to mislead and appease purchasers of cryptocurrencies.  ¶¶ 30, 132, 137–38, 141, 144, 150, 153, 155, 238.  Macedo and Delphi derived profits from the Defendants' scheme.  ¶¶ 174–97.

In support of dismissal, the TFL Defendants rely on a case that is inapposite because the plaintiff failed to allege both an agreement among Defendants and how their acts supported a conspiracy.  TFL Br. at 41, (relying on *Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.*, 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001).  Unlike *Nasik Breeding*, Plaintiff has alleged that the Defendants knew what the other members of the conspiracy "were up to" and that the Defendants profited from the scheme.

The Jump Defendants also argue that under the intracorporate conspiracy doctrine, Kwon and Platias could not conspire with Terraform Labs while promoting its algorithmic stablecoin because they are considered a single entity.  Jump Br. at 29.  The exception to this doctrine "applies where a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose, wholly separate and apart from the entity."  *Reich v. Lopez*, 38 F. Supp. 3d 436, 463 (S.D.N.Y. 2014) (quoting *Broich v. Inc. Vill. of Southampton,* 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009)).  Plaintiffs can avoid the application of the intracorporate conspiracy doctrine only by alleging that "the individual defendants were motivated by an [ ] independent personal stake in achieving the corporation's objective rather than merely carrying out the corporation's managerial policy."  *Dunlop v. City of New York*, No. 06 Civ. 0433, 2008 WL 1970002, at *10 (S.D.N.Y. May 6, 2008) (internal citation omitted).  Further, courts have held that the intracorporate conspiracy doctrine does not apply to civil claims for RICO conspiracy. *See Sun Life Assurance Co. of Canada v. Imperial Premium Finance, LLC*, 904 F. 3d 1197, 1213 (11th Cir. 2018); *Kirwin v. Price Commc'ns Corp.*, 391 F. 3d 1323, 1326–27 (11th Cir. 2004) (same).

In *Reich*, the Court found Plaintiffs' allegations were not barred by the intracorporate conspiracy doctrine at the dismissal stage where Plaintiffs alleged the individual defendants "profited wildly" from the ongoing scheme which implied a "personal stake in achieving the corporation's objective that goes beyond merely carrying out the corporation's managerial policy." 38 F. Supp. 3d at 465.

The Jump Defendants' reliance on *Nollah v. New York City*, No. 17-CV-634, 2018 WL 4636847 (S.D.N.Y. Sept. 27, 2018) is misplaced.  2018 WL 4636847, at *1 (the Court denied plaintiff's claim that defendants conspired to deny his right to a fair trial (not RICO) where plaintiff failed to allege "that Defendants had any personal interest in prosecuting [plaintiff]").  Here, as in

*Reich*, Plaintiff alleged that Kwon and Platias had a personal stake in the scheme that went beyond merely carrying out Terraform Labs' policy, i.e., personal profit.  ¶¶ 174–97.  Further, Plaintiff alleged that Kariya and the TFL Defendants had a longstanding relationship dating back to 2019. ¶ 146.  Thus, to the extent this Court finds that the intracorporate conspiracy doctrine applies at all, Plaintiff sufficiently alleged the exception to the doctrine.

## IV.   PLAINTIFF'S CLASS CLAIMS ARE NOT BARRED BY THE ANCHOR TERMS OF SERVICE

The TFL and Jump Defendants assert that the Anchor Protocol's Terms of Service ("TOS") release all claims against Terraform Labs and Kwon, waive the right to purse class claims, select Singapore law as the governing law, and require claims to be arbitrated in Singapore.  TFL Br. at 42; Jump Br. at 29-30.  Defendants' request that this Court consider the Anchor TOS – which is not relied upon or referenced anywhere in the Complaint – is another example of an improper attempt to insert facts into the Complaint.  Their argument fails for this reason alone.

Further, as acknowledged by Defendants, Plaintiff did not stake tokens in the Anchor Protocol and therefore could have never agreed to the TOS.  TFL. Br. at 42.  Plaintiff did not release his claims against Defendants or waive his right to pursue a class claim, nor did he agree to select Singapore as his governing law or to arbitrate his claims there.

The Terraform and Jump Defendants argue that since certain members of the proposed class likely staked their tokens on Anchor, members of the Class are subject to Anchor's TOS.  *Id.*; Jump Br. at 29–30.  Defendants assert, without pointing to any authority, that Plaintiff's class claims must be dismissed because they are neither superior nor typical.  *Id.*  However, this is not a motion for class certification.  These arguments can be addressed only after fact and expert discovery at the appropriate time.

## V.   THE RICO AMENDMENT OF THE PSLRA DOES NOT APPLY BECAUSE UST AND LUNA ARE NOT SECURITIES

The TFL Defendants argue that Section 107 of the PSLRA bars Plaintiff's RICO claim here.  TFL Br. at 18–20.  This is baffling because they agree with Plaintiff that UST and Luna are not securities.  TFL Br. at 21 n.9; ¶¶ 201–05.  They assert, nevertheless, that because a plaintiff in California has asserted that UST and Luna coins are securities, *even though they believe that allegation is incorrect*, this RICO case must be dismissed under Section 107.  *See Patterson v. Terraform Labs, Pte. Ltd.*, No. 3:22-cv-03600 (N.D. Cal. June 17, 2022) (the "*Patterson* Action"); TFL Br. at 18–21.  This argument fails.

### A.   THE RICO AMENDMENT APPLIES ONLY TO CONDUCT CONCERNING THE PURCHASE AND SALE OF SECURITIES

As the TFL Defendants correctly observe, Section 107 of the PSLRA provides that "no person may rely upon any conduct that would have been actionable as fraud *in the purchase or sale of securities* to establish a violation of section 1962."  18 U.S.C. § 1964(c) (the "RICO Amendment").  But the parties agree that the UST and Luna coins are not securities.  Thus, none of the conduct alleged in the Complaint pertains to "the purchase or sale of securities," and the PSLRA preemption does not apply.

By arguing that Plaintiff's claims are barred by the RICO Amendment *even though they do not involve securities*, the TFL Defendants ask the Court to remove the critical phrase, "in the purchase or sale of securities" from the RICO Amendment.  In that case, the RICO Amendment would state as follows: "no person may rely upon the conduct that would have been actionable as fraud to establish a violation of section 1962," and thus *all fraudulent conduct* would be barred as a predicate act from RICO actions.  Of course, that is not what the RICO Amendment says, because that is not what Congress intended to do, as evidenced by the fact that mail and wire fraud

have served as viable predicate acts in RICO actions in the nearly 30 years since the PSLRA was passed.   Indeed, the RICO Amendment was enacted primarily to prevent plaintiffs from bootstrapping securities laws violations within the RICO parameters because RICO "offered the potential bonanza of recovering treble damages."   *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F. 3d 268, 274 (2d Cir. 2001) (citing *Bald Eagle Area Sch. Dist.*, 189 F. 3d at 327).   It was not enacted to bar RICO claims for fraudulent conduct surrounding products that are not securities. This is bolstered by the legislative history, which stated that the RICO Amendment was "intend[ed]" to "eliminate **securities fraud** as a predicate offense in a civil RICO action."   H.R. Rep. 104–369, at 47 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 746.

The TFL Defendants posit that "[e]ven a securities claim with no legal viability makes Section 107 viable.   TFL Br. at 18.   But the case they rely upon – *MLSMK Inv. Co.*, 651 F. 3d at 274 – does not help them.   There, the question was whether the PSLRA preemption provision "applie[d] to all civil RICO claims **predicated upon securities fraud**."   *Id.* at 274.   In *MLSMK*, the plaintiff pled securities fraud claims as RICO claims against defendants who, in a securities fraud suit, would only face liability for aiding and abetting securities fraud.   *Id.* at 274–75.   The focus in *MLSMK* was whether the plaintiff could "pursue a securities fraud action against **the defendant**," *id.* at 277, and the court held that the RICO Amendment barred RICO claims premised on securities fraud **conduct** (i.e., aiding and abetting) and not just securities fraud **claims**.   But fundamental to the court's entire analysis was that – whether conduct or claims – at the heart were securities. Similarly, in *Picard v. Kohn*, 907 F. Supp. 2d 392, 398 (S.D.N.Y. 2012) (Rakoff, J.), the RICO Amendment applied to conduct that comprised foreign **securities** fraud.   Finally, in *Lerner v. Colman*, 26 F.4th 71, 78 (1st Cir. 2022), the court held that even though the **plaintiff** there could not have brought a securities fraud action, the RICO Amendment applied because the alleged

schemes "could have formed the basis for securities fraud actions by proper plaintiffs." In this case, Plaintiff and Defendants agree that *no party* could bring a securities fraud action in connection with the purchase and sale of the UST and Luna coins because they are not securities.

The TFL Defendants also rely upon allegations in the *Patterson* Action to support their argument, and claim that just because one plaintiff has attempted to assert that the UST and Luna coins are securities, the RICO Amendment applies. TFL Br. at 19–20. But the judgment of the plaintiff in the *Patterson* Action does not govern here.

### B. THE UST AND LUNA COINS ARE NOT SECURITIES

Plaintiff has alleged facts demonstrating precluding dismissal on the grounds that the UST and Luna coins are securities. ¶¶ 201–05. The governing test is found in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946),[26] which holds that securities have the following characteristics: (1) purchasers must have invested money; (2) purchases must have invested in a common enterprise; (3) purchasers must expect to earn profit from owning the financial instrument at issue; and (4) the profits must be expected to be derived from the efforts of others. *Id.* at 299. As with the majority of issues presented here, the question of whether the UST and Luna coins are securities "is a fact intensive inquiry," requiring "token-by-token *proof*." *In re Bibox Group Hldgs. Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 336 (S.D.N.Y. 2021) (emphasis added).

In its "Framework for 'Investment Contract' Analysis of Digital Assets," the SEC explained that a digital asset is less likely to meet the *Howey* test when "the design of the digital asset provides that its value will remain constant... and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment." *See* SEC,

---

[26] Defendants do not even explain, let alone cite to any authority that supports, their suggestion that *West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2595 (2022) overrules *Howey*. TFL Br. at 20 n.9.

*Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3. 2019), https://www.sec.gov/news/public-statement/statement-framework-investment-contract-analysis-digital-assets.  That describes the UST coin to a "t".  Further, a digital asset is less likely to be a security when it "is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for increase in market value of the digital asset."  Both the UST and Luna coins were marketed with their functions in mind:  UST to serve as a viable medium of exchange, and Luna to create the arbitrage market on which the algorithm was based.[27]

Indeed, the UST and Luna do not satisfy the *Howey* test.  *First*, purchasers of UST did not "invest money" as required by *Howey.*  They simply converted their fiat currencies or other assets to UST into an equivalent amount of UST.  ¶ 51.  This is no different than, for example, a traveler who converts her U.S. dollar to local currencies.

*Second*, the "common enterprise" prong is not satisfied.  *Howey*, 328 U.S. at 300, requires that the holder of the alleged security obtained a participatory interest in the future economic performance of a business enterprise, which can be demonstrated by a showing of "horizontal commonality" or "vertical commonality."  *Revak v. SEC Realty Corp.*, 18 F. 3d 81 (2d Cir. 1994).  "Horizontal commonality" requires that the "fortunes of each investor" are tied to the fortunes of other investors and "depend upon the profitability of the enterprise as a whole," and a "sharing or

---

[27] The TFL Defendants flip-flop with respect to the SEC to suit their purposes.  First, they observe that the SEC has found more currencies to be securities than not, TFL Br. at 20 n.9, ignoring that each case hinges on its own facts and, indeed, that the *Howey* determination is often made on a full record.  After trying to use the SEC's findings offensively, the TFL Defendants then state that they "do not agree with the SEC's views and do not agree that UST and Luna should be considered securities."  *Id.*  The TFL Defendants then claim that the SEC does not even have the authority to make the determination as to whether digital assets are securities.  TFL Br. at 20 n.9.  According to the TFL Defendants, therefore, both this Court and the SEC lack authority to determine whether the UST and Luna coins are securities, but the allegations of the plaintiff in the *Patterson* Action should be given great weight.

pooling of funds." *Id*. at 87.  "Vertical commonality," although not expressly adopted by the Second Circuit, focuses on the relationship between the promoter and the investors.  *Id*. at 87. Neither apply here.  Each purchaser of UST and Luna coins is entitled only to the value of their own UST and Luna coins, precluding a finding of horizontal commonality.  *See Revak*, 18 F.3d at 88 (ownership of "individual units")  Further, vertical commonality is absent because the fortunes of the UST and Luna coin purchasers were not tied to Defendants.  Indeed, Defendants reaped profits, whereas many UST and Luna coin purchasers suffered losses.  ¶¶ 15, 67, 164–67, 175–87.

*Third*, purchasers of UST and Luna coins were not "led to expect profits solely from the efforts of" Defendants.  *Howey*, 328 U.S. at 298–99.  This prong is not satisfied "if the realization of profits depends significantly on the post-investment operation of market forces."  *SEC v. Mut. Benefits Corp.*, 408 F. 3d 737, 744 n.5 (11th Cir. 2005); *see also Grenader v. Spitz*, 537 F. 2d 612, 619 (2d Cir. 1976).  As noted, purchasers of UST had only the expectation that it would be worth $1.00.  To the extent that purchasers of Luna expected any profit, they were led to believe that such profits would come from the economic laws of supply and demand, not the efforts of Defendants.  ¶ 205.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss this action.

/s/   *Daniel L. Berger*
Daniel L. Berger
Caitlin M. Moyna
Vincent J. Pontrello
GRANT & EISENHOFER, P.A.
485 Lexington Avenue, Floor 29
New York, NY 10017
Tel: 646-722-8500
Email: dberger@gelaw.com
         cmoyna@gelaw.com
         vpontrello@gelaw.com

*Attorneys for Plaintiff*

Date:  December 19, 2022